1

1      UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3         CIVIL NO. CA 05-196 Erie

4

5

6  TANIELLE SHURNEY                )
                                   )
7         Plaintiff                )         DEPOSITION
                                   )
8       VS.                        )             OF
                                   )
9  SCOTT'S ECONO INN, INC., ET AL. )       TONYA TRAYLOR
                                   )
10        Defendants               )

11

12      DEPOSITION taken before me, Jodie L. Algarin, a

13  Notary Public within and for the State of Ohio, on the

14  11th Day of January, 2006, pursuant to Notice and

15  Subpoena and at the time and place therein specified, to

16  be used pursuant to the Rules of Civil Procedure or by

17  agreement of counsel in the aforesaid cause of action,

18  pending in the United States District Court for the

19  Western District of Pennsylvania.

20

21

22

23

24

25

1

2                              APPEARANCES

3

4              On Behalf of Plaintiff:

5              A.J. Adams, Attorney at Law
               602 West 9th Street
6              Erie, Pennsylvania  16502

7
               On Behalf of Defendant, Scott's Econo
8              Inn, Inc.:

9              Gerald J. Hutton, Attorney at Law
               Law Office of Baginski & Bashline
10             One PPG Place
               Suite 2910
11             Pittsburgh, Pennsylvania  15222-5409

12
               On Behalf of Defendant, Scott's Splash
13             Lagoon, Inc:

14             Gary D. Bax, Attorney at Law
               900 State Street
15             Suite 202
               Erie, Pennsylvania  16501

16

17             On Behalf of Defendant, Sean Pierce:

18             Susan H. Malone, Attorney at Law
               Office of Attorney General
19             Commonwealth of Pennsylvania
               Director of Western Region
20             6th Floor, Manor Complex
               564 Forbes Avenue
21             Pittsburgh, Pennsylvania  15219

22

23

24

25

                  NAGY-BAKER COURT REPORTING, INC.
                        (330) 746-7479
                        1-800-964-3376

1

2                          STIPULATIONS

3

4          It is stipulated and agreed by and between

5    counsel for the parties hereto that the deposition may be

6    taken at this time, 1:05 p.m., January 11, 2006, in the

7    offices of Streetsboro Police Department, 2080 State

8    Route 303, Streetsboro, Ohio.

9          It is further stipulated and agreed by and

10   between counsel that the deposition may be taken in

11   shorthand by Jodie L. Algarin, a Notary Public within and

12   for the State of Ohio, and may be by her transcribed with

13   the use of computer-assisted transcription; that the

14   witness's signature to the finished transcript of his/her

15   deposition may be and is hereby waived under agreement of

16   the parties; and that the deposition may be thereupon

17   used  on behalf of the parties in the aforesaid cause of

18   action as fully and to the same extent as if written in

19   the presence of the witness and subscribed by the witness

20   in the presence of the Notary Public.

21

22

23

24

25

4

1

2                                    INDEX

3

4

5    EXAMINATION BY MR. BAX          - PAGE     5

6    EXAMINATION BY MR. ADAMS        - PAGE    26

7    EXAMINATION BY MR. HUTTON       - PAGE    40

8

9

10

11   OBJECTIONS AND MOTIONS:

12   BY MR. HUTTON:  PAGE(S) 29, 30, 35

13   BY MR. BAX:  PAGE(S) 29, 30, 31, 32, 33, 36

14

15

16

17   DEFENDANT'S EXHIBITS INTRODUCED:

18   EXHIBIT 1   - PAGE    21

19   EXHIBIT 2   - PAGE    11

20

21

22

23

24

25

                     **NAGY-BAKER COURT REPORTING, INC.**
                            **(330) 746-7479**
                            **1-800-964-3376**

5

1                        WHEREUPON,

2                        TONYA TRAYLOR,

3                        of lawful age, being by me first duly

4                        sworn to testify the truth, the whole

5                        truth, and nothing but the truth, as

6                        hereinafter certified, deposes and

7                        says as follows:

8    EXAMINATION:

9    BY MR. BAX

10   Q            Would you please state your name?

11   A            Tonya Traylor.

12   Q            Ms. Traylor, my name is Gary Bax, and

13   I'm an attorney, and I represent Scott Splash Lagoon,

14   Incorporated.  Scott is a defendant in a lawsuit

15   commenced by a woman named Tanielle Shurney in Federal

16   court, the United States District Court, for the Western

17   District of Pennsylvania at Docket No. 105 CV 196.

18       Just so you are aware who the people are here, we

19   have the court reporter, and she's going to be making a

20   transcript, a booklet of questions/answers, okays or

21   other comments made during the course of this discovery

22   deposition.  This is Attorney A.J. Adams, and he

23   represents the plaintiff in this civil case, Tanielle

24   Shurney.  She is basically suing the defendants in the

25   case based on a claim of false arrest, false

1    imprisonment.

2        I represent Scott Splash Lagoon, Incorporated.  This

3    is Attorney Gary Hutton.  He represents Econo Lodge,

4    Inc., a hotel right across the street or next to Scott

5    Splash Lagoon.  This is attorney --

6                        MS. MALONE:  Susan Malone, the

7    attorney general's office, and I represent the state

8    trooper.

9    Q                    And the state trooper who arrested

10   Tanielle Shurney is also being sued.  So that's a little

11   bit of background.

12       Now, have you ever provided a deposition before or

13   testimony like this in this type of setting before?

14   A                    No.

15   Q                    Okay.  Let me give you some

16   instructions then.  If at any time you don't hear a

17   question that any of the attorneys ask or don't

18   understand a question that any of the attorneys ask,

19   please tell us and we will restate or rephrase the

20   question.  When you answer the question, we're going to

21   assume you've heard the question, that you understand the

22   question, and that you're responding as accurately as you

23   can based on your own personal knowledge to the question

24   that's been asked.  Do you understand those directions,

25   and will you agree to abide by them?

1    A              Yes.

2    Q              And I've told you before we're making a

3    transcript, and so I would ask that your answers be

4    spoken allowed, be verbal rather than a shake of the head

5    and that if you want to answer yes or no, say yes or no

6    rather than uh-huh or huh-uh, because it's hard to read

7    that on the transcript.

8    A              Okay.

9    Q              Also to wait for the end of the

10   question, and that way you know exactly what the question

11   is, and it gives the other attorneys a chance to

12   interpose an objection if they want to make an objection.

13   Even if an objection is made, however, you're going to be

14   asked to answer the question.  And I would ask also that

15   you not guess or speculate about any answers to any

16   questions that we ask.  If you don't know the answer,

17   it's perfectly appropriate if you say I don't know or I

18   don't recall as the case may be; okay?

19   A              Okay.

20   Q              Thanks.  Are you a resident of

21   Streetsboro, Ohio?

22   A              Yes.

23   Q              And what is your age?

24   A              Thirty-eight.

25   Q              And for the record, are you

1    African-American?

2    A                Yes.

3    Q                Okay.  Are you currently employed?

4    A                Yes.

5    Q                Who is your employer?

6    A                The Salvation Army.

7    Q                What is your position with the

8    Salvation Army?

9    A                I'm an accountant and an auditor.

10   Q                How long have you been employed with

11   the Salvation Army?

12   A                Fourteen plus years.

13   Q                Have you held the same position with

14   the Salvation Army over those 14 years?

15   A                No.

16   Q                Could you tell me 14 years ago what

17   your first position was and then tell me how you

18   progressed with the organization?

19   A                Sure.  Originally I was accounts

20   payable clerk, then I was a benefits clerk, bookkeeper

21   and now accountant auditor.

22   Q                For what period of time have you been

23   an accountant auditor?

24   A                About a year -- I've been an accountant

25   for about five years, the auditor part for one year.

1   Q                  Okay.  For the purposes of this civil

2   lawsuit that's been filed in Erie, Pennsylvania, we're

3   concerned about the time period of June and July of 2004.

4   What was your position with the Salvation Army in June

5   and July of 2004?

6   A                  I was a bookkeeper accountant.  It's

7   all accounting.  I include that in my accounting, but my

8   position is not what I am today.  I was a bookkeeper.

9   Q                  Okay.  Can I ask you a little bit about

10  your educational background.  ?Are you a high school

11  graduate?

12  A                  Yes.

13  Q                  And where did you go to high school and

14  when did you graduate?

15  A                  I went to Woodrow Wilson High School in

16  Youngstown, Ohio, and I graduated in 1985.

17  Q                  Did you have any education after

18  graduation from high school?

19  A                  Yes.

20  Q                  And where did you have that education?

21  A                  Youngstown State University.

22  Q                  What was your course of study at

23  Youngstown?

24  A                  I have a bachelor's degree in business

25  management.

1    Q               Is that a BA or BS?

2    A               BS and BA.

3    Q               When did you earn that?

4    A               1990.

5    Q               I'm sorry.  I didn't write down when

6  did you graduated from high school?

7    A               1985.

8    Q               Have you ever previously provided

9  testimony in any civil lawsuit?

10   A               No.

11   Q               So this is your first time?

12   A               Yes.

13   Q               Are you married?

14   A               No.

15   Q               Do you have any relationship with a

16  woman named Tanielle Shurney?

17   A               No.

18   Q               You've never met Tanielle Shurney and

19  never spoken with Tanielle Shurney; is that correct?

20   A               That's correct.

21   Q               Never corresponded with Tanielle

22  Shurney; correct?

23   A               Correct.

24   Q               Never had contact over a computer or

25  Internet with Tanielle Shurney; is that correct?

1    A                Correct.

2    Q                Do you know or have you ever had

3    contact with anyone named Tracy Smith?

4    A                No.

5    Q                Do you know or have ever had any

6    contact with anyone named Lisa Chapman or Champman.

7    A                No.

8    Q                In June and July of 2004 -- off the

9    record for a minute.

10       (Whereupon an off-the-record discussion was had.)

11   Q                In June and July of 2004, did you have

12   an account with Key Bank?

13   A                Yes.

14   Q                Streetsboro Police Department report

15   indicates that you had a Key Bank account where there was

16   a number, 5449270911030937.  Do you know -- can you tell

17   us the number of your account as of June 30 of 2004 with

18   Key Bank?

19   A                Do I have it memorized, no.

20   Q                Okay.

21   A                I could probably look at my paper

22   because I have it written on that paper.

23   Q                Fine.  You brought --

24       (Whereupon Defendant's Exhibit 2 was marked.)

25   Q                I'm going to show you what's been

1    marked as group Exhibit 2.  And ask you if these are

2    photocopies of documents that you brought to the

3    deposition today?

4    A              Yes.

5    Q              Using these documents, can you tell us

6    what your debit card account number was as of June 30 of

7    2004?

8    A              Yes.

9    Q              What was it?

10   A              5449270911030937.

11   Q              At any time did you ever lose your

12   card?

13   A              No.

14   Q              At all times did you maintain

15   possession of your -- and by your card, I'm going to call

16   it -- that's your debit card, the number you just

17   identified?

18   A              Yes.

19   Q              So you had possession of it at all

20   times?

21   A              Yes.

22   Q              Did it come to your attention at some

23   point in time that there were -- there was an

24   unauthorized use of purchases placed on that card?

25   A              Yes.

1    Q                Can you describe how that occurred?

2    A                I checked my bank account every day at

3    work and on --

4    Q                How do you do that?  On the computer?

5    A                Yes.  I go to Key.com, and I go in and

6    I look every day.  And this particular day, June 30, I

7    checked my account, and there were two charges -- well,

8    the initial page popped up and my account was in the

9    negative, you know.

10   Q                Overdrawn?

11   A                Overdrawn.  And so when I looked at the

12   detail, I noticed that that particular moment there were

13   two transactions that had showed up.

14   Q                What were those transactions?

15   A                There was one transaction for Splash

16   Lagoon for $198.79, and then there was a charge from

17   Adelphia -- it said Adelphia, Ohio, which is our

18   credit -- which is a cable company, which I do not have

19   Adelphia, and it was $40.

20   Q                Did you ever make any reservation in

21   June or July of 2004 with Scott Splash Lagoon or Econo

22   Lodge in Erie, Pennsylvania?

23   A                No.

24   Q                Did you ever authorize anybody to use

25   your debit card or debit card numbers to place a

1    reservation with Scott Splash Lagoon or Econo Lodge in

2    Erie, Pennsylvania, in June or July of 2004?

3    A                No.

4    Q                Okay.  So you saw those two

5    transactions.  Was the second transaction also

6    unauthorized?

7    A                Yes.

8    Q                Okay.  What happened next?

9    A                I called the 1-800-KEY2YOU number

10   immediately and said that I saw some charges on my

11   account that weren't mine.  The guy told me -- he said he

12   would put a halt -- I don't remember exactly, but he said

13   that he would cancel the number, but then I went directly

14   to an actual Key Bank that was right near where I was

15   working that day and filed a report.

16   Q                Okay.

17   A                And she actually is the one who stopped

18   the account.

19   Q                When you made the in-person report?

20   A                When I made the in-person.

21   Q                Okay.  Okay.  Now, did you ever contact

22   the reservation center for Scott Splash Lagoon or Econo

23   Lodge?

24   A                Yes.

25   Q                When did you do that?

1  A                I can't remember the date, but I have

2  it on here.  I called Splash Lagoon on June 30, same day.

3  Q                And do you recall the time of day that

4  you called Scott Splash Lagoon or not?

5  A                No.

6  Q                Was it during working hours or during

7  daytime hours?

8  A                I don't know.

9  Q                Okay.  What contact did you have with

10 Splash Lagoon or the reservation center?

11 A                I called Splash and I told them about

12 the transaction, and they told me to call back on July 2

13 and speak with Patty Purchase, the reservations manager.

14 Q                Do you recall the name of the person

15 that you spoke with on June 30?

16 A                I do not.

17 Q                Did you tell the persons on June 30 or

18 the person on June 30 at Splash Lagoon resort that you

19 had not authorized any reservation to be made using your

20 debit card number?

21 A                I don't remember.  I don't -- that was

22 my whole purpose of the call.

23 Q                But you have no specific recollection?

24 A                Huh-uh.

25 Q                You have to say yes or no.  You have no

1  specific recollection; is that correct?

2  A                    Yes.

3  Q                    Did you speak with one person or more

4  than one person on June 30?

5  A                    I don't know.

6  Q                    Okay.  Did you then call and speak with

7  Patty Purchase on July 2, 2004?

8  A                    Yes.

9  Q                    You contacted her then; correct?

10 A                    Yes.

11 Q                    Okay.  And what do you recall of that

12 conversation?

13 A                    We talked about a lot of different

14 things, but basically they were able to find the

15 reservation under my name and said that the person was

16 expected to arrive at the hotel on July 3.

17 Q                    Were you provided with the name

18 Tanielle Shurney at that point in time?

19 A                    No.

20 Q                    Okay.  Were you provided with any other

21 name at that time?

22 A                    No.

23 Q                    Okay.  And did you then have contact

24 with Officer Jon Hurley of the Streetsboro Police

25 Department?

1    A                Yes.  I called him -- you want me to

2    expand?

3    Q                Yes.  Sure, please.

4    A                I called him and just told him that I

5    spoke with Splash Lagoon and the person was expected to

6    show up on July 3.  And he said he would follow up or do

7    whatever police do.

8    Q                Why did you contact Officer Hurley

9    regarding this unauthorized use of your debit card?

10   A                Well, first of all, because I wanted

11   whoever it was to be busted.  Like I was mad.  I'm like

12   they got a lot of nerve.  So I was glad to know that they

13   actually booked something and maybe they could get

14   caught.

15   Q                Was it your belief that your debit card

16   number had been stolen and used improperly?

17   A                Not the card stolen, the number stolen,

18   yes.

19   Q                Okay.  And did you come to the

20   Streetsboro Police Department on June 30 of 2004?

21   A                Yes.

22   Q                And did you meet with Officer Hurley?

23   A                Yes.

24   Q                Do you recall that there was a second

25   officer there, an Officer Beaver?  Do you recall that or

1  not?

2  A                    I don't recall.

3  Q                    You dealt with Officer Hurley?

4  A                    Yes.

5  Q                    Okay.  And attached to an exhibit that

6  we marked as Hurley Exhibit 2 we have a handwritten

7  statement that's dated June 30 of 2004.  Do you recognize

8  that statement?

9  A                    Yes.

10  Q                    It's a two-page statement; is that

11  correct?

12  A                    Yes.

13  Q                    Okay.  Is that your handwriting?

14  A                    Yes.

15  Q                    In the block that says statement made

16  by name Tonya Traylor, is that your name?

17  A                    Yes.

18  Q                    Okay.  And is this a statement that you

19  completed during your visit to the Streetsboro, Ohio,

20  police department on June 30 of 2004?

21  A                    Yes.

22  Q                    In the statement you note four

23  unauthorized purchases; is that correct?

24  A                    Yes.

25  Q                    The first is for Splash Lagoon Resort

1  in Erie, Pennsylvania, in the amount of $198.79; is that

2  correct?

3  A                Yes.

4  Q                The second unauthorized purchase was

5  from Adelphia of Ohio for $40; is that also correct?

6  A                Yes.

7  Q                The third unauthorized purchase that

8  you had discovered was for Direct Marketing Cosmetic for

9  4.95?

10  A                Yes.

11  Q                And the fourth unauthorized purchase

12  was Direct Marketing -- what is that?  Lane?

13  A                Bry Lane.

14  Q                Bry Lane?

15  A                Bry Lane.  These names are what

16  literally showed up on my -- on the bank -- my bank

17  account.  It read exactly like that.

18  Q                Okay.  Now, under number -- under

19  purchase No. 3 and under purchase No. 4, there is a Lisa

20  Chapman that's noted there.  You don't know Lisa Chapman?

21  A                No.

22  Q                And you never authorized Lisa Chapman

23  to make those purchases; correct?

24  A                Correct.

25  Q                On the second page of your statement,

1    could you read the last paragraph just into the record?

2    Could you read it out loud?

3    A              I closed my debit card and will be

4    reissued a new card and number.  Plan to close my bank

5    account but have not done so yet.  I was told to file a

6    police report so that the bank could continue with their

7    attempt to restore my hard earned money back to me.

8    Q              Those are your words?

9    A              Yeah.

10   Q              Now, with regard to the phrase, I was

11   told to file a police report, who told you that?  Was

12   that the --

13   A              The bank.

14   Q              Okay.  And at the end of this on the

15   second page, at the end of the two-page report there's

16   also a signature, Tonya Traylor.  Is that your signature

17   also?

18   A              Yes.

19   Q              So you signed the first page and the

20   second page?

21   A              Yes.

22   Q              Okay.  And that also contains a date

23   and a time.  And does that -- is it fair to say that the

24   date and time reflect the date and the time that you

25   completed this handwritten statement, to the best of your

21

1  knowledge?

2  A                    Yes.  I think I came at night.

3  Q                    You also brought in some documents

4  today, and we've labeled these documents, the stack of

5  documents, as Traylor Exhibit 2.  Before we get to that,

6  I don't know if I've done this or not, but we did have

7  Traylor Exhibit 1, and Traylor Exhibit 1 is the notice of

8  deposition.  And is this the notice of deposition and

9  subpoena that I served upon you to come here today?

10  A                    Yes.

11  Q                    And so you've been compelled to give

12  your testimony today; correct?

13  A                    Yes.

14  Q                    Okay.  And when you appeared today, you

15  provided the documents that are marked Exhibit 2?

16  A                    Yes.

17  Q                    And could you describe what these

18  documents are?

19  A                    Sure, yes.

20  Q                    Kind of go through them from front to

21  back and tell us what they are.

22  A                    Okay.  The -- several of the letters

23  that actually -- that have the Key symbol on them were

24  the correspondence that I had back and forth with the

25  bank.  First two pages are the case when -- when I

1    called, they then generated the debit card dispute form

2    and they had me complete it, which I did.

3    Q                You completed that, and then you

4    attached your letter of July 9, 2004; is that correct?

5    A                Yes.

6    Q                And you authored the three-page letter

7    that's dated July 9, 2004?

8    A                Yes.

9    Q                And that's called detail account of my

10   dispute, Tonya Traylor; is that correct?

11   A                Yes.

12   Q                And you signed that at the end?

13   A                Yes.

14   Q                And was it your intention to accurately

15   report to Key Bank the circumstances surrounding the

16   unauthorized use of your debit account number?

17   A                Yes.

18   Q                And is it fair to say that the

19   correspondence of September 7, 2004, correspondence of

20   August 11, 2004, and July 19, 2004, July 9, 2004, all

21   relate to Key Bank's responses to your report of the

22   unauthorized use or theft of your credit card or debit

23   card number; is that correct?

24   A                Yes.

25   Q                Okay.  Were you contacted on July 3,

1    2004, by Officer Hurley at the time and asked about a

2    woman by the name of Tanielle Shurney?  Do you recall

3    that or not?

4    A               I do not recall it.

5    Q               Okay.  May have happened, may not have

6    happened.  You just don't recall?

7    A               I don't recall --

8    Q               Okay.

9    A               -- ever knowing the name, but it could

10   have just went in and out, but I don't recall.

11   Q               Okay.  Were you ever contacted by

12   anybody from the Streetsboro, Ohio, police department

13   after you filed this report with regard to any

14   investigation or any arrests that had been made?  And if

15   you don't recall, that's fine.

16   A               I'm going to -- yes, but it's vague.

17   Q               Okay.

18   A               I'm sure I had a conversation or two

19   with Officer Hurley afterwards, but I cannot remember

20   what was discussed.  I don't remember.

21   Q               Fine.  Did you ever have any personal

22   contact after you made the report to Officer Hurley with

23   a Pennsylvania State Police?

24   A               No.

25   Q               Did you ever have any personal contact

1    at any time with the Pennsylvania State Police?

2    A                No.

3    Q                Did you ever have any contact with

4    anyone from Splash Lagoon after you spoke with Patty

5    Purchase on July 2 of 2004?

6    A                Yes.

7    Q                And what was the nature of that

8    contact?

9    A                I spoke to Patty Purchase.

10   Q                And?

11   A                A couple, three times, but --

12   Q                What was said?

13   A                I was aware -- I knew that a person had

14   been arrested.  I don't even remember if I called her or

15   if she called me, because obviously I was curious,

16   because I thought it was real exciting that -- so at the

17   time I was curious to find out, and I did find out.

18   Didn't -- I don't remember knowing the name, though, but

19   that wasn't my concern.  I just knew that it happened.

20   That person actually did show up that day and they were

21   arrested.

22   Q                Okay.

23   A                And then I spoke to Patty a couple more

24   times.  I don't know if you want me to go on.

25   Q                Fine.  Go ahead.

1  A                Over -- just over the bank restoring my

2  money to me, and then Splash Lagoon reimbursing me for

3  the money, and she noticed it, so then she called and

4  thought that I got over twice.

5  Q                Okay.  That you were reimbursed twice?

6  A                Right.  But then I had a letter that

7  clearly said the same day I deposited it I called the

8  bank and told them, so it's like I covered myself that

9  they then -- the letter said you called us, and now we

10  are reversing, you know, but the reason I did it that way

11  is because the bank told me I had to try to get my money.

12  You need to try and make contact with everybody to get

13  it, and that's how that went down.

14      And then I talked to her another time, and I don't

15  know the time frame, when she said you need to contact

16  the Streetsboro Police Department because this lady is

17  claiming she's suing or whatever.  I said, I'm not it in

18  it anymore.  I'm not contacting anybody.  I got my money

19  back.

20  Q                And that's it?

21  A                And that's it.  And then you called.

22  Q                And I contacted you to ask about the

23  details of your trans -- your contacts with Splash Lagoon

24  and Officer Hurley; correct?

25  A                Yes.

1    Q                    Okay.  And I've also had contact with

2    you to arrange for your deposition today; is that also

3    correct?

4    A                    Yes.

5    Q                    The testimony you provided today is

6    based on the events as you recall as they occurred; is

7    that correct?

8    A                    Yes.

9    Q                    Okay.  When you spoke with Patty

10   Purchase of Scott Splash Lagoon on July 2 of 2004, did

11   you tell her that you had not authorized anyone to use

12   your debit card number for a reservation at either Econo

13   Lodge or at Scott Splash Lagoon?

14   A                    Yes.

15                        MR. BAX:  I think those are all the

16   questions that I have for you.  Thank you.

17   EXAMINATION:

18   BY MR. ADAMS

19   Q                    Ms. Traylor this is the first time

20   we're meeting; correct?

21   A                    Yes.

22   Q                    And we've never had any form of

23   communication either in writing or telephone?

24   A                    Yes.

25   Q                    Okay.  Now, I'm just going to ask a few

1    questions based upon the questions that Mr. Bax just

2    asked you.

3    A                Okay.

4    Q                If you don't understand them, I'll be

5    glad to repeat them.

6    A                Okay.

7    Q                Now, you indicated that you learned

8    about the Splash Lagoon being on your account on what

9    day?

10   A                June 30.

11   Q                June 30.  So on June 30, you called

12   Splash Lagoon or Econo Lodge; is that correct?

13   A                Yes.

14   Q                How did you get the number?

15   A                I don't remember, but, I mean, it's not

16   hard.  I would say I probably typed in Splash Lagoon --

17   wait.  Sometimes on my bank -- on the bank thing a number

18   will show up.  But I can't verify that, but I could have

19   easily typed in Splash Lagoon or the Internet and the web

20   site came up.  I heard of the place, so that may be it.

21   Q                Okay.  So then on June 30, you called

22   for -- however else you got the number, and you don't

23   remember who you spoke to; correct?

24   A                Correct.

25   Q                And what was the sum total of your

1    conversation with whoever that person was?

2    A                The sum total is I said, I notice that

3    there was a transaction posted to my account that I did

4    not make.  And then sum total would be that they then

5    said I needed to talk to the reservations manager and to

6    call back because she was not there when I called.

7    Q                Okay.  Did you, in fact, tell them on

8    June 30 I did not make that reservation, cancel that

9    reservation?

10                    MR. HUTTON:  Object to the form of

11   that.

12   Q                You can go ahead.

13   A                I don't think I told them to cancel it.

14   On that day I didn't even know -- I didn't know.

15   Q                You were under the impression on June

16   30 that someone had made a reservation using your debit

17   card number; correct?

18   A                Correct.

19   Q                And did they tell you the name of the

20   person who made the reservation using that debit card

21   number?

22   A                No.

23   Q                Okay.  Then what was the next contact

24   you had with Splash Lagoon or Econo Lodge?

25   A                That would have been on July 2 when I

1  called Patty Purchase.

2  Q                    Okay.  All right.  And what was the sum

3  total of your conversation with Ms. Purchase?

4                      MR. BAX:  I'm going to object to

5  the form of the question.  She's -- the question -- there

6  are a number of questions that have been asked.  I think

7  the sum total --

8                      MR. HUTTON:  Overly broad and I

9  join in the objection.

10  Q                    We'll be very specific then.  Did you

11  call Splash Lagoon or Econo Lodge on July 2?

12  A                    Yes.

13  Q                    Did somebody answer the phone?

14  A                    Yes.

15  Q                    Do you know who answered the phone?

16  A                    I spoke to Patty Purchase.  I don't

17  know who answered the phone when I first called, but I

18  spoke to Patty Purchase.

19  Q                    Do you remember approximately what time

20  of day it was on July 2?

21  A                    I do not.

22  Q                    And when you spoke to Ms. Purchase at

23  that point in time, did you learn whose name the

24  reservation was in using your debit card?

25  A                    Okay.  I need to ask -- I'm --

1    Q               Go ahead.

2    A               No, I did not know who the person was.

3    Q               Is it safe to say that you were upset

4    because somebody used your debit card number?

5    A               Definitely.

6    Q               And as a result of being upset, do you

7    believe you would have asked Ms. Purchase who the person

8    was who used your debit card number?

9                    MR. BAX:  Object to the form of the

10   question.

11   Q               Okay.

12   A               No.

13   Q               So you never were curious as to who

14   might have used your card?

15                   MR. HUTTON:  Object to the form of

16   the question.  You're asking about a conversation on July

17   2, and to use the phrase never would be all encompassing

18   in terms of time.

19   Q               On July 2, did you make any inquiry --

20   that is, ask Ms. Purchase or anybody there who used your

21   account number?

22   A               I may have asked that question, but I

23   don't know that I got an answer.

24   Q               Okay.  So the name Tanielle Shurney did

25   not come up in that conversation on July 2?

1          MR. BAX:  Object to the form of the

2   question.  Mischaracterizes her answer.

3   Q            Did the name Tanielle Shurney come up

4   during the course of the conversation?

5   A            I don't know.

6   Q            Okay.  Did you at that point in time

7   indicate you wanted to cancel the reservation?

8   A            Yes.  Yes.

9   Q            Okay.  Now, did you have a conversation

10  with Ms. Purchase as to how you were going to get your

11  money back?

12  A            Yes.

13  Q            And what was that conversation?

14  A            She said that she needed to contact

15  their accounting department or whoever handles that part

16  of it and she would follow up with me getting my money

17  back.

18  Q            And did she say she would be your

19  contact person for purposes of this problem, to call me

20  when you have a question?

21          MR. BAX:  Object to the form of the

22  question.

23  Q            You can answer if you understand the

24  question.

25  A            I don't remember.

1   Q                    Okay.  What was the next conversation

2   that you had with Ms. Purchase after July 2?

3   A                    I don't remember dates, times, because

4   I only -- I only remember actually what I wrote on this

5   paper at this point.  I can vaguely remember talking to

6   her, but obviously I was trying to get -- because it took

7   about a month before she actually -- it took a while for

8   Splash Lagoon to reimburse me the money.  So I know I

9   spoke to her a couple times, but that's all I know.

10  Q                    Okay.  So the money was actually taken

11  out of your account on June 26 of 2004; is that correct?

12  A                    I noticed it on June 30.

13  Q                    Okay.  And it says -- looking at your

14  statement, the transaction date was June 26.

15  A                    Okay.

16  Q                    Is that correct?

17  A                    Yes.

18                       MR. BAX:  If you know.

19  A                    Yes.

20  Q                    You might as well --

21  A                    This is based on the bank records, not

22  me saying it, yes.

23  Q                    That's fine.  On Page 2 of your report,

24  do you see that there?

25  A                    Yes.

1    Q                Just has the three transaction dates?

2    A                Yes.

3    Q                June 27, July 1 and July 2?

4    A                Yes.

5    Q                Do you have any explanation as to why

6    the Splash Lagoon transaction date of June 26 isn't

7    included in Page 2?

8    A                This is from the bank.  I can

9    speculate, but I don't know.  It's just my opinion, but

10   this came from the bank and I believe --

11                   MR. BAX:  I'm going to object to

12   any answer that calls for her to speculate and move to

13   strike her response.

14   Q                Okay.  Go ahead.  You can answer.

15   A                I can still answer?

16   Q                Yes.

17   A                I believe by the time this letter was

18   sent to me on September 7, 2004, the issue with Splash

19   Lagoon was already resolved because they had given me

20   back my money and these other three weren't.

21   Q                All right.  Now, the Adelphia, which we

22   all know to be a cable company, did you learn the

23   person's name or account that was used to pay with your

24   debit card number?

25   A                No.  They wouldn't share any

1    information with me at all when I called Adelphia.  They

2    just said file it with your bank, and that's as far as I

3    got with Adelphia.

4    Q                 How did you learn about Ms. Chapman's

5    being the person for the two other transaction accounts?

6    A                 When I called both of those -- wait.

7    That's on this one.  When I called Cosmetique and when I

8    called Bry Lane Home, they were able to trace my credit

9    card number, and they told me a Lisa Chapman made this

10   particular purchase in both cases.

11   Q                 And you had some conversation with

12   Officer Hurley about his efforts regarding contacting Ms.

13   Chapman?

14   A                 I don't remember.  It's in my report,

15   but I don't remember speaking to him about it.

16   Q                 Okay.  Did you have any contact with

17   Ms. Chapman?

18   A                 No.

19   Q                 And you do not know who Ms. Chapman is?

20   A                 I do not know who she is.

21   Q                 When were you compensated for Ms.

22   Chapman's use of your card?

23   A                 I don't remember exactly.

24   Q                 Okay.

25   A                 I don't remember.

1    Q                    All right.

2                         MR. HUTTON:  Make a belated

3    objection to the form of the question.  It assumes there

4    was a Ms. Chapman, which is the person who used Ms.

5    Chapman's name in making the charge.

6    Q                    Where is the Salvation Army office that

7    you work at?

8    A                    2507 East 22nd Street in Cleveland.

9    Q                    Is that East Cleveland or regular

10   Cleveland?

11   A                    Downtown Cleveland.  Zip code is 44115.

12   Q                    Did anything unusual happen around the

13   end of June of 2004 that you can think of as to that

14   debit card number?

15   A                    I can guess.  I mean, obviously was

16   trying to wonder where I might have been.  I did eat at a

17   restaurant at one place, and it just stuck out as maybe

18   it was at the restaurant, but that is based on nothing

19   other than me trying to wonder when it could have

20   happened.

21   Q                    Do you remember the name of the

22   restaurant?

23   A                    I can see the restaurant.  I remember

24   what I ate.  I can't think of the name of it.

25   Q                    It's close by your office?

1    A                    Relatively close.

2    Q                    Okay.  So then what is the first

3    contact you have with anybody from the Pennsylvania State

4    Police about this matter?

5                         MR. BAX:  I'm going to object to

6    the form of the question.  Assumes she had contact.

7    Q                    Did you ever have contact with anybody

8    from the Pennsylvania State Police regarding this?

9    A                    I never had contact with the police in

10   Pennsylvania.

11   Q                    So you've never heard from Trooper

12   Pierce or anybody from the Pennsylvania State Police

13   right up to today's date?

14   A                    Correct.

15   Q                    Okay.  Have you heard from the

16   Pennsylvania State Police in any way since this incident

17   happened?

18   A                    No.

19   Q                    Either directly or through the attorney

20   general's office?

21   A                    No.

22   Q                    Did you submit any reports to anybody

23   from the Pennsylvania State Police or the Pennsylvania

24   Attorney General regarding this incident?

25   A                    No.

1    Q                And nobody's contacted you about it?

2    A                Correct.

3    Q                Okay.  You said you talked about a lot

4    of stuff when you were talking to Ms. Purchase.  Was it

5    just -- was it about this incident or --

6    A                Sort of, yeah.  I mean, I talked to

7    her, yeah.  We were talking about how it happened and the

8    tragedy and just, you know, it's unfortunate that people

9    steal stuff.  It just got to be general.

10   Q                Did she mention to you the fact that

11   maybe a woman named Tracy Smith made this reservation?

12   A                No, never heard that name.

13   Q                And she didn't indicate to you any of

14   the circumstances that led to them getting the

15   reservation?

16   A                Right.  She did not.

17   Q                She didn't share any of that with you?

18   A                She did not.

19   Q                Did she seem to know how it happened?

20   Did she seem to have any knowledge as to how it happened?

21   A                No.

22   Q                So she was as surprised as you were?

23   A                Yes.

24   Q                So just to be clear, then, on July 2,

25   you were at least under the clear impression that the

1   reservation that was made was cancelled?

2   A               No.  I was just calling to report to

3   say that it wasn't mine.  I didn't know what the process

4   was of whether it was cancelled or not.

5   Q               You didn't say, oh, what the heck, I

6   already paid for it, I'm going to show up and do it

7   myself?

8   A               Oh, no, no.

9   Q               Okay.  Was there any subsequent uses of

10  this card other than the four attempts that we've talked

11  about that you know of?

12  A               That were fraudulent?

13  Q               Right.

14  A               No.

15  Q               This card ended on what day?

16  A               I would say June 30 when I went to the

17  bank and they cancelled the number.  I didn't cancel my

18  bank account, just the debit card part of it.

19  Q               Okay.  So the debit card account was

20  closed before the date of the reservation?

21  A               Yes.

22  Q               Okay.  And did you get two checks back,

23  then, from the hotel and Splash Lagoon?

24  A               No.  I had to request provisional

25  credit from the bank to give me my money back while they

1    were going to through the process of investigating.  So I

2    got the money back from Splash Lagoon.  In some kind of

3    way Splash saw that.  Then Splash Lagoon issued me a

4    check for the same amount.  Then I called the bank and

5    said I am in receipt of the Splash Lagoon check.  I'm

6    depositing it, and then they took it back out.

7    Q               Okay.  And do you have any idea when

8    that was?

9    A               I have a bank statement, but I didn't

10   bring it.

11   Q               Was it after --

12   A               According to this letter that I -- it

13   was on or about August 11, because I called the bank and

14   said I deposited the Splash Lagoon check, and they said

15   per your telephone conversation Splash Lagoon has sent

16   you a check in the amount of $198.79, and it was posted

17   to your account on August 9, therefore today we reversed

18   the duplicate credit previously applied by our office.

19   Q               Okay.  And Ms. Purchase was the only

20   person that you really did speak to at the Econo Lodge

21   or Splash Lagoon throughout the course of this

22   transaction?

23   A               Yes.

24               MR. ADAMS:  Okay.  I have nothing

25   further.  Thank you.

1  EXAMINATION:

2  BY MR. HUTTON

3  Q            My name is Jerry Hutton.  I represent

4  Scott's Econo Lodge.  I just have a few questions for

5  you.  If I wanted to understand your testimony summary,

6  would it be accurate that you owned a credit card that

7  was affixed to a bank account?

8  A            Debit card.

9  Q            Debit card.  And that that was with

10 Keystone Bank or Key Bank?

11 A            Key Bank.

12 Q            And that card was valid and in effect

13 on June 26, 2004?

14 A            Yes.

15 Q            And somehow someone was able to access

16 your account and place charges on your bank statement or

17 against your bank account through that number?

18 A            Yes.

19 Q            And that's what happened to you?

20 A            Yes.

21 Q            And am I accurate that you learned that

22 charges were being improperly placed on your Key account

23 on June 30 and you made a prompt report to the bank and

24 to the police; would that be accurate on June 30, 2004?

25 A            Yes.

1    Q            And at that time while those charges

2    that you learned had been posted against your account was

3    a charge that was posted on June 26, 2004, with Splash

4    Lagoon in the amount of 190 or 180 some dollars, whatever

5    the amount is?

6    A            Yes.

7    Q            And at that time that charge was placed

8    on your account, that account was open, valid and in

9    effect?

10   A            Yes.

11   Q            And that number was a number that was a

12   valid number on your account?

13   A            Yes.

14   Q            Your bank account?

15   A            Yes.

16   Q            And you hadn't given anyone permission

17   -- no matter what name we referred to, you hadn't given

18   anyone permission to access your bank funds and charge

19   debits for any of these things that are listed in these

20   records attached to Exhibit 2.  That was your account and

21   your account only; is that fair to state?

22   A            Yes.  That's correct.

23   Q            And you learned that Splash Lagoon had

24   placed a charge against your account of about $180 and

25   that your balance was reduced by that amount?

1    A                    Yes.

2    Q                    And that actually that accommodation of

3    the other charges that occurred in the next couple days

4    started the effect of overdrafts?

5    A                    Yes.

6    Q                    You had additional charges being posed

7    against you because of the overdraft charges?

8    A                    Yes.

9    Q                    Okay.  And am I correct that none of

10   these charges, whether it was from Lane Bryant or

11   Adelphia or Splash Lagoon were charges that you approved

12   of?

13   A                    Correct.

14   Q                    You had not made any reservation with

15   Splash Lagoon; is that fair?

16   A                    That's correct.

17   Q                    You didn't authorize anyone to make a

18   reservation using your account number for that July 4

19   weekend of 2004?

20   A                    Correct.

21   Q                    And I take it that you have a habit of

22   regularly checking your account?

23   A                    Every day.

24   Q                    And that's the reason why you caught

25   that before the reservation was actually used because you

1    had the luck of seeing it on June 30, promptly reported

2    it?

3    A            Correct.

4    Q            You didn't wait to receive a -- 30 days

5    later a bank draft or bank statement saying this had

6    happened last month, here's the charge?

7    A            Right.

8    Q            Okay.  And one of the things you did,

9    you first contacted the bank, contacted the police, and

10   then after getting instructions from the bank and police,

11   you contacted Splash Lagoon?

12   A            Yes.

13   Q            Now, when you called Splash Lagoon on

14   June 30, I take it it's with the understanding that

15   there's a charge on my account that I did not authorize;

16   would that be fair?

17   A            Yes.

18   Q            Okay.  And did you give the people at

19   Splash Lagoon that impression, that there was an

20   unauthorized charge that was made by the Splash Lagoon on

21   your bank account that was improper?

22   A            Yes.

23   Q            Okay.  And then you waited later to

24   July 2 to talk to someone -- representative at Splash

25   Lagoon about that purchase?

1    A              Yes.

2    Q              And I take it you never made that

3    reservation; is that fair?

4    A              Yes.

5    Q              Is it also fair that having not made

6    the reservation based on what you testified in the last

7    part of your deposition, you did not request anyone to

8    cancel any reservations.  Simply the reservation wasn't

9    yours to make or cancel?

10   A              Yes.

11   Q              Wasn't in your name; is that fair?

12   There was no reservation, to your knowledge, never made

13   at Splash Lagoon in your name using your name and your

14   address and your telephone number?

15   A              Yes.

16   Q              Okay.  And I guess the police report

17   lists you as the victim; is that accurate?

18   A              Yes, I'm the victim.

19   Q              Your bank accounts were taken, charged.

20   You had to go to the problem of reporting all this to the

21   different merchants, and you had to go to the problem of

22   cleaning up your credit report, is that fair, to get the

23   money back?

24   A              Yes.  Credit report, I don't know, but

25   yes.

1  Q                Not simply you were charged; you also

2  had the inconvenience of --

3  A                They made me put forth the effort to

4  get the money back.  It was an inconvenience all the way

5  around, and it took a minute for them to give me

6  provisional credit.  For a couple, few days, I had no

7  money, so yes.

8  Q                Do you have -- I guess there's a charge

9  with the clothing -- is Bryant, Lane Bryant?

10  A                Yes.  It was called Bry Lane Home on my

11  bank statement; but when I called, they said the purchase

12  was made through Lanebryant.com.

13  Q                And do you have any idea what was being

14  purchased?

15  A                No.

16  Q                Clothes or --

17  A                It's a clothing store, but --

18  Q                Lady's clothing?

19  A                Yes.  Lady's clothing.

20  Q                Oversized lady's clothing?

21  A                Big girls.

22  Q                You're not a large lady; is that fair

23  to state?

24  A                Correct.

25  Q                Did you --

1    A          Actually I was then, but I lost weight.

2    I needed to say that for my own satisfaction.

3    Q          Did you get any information that would

4    identify the locale, address as to where those were being

5    shipped?

6    A          Yes.  They told me that the items

7    were -- they told me it was a Lisa Chapman and that her

8    zip code was 44112.

9    Q          Did they give you an address as to a

10    physical location where those goods -- I assume clothing?

11    A          They wouldn't tell me that.

12    Q          They wouldn't tell you that?

13    A          Nope.

14    Q          And I take it that after your efforts,

15    then, you were subsequently reimbursed these moneys; is

16    that right?

17    A          Say that one more time.

18    Q          After your efforts, you were

19    subsequently reimbursed the funds?

20    A          Yes.

21    Q          But it took effort?

22    A          Yes.  And time.

23    Q          It's also clear that your account was

24    charged on June 26.  Moneys taken from your bank

25    account?

1   A              Yes.

2                      MR. HUTTON:  That's all the

3   questions I have.

4                      MS. MALONE:  I have no questions.

5                      MR. BAX:  Any more questions?

6                      MR. ADAMS:  No.

7                      MR. BAX:  We're done now.  And you

8   have the opportunity to read and review this transcript

9   or booklet and on a separate page make any corrections to

10  typographical errors or make any additional comments or

11  correction on a separate sheet of paper.  Can't change

12  what's on the transcript.  You can make comments or

13  corrections on a separate sheet of paper.  Or if you want

14  to, you can waive your right to do that and trust the

15  court reporter will provide an accurate transcript.  It's

16  your choice what you want to do.  Would you like to read

17  or do you want to waive that?

18                      MR. HUTTON:  Off the record.

19        (Whereupon an off-the-record discussion was had.)

20                      THE WITNESS:  We'll rely on the

21  accuracy.

22                      MR. HUTTON:  So you waive it

23  then?

24                      THE WITNESS:  I waive it.

25        (Whereupon a recess was taken.)

1              MR. BAX:  Mr. Adams, we've now

2    completed the depositions of Officer Hurley and the

3    victim, Tonya Traylor, and at the end of these two

4    depositions based on the testimony that was provided by

5    these witnesses today, Scott Splash Lagoon, Inc., and the

6    other defendants in this case would request that you

7    immediately voluntarily discontinue this lawsuit.

8         We request that you do that.  If you don't do that,

9    we're putting you on notice today that we will consider

10   that any continuation of this litigation is done in bad

11   faith and we will seek attorneys' fees and sanctions for

12   that.

13             MR. HUTTON:  And particularly for

14   the violation of Rule 11 and particular as to the

15   allegations in the complaint that use of the card was

16   authorized or that this was not a fraudulent or stolen

17   use of the credit card.  As appearing allegations of the

18   plaintiff's as representative the motion to dismiss and

19   status conference we believe, and continue action of this

20   action is done in bad faith and results in unreasonable

21   cost to defense and ask all costs be reimbursed.

22        I sent you a Rule 11 and notified you this matter

23   should be dismissed; additionally after this testimony

24   I'm renewing my request for the authorization which had

25   been ordered by Judge McLaughlin, status conference that

1    has not been received.    Thank you.

2                                        SIGNATURE WAIVED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
1-800-964-3376