1          UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3          CIVIL NO. CA 05-196 Erie

4

5

6

7   TANIELLE SHURNEY                    )
                                        )
8          Plaintiff                    )       DEPOSITION
                                        )
9      VS.                              )          OF
                                        )
10  SCOTT'S ECONO INN, INC., ET AL.     )       JON HURLEY
                                        )
11         Defendants                   )

12

13      DEPOSITION taken before me, Jodie L. Algarin, a

14  Notary Public within and for the State of Ohio, on the

15  11th Day of January, 2006, pursuant to Notice and

16  Subpoena and at the time and place therein specified, to

17  be used pursuant to the Rules of Civil Procedure or by

18  agreement of counsel in the aforesaid cause of action,

19  pending in the United States District Court for the

20  Western District of Pennsylvania.

21

22

23

24

25

1                              APPEARANCES

2

3              On Behalf of Plaintiff:

4              A.J. Adams, Attorney at Law
               602 West 9th Street
5              Erie, Pennsylvania  16502

6
               On Behalf of Defendant, Scott's Econo
7              Inn, Inc.:

8              Gerald J. Hutton, Attorney at Law
               Law Office of Baginski & Bashline
9              One PPG Place
               Suite 2910
10             Pittsburgh, Pennsylvania  15222-5409

11
               On Behalf of Defendant, Scott's Splash
12             Lagoon, Inc:

13             Gary D. Bax, Attorney at Law
               900 State Street
14             Suite 202
               Erie, Pennsylvania  16501

15

16             On Behalf of Defendant, Sean Pierce:

17             Susan H. Malone, Attorney at Law
               Office of Attorney General
18             Commonwealth of Pennsylvania
               Director of Western Region
19             6th Floor, Manor Complex
               564 Forbes Avenue
20             Pittsburgh, Pennsylvania  15219

21

22

23

24

25

1

2                              STIPULATIONS

3

4            It is stipulated and agreed by and between

5    counsel for the parties hereto that the deposition may be

6    taken at this time, 11:45 a.m., January 11, 2006, in the

7    offices of Streetsboro Police Department, 2080 State

8    Route 303, Streetsboro, Ohio.

9            It is further stipulated and agreed by and

10   between counsel that the deposition may be taken in

11   shorthand by Jodie L. Algarin, a Notary Public within and

12   for the State of Ohio, and may be by her transcribed with

13   the use of computer-assisted transcription; that the

14   witness's signature to the finished transcript of his/her

15   deposition may be and is hereby waived under agreement of

16   the parties; and that the deposition may be thereupon

17   used  on behalf of the parties in the aforesaid cause of

18   action as fully and to the same extent as if written in

19   the presence of the witness and subscribed by the witness

20   in the presence of the Notary Public.

21

22

23

24

25

4

1

2                          INDEX

3

4

5    EXAMINATION BY MR. BAX          - PAGE     5

6    EXAMINATION BY MS. ADAMS        - PAGE    15

7    EXAMINATION BY MR. HUTTON       - PAGE    32

8    RE-EXAMINATION BY MR. ADAMS       - PAGE    40

9    RE-EXAMINATION BY MR. BAX         - PAGE    41

10

11

12

13   OBJECTIONS AND MOTIONS:

14   BY MR. HUTTON:  PAGE(S) 29, 40

15   BY MR. BAX:  PAGE(S) 29, 40

16   BY MR. ADAMS:  PAGE(S) 37

17

18

19

20   DEFENDANT'S EXHIBITS INTRODUCED:

21   EXHIBIT 1    - PAGE     8

22   EXHIBIT 2    - PAGE     8

23

24

25

                    NAGY-BAKER COURT REPORTING, INC.
                           (330) 746-7479
                          1-800-964-3376

5

1                        WHEREUPON,

2                        JON HURLEY,

3                        of lawful age, being by me first duly

4                        sworn to testify the truth, the whole

5                        truth, and nothing but the truth, as

6                        hereinafter certified, deposes and

7                        says as follows:

8   EXAMINATION:

9   BY MR. BAX

10  Q                    Please state your name.

11  A                    Officer Jon Hurley.

12  Q                    Officer Hurley, my name is Gary Bax,

13  and I'm an attorney, and I represent Scott's Splash

14  Lagoon in a lawsuit which commenced in United States

15  District Court for the Western District of Pennsylvania

16  at Docket No. 105 CV 196.  This is a lawsuit commenced by

17  a plaintiff named Tanielle Shurney.

18      This is a discovery deposition.  It's taken pursuant

19  to the Federal Rules of Civil Procedure and also to the

20  local rules of procedure for the Western District of

21  Pennsylvania.

22      I have some instructions for you.  If at any time

23  you don't hear a question that we ask or don't understand

24  a question that we ask, please tell us and we will

25  restate or rephrase the question.  When you answer the

1    question, I'm going to assume you've heard the question,

2    that you understand the question and that you're

3    answering the question as accurately as you can based on

4    your own personal knowledge.  Do you understand those

5    directions and will you agree to abide by them?

6    A                Yes, I do.  Yes, I will.

7    Q                We also ask you not guess or speculate

8    an answer; again, based on your own personal knowledge.

9    Will you agree to do that?

10   A                Yes, I will.

11   Q                And at any time if you don't recall

12   something or don't know something, it's perfectly

13   appropriate for you to say you don't know or don't

14   recall; okay?

15   A                Okay.

16   Q                Other thing is, and you're doing a

17   great job of it, ask that you respond verbally to all of

18   the questions rather than shaking a head or saying uh-huh

19   or huh-uh because that's difficult to read on the

20   transcript.  Also wait for the conclusion of all of the

21   questions because attorneys may wish to interpose

22   objections, and then I'll give them a chance to do that;

23   okay?

24   A                Okay.

25   Q                Okay.  How old are you?

 1    A                    Thirty-five.

 2    Q                    And what is your occupation?

 3    A                    Patrolman for the City of Streetsboro.

 4    Q                    How long have you been employed with

 5    the City of Streetsboro Police Department?

 6    A                    Up to date almost two years.

 7    Q                    Were you employed by the City of

 8    Streetsboro Police Department as of June and July, 2004?

 9    A                    Yes, I was.

10    Q                    Were you a patrolman at that point in

11    time?

12    A                    Yes, I was.

13    Q                    If you could provide us with a little

14    bit of background and your training and employment as a

15    police officer.

16    A                    Okay.  City of Streetsboro is the first

17    law enforcement job I've had.  The time of the incident

18    the background that I had was the academy.  After getting

19    out of the academy, getting hired at Streetsboro, and

20    then going through the field training program that we

21    have here in Streetsboro.

22    Q                    What academy did you attend?

23    A                    Garrettsville Police Academy.  It was

24    in Garrettsville, Ohio.  It's a state required academy.

25    Q                    Required state academy for police

1    officers in Ohio?

2    A                    Correct.  It's through OPOTA, which is

3    the state that governs the training academy for the

4    police departments.

5    Q                    When did you complete that training?

6    A                    That was July -- I believe it was July

7    of 2003.

8    Q                    And when did you begin your employment

9    with Streetsboro?

10   A                    May of 2004.

11       (Whereupon Defendant's Exhibit 1 was marked.)

12   Q                    I want to show you what's been marked

13   as deposition Exhibit 1, and is this the notice of

14   deposition and subpoena that I provided to you to compel

15   your attendance at this deposition?

16   A                    The first two pages look familiar.

17   This one might be a little different version, but I

18   believe the same information.

19   Q                    The subpoena?

20   A                    Yeah.  I have copies in the back if we

21   need them.

22       (Whereupon Defendant's Exhibit 2 was marked.)

23   Q                    Okay.  I'm going to show you what is

24   Defendant's Exhibit 2 and ask you to identify that

25   document or those documents.

1   A                Okay.  This one, the initial part of it

2   is the police report, Streetsboro police report, that I

3   completed after the incident, and then it's -- contained

4   in there are the statements from the victim who came and

5   made the report.  Following that is the Pennsylvania

6   State Police, their initial report that I had them fax to

7   me after they made the arrest.

8   Q                And are all of the documents that are

9   labeled Exhibit 2, are those from the official

10  Streetsboro Police Department file regarding incident No.

11  0402502?

12  A                Yes, it is.

13  Q                Are there any documents in the file

14  that are not in this labeled Exhibit 2?

15  A                Yes.  There are two pages that are

16  LEADs printouts that are not allowed to be duplicated and

17  they state -- the first one is a teletype sent to the

18  Erie State Police requesting that they go and identify

19  the person filling the reservation and give the

20  information back to Streetsboro Police Department.  The

21  second teletype is the information of the victim, her

22  address that the Pennsylvania State Police required.

23  Q                Okay.  I want to ask you about your

24  knowledge and contact with an individual named Tonya

25  Traylor.  First of all, can you tell me how you came in

1    contact with Tonya Traylor?

2    A                She came up to our police department,

3    Streetsboro Police Department, just to fill out a report

4    that someone had used her credit card.

5    Q                What date was that?

6    A                Going by the report it's the 30th of

7    June.

8    Q                Of 2004?

9    A                Of 2004.

10   Q                And did Tonya Traylor provide you with

11   a written statement?

12   A                Yes, she did.

13   Q                And is the written statement set forth

14   in Exhibit 2?

15   A                Yes, it is.

16   Q                And there is a handwritten statement on

17   6/30/04.  I checked my Key Bank account on line, et

18   cetera.  Is that Tonya's written statement?

19   A                Yes, it is.

20   Q                Is this the statement that she provided

21   to you on June 30 of 2004?

22   A                Yes, it is.  And it is dated such on

23   the second page.

24   Q                Okay.  You were on duty on June 30,

25   2004?

1    A                 Yes, I was.

2    Q                 What was your duty that day?

3    A                 Patrolman, take reports on station,

4    patrol the city, enforcing the ORC state laws and

5    ordinances.

6    Q                 Are those your customary duties?

7    A                 Yes, they are.

8    Q                 Were you fulfilling your normal and

9    customary duties on that June 30, 2004?

10   A                 Yes.

11   Q                 What did Tonya Traylor tell you?

12   A                 When she came up to the station, she

13   initiated by filling out the statement; and once her

14   statement was complete, spoke with her about the

15   statement that she made just saying that -- just like her

16   statement says, that she realized that her account was

17   overdrawn.  She went and checked the accounts and noticed

18   entries that she didn't recognize, and she contacted

19   those entries on the account to find out who and why they

20   were made.

21   Q                 Was one of the accounts that Tonya

22   Traylor reported to you was an unauthorized charge -- was

23   one of those for Scott's Splash Lagoon?

24   A                 Yes, it was.

25   Q                 What did you do after you learned of

1    that Scott Splash Lagoon unauthorized purchase?

2    A                    In my supplemental statements where she

3    had made contact with me stating that one of the accounts

4    was to the Splash Lagoon, she contacted Splash Lagoon and

5    they told her that this person was going to fulfill their

6    reservation on -- I don't find the date right now.  It

7    was like two days since she made the report.

8        And I asked what their police jurisdiction was, who

9    had jurisdiction of that area, and the lady I spoke with

10   after I called Splash Lagoon was a Patty Purchase.  She

11   gave me the Erie state police post that had jurisdiction

12   for that area.  And after I spoke with Patty, I told her

13   if she could contact the state police when this person

14   arrived to fill the reservation.  Then I called the state

15   police post that has that jurisdiction and advised them

16   that a representative of Splash Lagoon may be contacting

17   you, if you could go down and identify the person filling

18   the reservation and send that information back to me.

19   And that's what is basically stated in the teletype to

20   the state police.  They requested that.

21   Q                    Did you speak with anyone in Erie other

22   than Patty Purchase?

23   A                    As far as Splash Lagoon?

24   Q                    Yes.

25   A                    No.

1    Q                And who did you speak with at the

2    Pennsylvania State Police?

3    A                I believe the first one was the Trooper

4    Pierce, I believe.

5    Q                I see on your report there are a couple

6    of officers' names.  There is a Trooper Angelo, Trooper

7    Gilson and then there's a Trooper Pierce?

8    A                Yeah.  I believe Trooper Angelo is the

9    first one I spoke to, and then Trooper Pierce is the one

10   who handled the report, because upon the Pennsylvania

11   State Police report, that's his report, I believe.

12   Q                Okay.

13   A                So I spoke with Trooper Angelo

14   initially when I stated if he can go to the hotel Splash

15   Lagoon and identify this person.  And from there, I'm not

16   sure who they sent down there.

17   Q                Let me just ask you a few questions

18   again about this Exhibit 2.  Does this appear to be a

19   true, accurate and complete photocopy of your file except

20   for the two LEADs pages?

21   A                Yes.

22   Q                And is this an official Streetsboro

23   Police Department document or series of documents?

24   A                Yes, it is.

25   Q                And were these documents prepared in

1    the ordinary course of business of the Streetsboro Police

2    Department?

3    A          Yes.

4    Q          Did you ever have any subsequent

5    contact with Patricia Purchase of the reservation center?

6    A          I don't believe.  After I initially

7    called her -- after speaking with Tonya Traylor, I called

8    Patty Purchase.  That might have been where I left

9    messages.  I believe there was basically one conversation

10   with her.

11   Q          She has given a report in which she has

12   stated that you had her fax information to him.  Do you

13   recall that or not?

14   A          I don't recall that.

15   Q          You're saying it may have happened, may

16   not have happened; you just don't recall?

17   A          Right.

18   Q          And for clarification sake, you

19   instructed Patty Purchase of the Splash Lagoon

20   reservation center to contact the Pennsylvania State

21   Police when Tanielle Shurney appeared for registration;

22   is that correct?

23   A          That -- whenever the person who was

24   filling that reservation; correct.

25                    MR. BAX:  Okay.  I think those are

1    all the questions I have for you right now.

2                          MR. HUTTON:  I think we should turn

3    it over to the plaintiff.

4                          MR. ADAMS:  Thank you.

5    EXAMINATION:

6    BY MS. ADAMS

7    Q                     Officer Hurley, I believe you indicated

8    you were certified in May of 2004; is that correct?

9    A                     I completed my academy testing in -- I

10   believe it was July of 2003 is when I took the

11   state -- Ohio State exam.

12   Q                     When did you take the oath as a police

13   officer?

14   A                     That was Streetsboro.  I did that in

15   May of 2004.

16   Q                     Okay.  And now obviously this happened

17   in June of 2004, approximately a month or so after you

18   came on board; correct?

19   A                     Correct.

20   Q                     Now, how many of these credit card

21   investigations did you conduct prior to this one?

22   A                     I believe this was my first one; but as

23   the report reflects, there were two of us on the call on

24   the first page, Patrolman Troy Beaver, who has had about

25   14 years experience here in Streetsboro, and he was in

1  the vehicle with me and took the report and spoke with --

2  he was out in the lobby.  We spoke with the victim, Tonya

3  Traylor, at the same time.

4  Q                And forgive me for not knowing the

5  local procedure.  Do you have a training officer for a

6  period of time?

7  A                Yes.  And that was Patrolman Beaver.

8  Q                How long were you in that training

9  period, six months or a year?

10  A                I believe mine was -- Patrolman Beaver

11  was on afternoon shift; and prior to that, when I started

12  in May, I believe it was two weeks on day shift, and this

13  would have been my second two weeks with Patrolman

14  Beaver.

15  Q                Okay.  So you were at the desk, then,

16  when Ms. Traylor appeared at the police station; is that

17  correct?

18  A                We were out on the road and got called

19  back in.

20  Q                Okay.  And who conducted the interview,

21  then, with Ms. Traylor?

22  A                Both Patrolman Beaver and myself.

23  Q                Okay.  Now, does Patrolman Beaver have

24  a report separate and apart from this exhibit which has

25  been marked?

```
 1    A                  No.  This is the entire report.

 2    Q                  So there's no other information that

 3    Trooper Beaver would have had that is not included in

 4    this report?

 5    A                  Correct.

 6    Q                  Okay.  So when you took this report,

 7    then, who was the lead investigator?  Would it be you or

 8    Trooper Beaver?

 9    A                  I was the lead.  Patrolman Beaver was

10    there to see I was doing the things I needed to do.

11    Q                  Did you ask him for guidance during the

12    course of this investigation?

13    A                  Yes, I did.  And even after that,

14    talked with our shift sergeant who is Sergeant Wilson.

15    Q                  Good.

16    A                  And he again advised, you know, of the

17    situation, recommended that we contact the Erie State

18    Police.

19    Q                  And who -- go ahead.

20    A                  See if we can have Erie state police go

21    and identify this person.

22    Q                  Are you referring to Officer Beaver or

23    third officer?

24    A                  Sergeant Wilson.  Sergeant Wilson is

25    the one recommended we contact Erie state police.
```

1    Q              What is the first thing you did, then,

2    in terms of the investigation after you took the

3    statement from --

4    A              After I took the initial statement when

5    Tonya Traylor contacted saying she had been in touch with

6    Patty Purchase and that she requested that we, the police

7    department, call her -- and I'm not sure if it was a day

8    or two after the initial report is when I called Patty

9    Purchase and did some follow-up.

10   Q              So to clarify, then, it's your

11   understanding that the first contact made with Splash

12   Lagoon was, in fact, Ms. Traylor contacting Splash

13   Lagoon?

14   A              Correct.

15   Q              Before she ever contacted the police?

16   A              (Nodding head.)

17   Q              Is that correct?

18   A              Yes.  And I believe that states that in

19   the statement or in the supplemental.

20   Q              Okay.  And then when -- if you know the

21   answer to this -- when she, in fact, contacted Ms.

22   Purchase was she advised to contact you by Ms. Purchase?

23   A              Yes.

24   Q              Okay.  So then when she gave this

25   written statement, she gave some information involving

1  some individuals that I'm noting in here -- did you

2  conduct an investigation with regard to the persons who

3  were listed as using the credit card, one Lisa Champman?

4  A            We did as much looking into it as we

5  could with the information that we had.  Had a name.

6  There was only so much follow-up with that, and then

7  subsequently we heard from Tonya Traylor, and she gave me

8  the information for Patty Purchase, and we went with that

9  lead first.

10  Q            Okay.  Well, what was the sum total of

11  your investigation regarding Lisa Champman?

12  A            Lisa Champman?

13  Q            Yes.

14  A            Contacted Tonya Traylor to see if

15  she -- if that name was familiar to her, and she said no,

16  it was not familiar to her.

17  Q            Okay.  I didn't mean to interrupt.  I

18  note from her written statement that she already

19  indicated the fact that she did not know who Lisa

20  Champman was.

21  A            Right.  I wanted to confirm that she

22  didn't know any names, Lisa Champman or Tonya Traylor --

23  I'm sorry, Tanielle Shurney.

24  Q            Is it safe to say, then, you took the

25  written statement from Ms. Traylor and then asked her

1    questions after you immediately read that statement?

2    A                    Correct.

3    Q                    And one of those questions was, did you

4    know Lisa Champman?

5    A                    Correct.

6    Q                    So after you found out she didn't know

7    Lisa Champman, what steps did you take to investigate

8    Lisa Champman's use of this card?

9    A                    The information that we had on Lisa

10   Champman -- we had an address for her, okay, and once we

11   confirmed the address basically through the phone book

12   and crisscross book that we have, before we were able to

13   initiate speaking with this person, that's when Tonya

14   Traylor advised me of speaking with Patty Purchase and

15   that the person was going to come and fill the

16   reservation at the hotel.  And then at that point we went

17   with that lead first.

18   Q                    And what name did you know to be

19   associated with the reservation at the hotel?

20   A                    Tanielle Shurney.

21   Q                    How did you get that information?

22   A                    From Tonya Traylor.

23   Q                    And is it your understanding that Tonya

24   Traylor got that from Ms. Purchase?

25   A                    I don't know where she got that from.

21

1   I don't know where she got that from.

2   Q                Okay.  So now once you found out that

3   for whatever reason Tanielle Shurney's name was on this

4   reservation, what else did you do regarding Lisa

5   Champman?

6   A                Nothing.

7   Q                Is it safe to say that other than

8   checking her name in the crisscross directory and her

9   address, that that concluded the investigation?

10  A                Correct, because our victim, Tonya

11  Traylor, got compensation for her, so as far as -- our

12  investigation was done; the case was over.

13  Q                Okay.

14  A                From our end.

15  Q                And noting that you looked in the local

16  directory, I'm assuming Lisa Champman is someone within

17  your police department's jurisdiction?

18  A                No, she's not in our police department

19  jurisdiction.

20  Q                She's within the Ohio State Police

21  jurisdiction?

22  A                Correct.  Cleveland, Ohio.

23  Q                Did you make a referral to the Ohio

24  State Police so they could conduct an investigation

25  regarding Lisa Champman?

1   A                No.

2   Q                Is it safe to say that there's no

3   ongoing investigations of Lisa Champman regarding this

4   incident?

5   A                Not from Streetsboro's end.

6   Q                And do you know of any other police or

7   agency that is investigating Lisa Champman with regard to

8   this particular situation?

9   A                I don't know the answer to that.

10  Q                Is it safe to say that your

11  investigation regarding Lisa Champman ended when Tonya

12  Traylor was compensated for her loss regarding the car?

13  A                Correct.

14  Q                Now, was this a credit card or a debit

15  card?

16  A                I believe she said it was a credit/bank

17  card, like a checking card.

18  Q                Okay.  And did she show you the

19  statement that reflected the use of the credit card or

20  whatever it was for purposes of the direct marketing

21  purchases and the Splash Lagoon purchase?

22  A                No.

23  Q                So you never saw any documentation

24  regarding the transaction; is that a safe statement?

25  A                Yes.

1   Q                Okay.  Now, you also learned from Tonya

2   Traylor that she did not know Tanielle Shurney; correct?

3   A                Correct.

4   Q                Now, what do you know of Tanielle

5   Shurney as of today's date?

6   A                I don't know -- other than what the

7   Pennsylvania State Police report reflects.

8   Q                Okay.  Did you, when you heard the name

9   Tanielle Shurney, run what we call in Pennsylvania an

10  NCIC to determine whether or not she has any prior

11  involvement in the criminal justice system?

12  A                No, we didn't.

13  Q                Did you conduct any sort of

14  investigation regarding Tanielle Shurney at all?

15  A                No.

16  Q                Did you hear of any other names

17  associated with the reservation other than Tanielle

18  Shurney's?

19  A                I believe there was a Tracy Smith is

20  the other name that Tonya Traylor said was showing up on

21  whenever she was calling the places that had made -- that

22  were entries on her account that she was not familiar

23  with; the people she spoke with, that name came up.

24  Q                Okay.

25  A                Again, I don't know who gave that name.

24

1    That's just what Tonya Traylor gave.

2    Q                I never mean to cut you off.  I

3    apologize if I do.

4    A                Sure.

5    Q                How many references was Tracy Smith's

6    name on the Tonya Traylor card?  How many references; do

7    you know?

8    A                No, I don't.

9    Q                I see here in Tonya Traylor's statement

10   that the only indications of the use of the card involve

11   Lisa Champman.

12   A                Okay.

13   Q                Is there another part of her statement

14   that shows that, in fact, Tracy Smith used the card for

15   other purchases?

16   A                Not in her statement.

17   Q                Okay.  What information do you have

18   that led you to conclude that Tracy Smith had used the

19   card for something other than the Splash Lagoon

20   reservation?

21   A                The Tracy Smith entry in our names

22   section of my report came because it showed up on the

23   Pennsylvania State Police report.  From their end of the

24   investigation that name came up, so I placed it in my

25   name section of my report.

1   Q               I see.  So when the state police in

2   Pennsylvania started their part of the investigation, the

3   name Tracy Smith somehow came up; and as a result of that

4   as a courtesy to your department, they faxed you that

5   name?

6   A               Correct.

7   Q               And as a result of you getting her name

8   faxed to you, did you conduct an investigation regarding

9   Tracy Smith?

10  A               No.

11  Q               Did you run an NCIC involving Tracy

12  Smith?

13  A               No.

14  Q               Did you do anything involving Tracy

15  Smith?

16  A               No.

17  Q               After you referred this matter to the

18  Pennsylvania State Police, did you do anything else at

19  all?

20  A               No.

21  Q               When the arrest of Ms. Shurney was

22  made -- and for your information it was in the parking

23  lot of this hotel -- were you subsequently contacted via

24  telephone or other means during the course of the arrest?

25  A               Yes.

1    Q                    And when were you contacted?

2    A                    I don't know the exact time we were

3    contacted.  The dispatcher was contacted stating that

4    they had Tanielle Shurney and they needed the victim of

5    this report, Tonya Traylor.  They needed her information,

6    so we faxed her information, which shows on the teletype

7    to the Pennsylvania State Police.

8    Q                    And that would be -- we don't need to

9    see it.  Obviously her demographic information --

10   A                    Address.

11   Q                    -- and the credit card number, things

12   of that nature?

13   A                    Correct.

14   Q                    So you did not indicate to the state

15   police that they should, in fact, arrest Ms. Shurney?

16   A                    No.

17   Q                    You just -- what exactly did you ask

18   the Pennsylvania State Police to do vis-a-vis Ms.

19   Shurney?

20   A                    You're welcome to read the teletype.

21   Q                    Why don't you just read it into the

22   record, because we'll all get copies of the transcript.

23   A                    Okay.  A representative from Scott

24   Enterprises will contact you when the suspect arrives.

25   Can you go to Econo Lodge and identify the suspect and

1  forward the information to Officer Hurley, Streetsboro

2  Police Department.

3  Q                Okay.  And then when Ms. Shurney

4  checked into the hotel, she was stopped by the trooper;

5  and then you were contacted by the trooper, and that

6  would be Trooper Pierce?

7  A                That's my understanding.

8  Q                Okay.  Do you recall the mode of

9  communication?  Was it a telephone call?

10 A                I wasn't at work yet.

11 Q                Okay.  How, in fact, were you contacted

12 then?

13 A                My dispatcher contacted me by phone at

14 home saying, I believe, it was Trooper Pierce who

15 contacted her, and the dispatcher was just wanting to

16 know what our end was.  And I said, yes, go ahead and

17 send her -- send state police Tonya Traylor's

18 information.  There's no problem with that.

19 Q                The dispatcher then, you believe, would

20 have received a telephone call as opposed to a teletype?

21 A                Right.  If there was a teletype, it

22 would have been in the report.

23 Q                Okay.  So then to the best of your

24 knowledge, Trooper Pierce contacts your dispatcher who

25 calls you at home, and then you authorize your dispatcher

1    to release what information?

2    A                The address of the victim, and I don't

3    know that Trooper Pierce -- I don't know who contacted

4    the dispatcher.

5    Q                Okay.  Somebody from Pennsylvania State

6    Police?

7    A                I would imagine so, yes.

8    Q                Have you done anything else after the

9    time your dispatcher contacted you regarding this

10   investigation at all?

11   A                After we received the initial contact,

12   I came into work and was contacted -- it could have

13   been -- I believe that was the second officer, maybe

14   Gilson, Trooper Gilson.  Basically they were stating that

15   they had this Tanielle Shurney in custody, and they also

16   requested a copy of my report faxed to them at the same

17   time.  I asked if they could fax a copy of their report

18   to me, and that was the end of our contact.

19   Q                Okay.  And that was basically your end

20   with regard to this investigation in total?

21   A                Correct.

22   Q                So none of the other uses of the card

23   or no other subsequent investigations were maintained by

24   you or this police department after you received that

25   teletype information from the Pennsylvania State Police?

1    A                Correct.

2    Q                Okay.  Did you ask Ms. Traylor --

3    because I see it's not here on the statement -- how she

4    may have lost the card?

5                     MR. BAX:  Object to the form of the

6    question.  Assumes facts not in evidence.

7                     MR. HUTTON:  Object also.

8    Q                Did you ask her how the card was

9    misplaced?

10                    MR. BAX:  Object to the form of the

11   question.  Assumes fact not in evidence.  I'm objecting.

12   You can't suggest answers to him.

13                    MR. HUTTON:  Objection.

14   Q                Did you ask Ms. Traylor anything

15   regarding the circumstances that led to her filing this

16   police report that are not included in this statement?

17   A                I don't recall everything that we

18   talked about other than what's on the report.

19   Q                Okay.  And she did not offer how she

20   believed the card may have been misplaced?

21                    MR. BAX:  Object to the form of the

22   question.

23   Q                We'll ask Ms. Traylor.  How were you

24   certain that the credit card number that Ms. Traylor had

25   used or was authorized to use was the same credit card

1    number that was used at Splash Lagoon?

2    A                The only credit card number that I had

3    reference to was the one she made in her statement.

4    Q                Okay.  And how do you know that that

5    was the same number that came up as being the number used

6    at Splash Lagoon or at the Econo Lodge I should say?

7    A                I didn't confirm the number.  Whenever

8    I spoke with Patty Purchase, she was saying that that's

9    what was used, that Tonya Traylor's credit card was the

10   one that was used.

11   Q                So you and Ms. Purchase did not compare

12   numbers to make sure that you're talking about the same

13   card?

14   A                She told me that the name Tonya Traylor

15   is on the card.  The name was on the card, not the

16   number.

17   Q                So presupposing that Ms. Traylor had

18   more than one card, there was no indication as to the

19   name of the credit card?

20   A                All we knew is the card belonged to

21   Tonya Traylor.

22   Q                Okay.  Was there some reason why Lisa

23   Champman wasn't contacted to see if she had a

24   relationship with Tanielle Shurney?

25   A                From our end, we didn't need to.  The

1  case was completed.  There was no further follow-up

2  needed.

3  Q              So you believe that it was one person

4  that was responsible for all the usages of the credit

5  card?

6  A              Like I said, when we requested just --

7  we never even got the complete identification of the

8  person going down to Erie, Pennsylvania, for the

9  reservation.  I just needed the information sent here.  I

10 mean, subsequently it was in the police report from the

11 state police.  Once they found that they had the suspect

12 in custody, you know, wanted to see what the proceeding

13 from that outcome of that before we proceeded any

14 further, if needed.

15 Q              It's safe to say you yourself or

16 members of your police department have no evidence

17 linking Ms. Shurney to the use of the card other than the

18 fact that she showed up and signed her name for the

19 reservation?

20 A              The only thing we have is our victim's

21 statement coming to the police station saying that that's

22 the name that was showing up on the card and that's the

23 reservation that Patty Purchase said was going to be

24 fulfilled.

25 Q              Just a few closing questions then.  Do

1    you recall having any contact with anyone named Kristen

2    Mooney at Splash Lagoon?

3    A                That does not sound familiar.

4    Q                Sandy Calabris, C-A-L-A-B-R-I-S?

5    A                Again, doesn't sound familiar.

6    Q                Jeffrey Mona, M-O-N-A?

7    A                Doesn't sound familiar.

8    Q                And any other contacts with Trooper

9    Pierce other than what you've testified about?

10   A                No, I don't believe so.

11                    MR. ADAMS:  Okay.  Thank you very

12   much.  I have no further questions, Officer Hurley.

13   EXAMINATION:

14   BY MR. HUTTON

15   Q                My name is Gary Hutton.  I represent

16   Scott's Econo Lodge.  As I understand your testimony,

17   this matter came to your attention when credit card

18   check -- the card holder came to the Streetsboro Police

19   Department to file a complaint that her card had been

20   improperly accessed and was being used; is that correct?

21   A                Correct.

22   Q                And when she told you that, Ms. Taylor

23   told you that she had made inquiry and she had found at

24   least four uses of the card; is that correct?

25   A                Correct.

1    Q           And various names came up as being as

2  improperly accessing and having charges placed against

3  Mrs. Taylor's account; is that correct?

4    A           Yes, that's correct.

5    Q           All those charges, whether they were by

6  one individual using various names or by different

7  individuals, Ms. Taylor, gave the information all charges

8  were unauthorized; is that correct?

9    A           Correct.

10   Q          That included the charge that appeared

11  for the Splash Lagoon or Econo Lodge that was not

12  authorized according to the information that was provided

13  to the Streetsboro Police Department yourself and Officer

14  Beaver?

15   A          That's correct.

16   Q         And then based on the information that

17  you received from Mrs. Taylor as she showed you the

18  banking information, did you have a belief and

19  understanding at that time that her -- that Mrs. Taylor's

20  card was being improperly used, and the use of the card

21  by the individual or individuals constituted credit card

22  fraud, a criminal offense?

23   A          Yes, I did.

24   Q         Is that why you made further inquiry

25  into that investigation?

1  A                    That's correct.

2  Q                    You have reason to believe some

3  identified individual or individuals were committing

4  credit card fraud and the victim was Mrs. Tonya Taylor?

5  A                    Traylor, yes.

6  Q                    Traylor.  Excuse me.  As part of that

7  investigation, a few names came up.  Champman's name came

8  up, Shurney's name came up, and eventually Tracy Smith's

9  name came up?

10 A                    That's correct.

11 Q                    And you had also talked to a Ms. Patty

12 Purchase?

13 A                    Yes, I did.

14 Q                    And that call was instituted by your

15 office to request the assistance of Scott's Enterprises

16 or the Econo Lodge, Splash Lagoon in the course of this

17 ongoing investigation as to who was using Ms. Traylor's

18 credit card improperly and without her authorization?

19 A                    Yes.  That's correct.

20 Q                    You requested Scott's assistance?

21 A                    Yes.  By calling the state police.

22 Q                    They agreed to provide that?

23 A                    Yes, they did.

24 Q                    At the time that you made that call, I

25 think you said the LEADs report was to request the

35

1    identity or verify the identity of the person who showed

2    up at the motel hotel to use the reservation?

3    A                Correct.

4    Q                As part of the credit card, were you

5    concerned that all the names that were being provided to

6    the various banks and motels and Lane Bryant and stores

7    may also have been fictitious?

8    A                That's correct.

9    Q                You actually didn't know who was

10   actually --

11   A                I didn't know who was going to show up.

12   Q                You didn't know if it would be Ms.

13   Shurney, you didn't know if it was going to be Ms.

14   Champman, you didn't know it was going to be any possible

15   person male, female, young, old.  You had no idea who was

16   going to come in and actually take the service that had

17   been paid for on that card?

18   A                Correct.  That's why I was requesting

19   the identification be sent.

20   Q                That person would be identified when

21   they appeared at the motel to take the use of the

22   service; i.e., appear at the hotel to check in?

23   A                Correct.

24   Q                Is that the time that you requested the

25   hotel contact the state police to have that individual

1  confined or I guess arrested so they could be identified

2  so this investigation could be completed?

3  A          Well, not arrested.  Just to where the

4  representative from the hotel would call the state

5  police, state police officer/trooper would show up and

6  identify -- just questions, who are you, get some

7  identification of this person so we could find out who

8  this person was.

9  Q          Okay.  Was it your understanding at

10  that point that it was Tanielle Shurney who appeared at

11  the motel, at least according to the --

12  A          By the state police report.

13  Q          That was based on driver's

14  identification and such; is that true?

15  A          I would assume so, yes.

16  Q          There was some questions about your

17  investigation to Ms. Champman.  As I understand, the

18  address you got for Champman was a Cleveland address?

19  A          Correct.

20  Q          And this credit card fraud that you're

21  investigating with Ms. Traylor, that's multi-

22  jurisdictional; is that right?  It didn't occur here

23  simply in Streetsboro.

24  A          None of the purchases on the credit

25  card were purchases from Streetsboro.  It was just our

1  victim lives in Streetsboro, so the police report is made

2  in Streetsboro.

3  Q               This type of crime often falls outside

4  of one locale's jurisdiction, one police department

5  jurisdiction?

6  A               Correct.

7  Q               That's why you eventually made contact

8  with the Pennsylvania State Police to help conclude this

9  investigation?

10 A               Correct.  To my knowledge, no crime in

11 reference to this report was committed in Streetsboro.

12 Q               Okay.  But a crime had been committed

13 based on your investigation?

14                 MR. ADAMS:  Objection.

15 Q               Is that fair to state?

16                 MR. ADAMS:  Calls --

17 Q               Improper use of a credit card.  You can

18 answer, Officer.

19 A               Yes.  There was a crime committed.

20 Q               That's what you reasonably based on the

21 information?

22 A               Based on the victim's statement who

23 came up here, that was what happened.

24 Q               Just look at Exhibit 2 for a second.

25 The first three pages, is that part of the single

1  document or I want to have it identified.

2  A          Okay.

3  Q          What are those initial pages?  How

4  would you describe those?

5  A          The first page is basically the cover

6  page.  Real brief narrative and information on the report

7  itself.  The next two pages are the names that are

8  associated with the report.  The fourth page is charges,

9  what the report is about, which says it's credit card

10  charges.  That's what we're talking about.

11      The following two pages -- I'm sorry -- the next

12  page is the investigative narrative where -- narrative

13  stating what contact was made, what happened, more

14  in-depth information.

15  Q          That one has -- it says investigative

16  report 001 title/subject credit card fraud, Bates No. 1,

17  incident 0402502?

18  A          That's correct.

19  Q          Name appears on the bottom, Trooper Jon

20  H. Hurley.  That's yours?

21  A          Patrolman.

22  Q          It's dated 6/30, 2004; is that correct?

23  A          Yes.  That's correct.

24  Q          All these records from Exhibit No. 2,

25  are they prepared contemporaneously with the report?

1    They're made at that time?

2    A                Right.  As it happens, within a

3    reasonable amount of time as in the next five pages,

4    those are supplemental reports, that is a phone call was

5    made in reference to this report, then the report was

6    made, supplemental information as to what that call or

7    what that information would represent on the page.

8    Q                Then the handwritten statement is the

9    statement given to you by Ms. Taylor?

10   A                Correct.

11   Q                That was given here at the police

12   department?

13   A                Yes, it was.

14   Q                Okay.  And the following pages are from

15   the information from the Pennsylvania State Police?

16   A                That's correct.

17   Q                As part of your investigation, did you

18   learn whether or not Ms. Taylor had given anyone

19   authorization?  Did she tell you that she had given

20   anyone authorization to access her credit card or bank

21   card or check account, whether it be Ms. Shurney, Smith,

22   Champman?

23   A                She -- I believe she stated she was the

24   only one to use that credit card; and of those names, she

25   didn't recognize any of those names or give authorization

1    to any of those names.

2                        MR. HUTTON:  That's all I have,

3    Officer.  Thank you.

4                        MS. MALONE:  I have no questions.

5                        MR. BAX:  No questions.

6                        MR. ADAMS:  I just have a few

7    follow-ups.

8    RE-EXAMINATION:

9    BY MR. ADAMS

10   Q                   I thought when we talked initially that

11   there wasn't any subsequent investigation by you after

12   Ms. Shurney was arrested.  Now it seems as if you're

13   talking about confronting Ms. Traylor with the names of

14   individuals that came up on the teletype box.

15                       MR. BAX:  Object to the form of the

16   question.

17                       MR. HUTTON:  Object.  He didn't so

18   testify.

19   Q                   Lastly, did you know that the

20   reservation was made in Tanielle Shurney's name prior to

21   her being arrested?

22   A                   I don't recall.  I'll look in the

23   statement.  When I spoke with Patty Purchase, who is the

24   manager of Splash Lagoon, she did say there was a

25   reservation under the name of Tanielle Shurney.

1    Q              And that was obviously the date of --

2    that conversation was when?

3    A              I called Ms. Purchase on the 2nd of

4    July.

5    Q              And that was obviously before Ms.

6    Shurney was arrested?

7    A              I believe so, yes.

8                  MR. ADAMS:  Thank you.  I have

9    nothing further.

10                  MR. BAX:  Just a follow-up

11    question.

12    RE-EXAMINATION:

13    BY MR. BAX

14    Q              Again, referring to the investigative

15    narrative of your official report that was prepared on

16    June 30 of 2004, you state in there that -- referring to

17    that Tanielle Shurney reservation, you state, quote, the

18    reservation was made with Traylor's account number, close

19    quote.  Was that the information provided to you by Patty

20    Purchase?

21    A              Yes.  That's correct.

22    Q              So do you recall if you compared the

23    card numbers at that point in time?

24    A              I don't recall if we compared the

25    numbers.  Just the names, I believe.  I don't remember if

1   the numbers were compared.

2                    MR. BAX:   Okay.   Those are all the

3   questions I have.

4                    MR. ADAMS:   We're off the record.

5        (Whereupon an off-the-record discussion was had.)

6                    MR. BAX:   Officer, you have the

7   opportunity to read and review the deposition transcript

8   if you would like to, and then on a separate sheet of

9   paper you can make notations or you can make other

10  comments.   Or if you choose to, you can waive your right

11  to read or review the transcript.   Do you have a choice

12  as to what you like to do?

13                   THE WITNESS:   I can waive the

14  right.

15                                      SIGNATURE WAIVED

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5                    REPORTER'S CERTIFICATE
6
7        I HEREBY CERTIFY that the above and foregoing
8   is a true and correct transcript of all the testimony
9   introduced and proceedings had in the taking of the
10  testimony in the above-entitled matter, as shown by my
11  stenotype notes taken by me at the time said testimony
12  was taken.
13
14                    _____
15                    Jodie L. Algarin
                      Registered Professional Reporter
16
17
18
19
20
21
22
23
24
25

44

```
 1
 2    STATE OF OHIO      )
                          )  SS:          NOTARY CERTIFICATE
 3    MAHONING COUNTY   )

 4

 5              I, Jodie L. Algarin, Notary Public

 6    within the State and County aforesaid, duly commissioned

 7    and qualified, do hereby certify that the within-named

 8    deponent was by me first duly sworn to testify the

 9    truth, the whole truth, and nothing but the truth, and

10    that the foregoing testimony was written by me in

11    stenotype in the presence of the witness; that by

12    agreement of counsel, signature was waived.

13

14              I do further certify that I am not

15    of counsel, attorney or relative to either party, or

16    otherwise interested in the event of this action or

17    proceeding.

18

19              IN WITNESS WHEREOF, I have hereunto

20    set my hand and seal of office at Youngstown, Ohio, this

21    25th Day of January, 2006.

22

23

24    Jodie L. Algarin, Notary Public
      My Commission Expires 04/24/06

25
```

**NAGY-BAKER COURT REPORTING, INC.**
**(330) 746-7479**
**1-800-964-3376**

**0**

001  38:16
04/24/06
  44:24
0402502
  9:11, 38:17
05-196  1:3

**1**

1  4:21,
  8:11, 8:13,
  38:16
105  5:16
11  3:6
11:45  3:6
11th  1:15
14  15:25
15  4:6
15219  2:20
15222-5409
  2:10
16501  2:14
16502  2:5
196  5:16

**2**

2  4:22,
  8:22, 8:24,
  9:9, 9:14,
  10:14,
  13:18,
  37:24, 38:24
2003  8:7,
  15:10
2004  7:8,
  8:10, 10:8,
  10:9, 10:21,
  10:25, 11:9,
  15:8, 15:15,
  15:17,
  38:22, 41:16
2006  1:15,
  3:6, 44:21
202  2:14
2080  3:7
25th  44:21
29  4:14,
  4:15
2910  2:9
2nd  41:3

**3**

30  10:21,
  10:24, 11:9,
  41:16
303  3:8
30th  10:6
32  4:7
37  4:16

**4**

40  4:8,
  4:14, 4:15
41  4:9

**5**

5  4:5
564  2:19

**6**

6/30  38:22
6/30/04
  10:17
602  2:4
6th  2:19

**8**

8  4:21, 4:22

**9**

900  2:13
9th  2:4

**A**

A.J  2:4
a.m  3:6
abide  6:5
able  20:12
above-entitled
  43:10
academy
  7:18, 7:19,
  7:22, 7:23,
  7:24, 7:25,
  8:3, 15:9
access  39:20
accessed
  32:20
accessing
  33:2
according
  33:12, 36:11
account
  10:17,
  11:16,
  11:19,
  23:22, 33:3,
  39:21, 41:18
accounts
  11:17,
  11:21, 12:3
accurate
  13:19
accurately
  6:3
action  1:18,
  3:18, 44:16
Adams  2:4,
  4:6, 4:8,
  4:16, 15:4,
  15:6, 32:11,
  37:14,
  37:16, 40:6,
  40:9, 41:8,
  42:4
address
  9:22, 20:10,
  20:11, 21:9,
  26:10, 28:2,
  36:18, 36:18
advised
  12:15,
  17:16,
  18:22, 20:14
aforesaid
  1:18, 3:17,
  44:6
afternoon
  16:11
against  33:2
age  5:3
agency  22:7
agree  6:5,
  6:9
agreed  3:4,
  3:9, 34:22
agreement
  1:18, 3:15,
  44:12
ahead  17:19,
  27:16
AL  1:10
Algarin
  1:13, 3:11,
  43:14, 44:5,
  44:24
allowed  9:16
already
  19:18
amount  39:3
Angelo  13:6,
  13:8, 13:13
answering
  6:3
answers
  29:12
apart  16:24
apologize
  24:3
appear
  13:18, 35:22
APPEARANCES
  2:1
appeared
  14:21,
  16:16,
  33:10,
  35:21, 36:10
appears
  38:19
appropriate
  6:13
approximately
  15:17
arrested
  36:1, 36:3,
  40:12,
  40:21, 41:6
arrived
  12:14
arrives
  26:24
assistance
  34:15, 34:20
associated
  20:19,
  23:17, 38:8
assume  6:1,
  36:15
Assumes
  29:6, 29:11
assuming
  21:16
attend  7:22
attendance
  8:15
attention
  32:17
attorney
  2:4, 2:8,
  2:13, 2:17,
  2:17, 5:13,
  44:15
attorneys
  6:21
authorization
  34:18,
  39:19,
  39:20, 39:25
authorize
  27:25
authorized
  29:25, 33:12
Avenue  2:19

**B**

background
  7:14, 7:18
Baginski  2:8
bank  10:17,
  39:20
banking
  33:18
banks  35:6
Bashline  2:8
basically
  12:19, 14:9,
  20:11,
  28:14,
  28:19, 38:5
Bates  38:16
Bax  2:13,
  4:5, 4:9,
  4:15, 5:9,
  5:12, 14:25,
  29:5, 29:10,
  29:21, 40:5,
  40:15,
  41:10,
  41:13, 42:2,
  42:6
Beaver
  15:24, 16:7,
  16:10,
  16:14,
  16:22,
  16:23, 17:3,
  17:8, 17:9,
  17:22, 33:14
begin  8:8
behalf  2:3,
  2:6, 2:11,
  2:16, 3:17
belief  33:18
believed
  29:20
belonged
  30:20
best  27:23
bit  7:14
board  15:18
book  20:11,
  20:12
bottom  38:19
box  40:14
brief  38:6
Bryant  35:6

**C**

C-A-L-A-B-R-I-S
  32:4
CA  1:3
Calabris
  32:4
calling
against  33:2
attorneys
  6:21
can't  29:12
card  10:4,
  15:20, 19:3,
  20:8, 22:14,
  22:15,
  22:17,
  22:17,
  22:19, 24:6,
  24:10,
  24:14,
  24:19,
  26:11,
  28:22, 29:4,
  29:8, 29:20,
  29:24,
  29:25, 30:2,
  30:9, 30:13,
  30:15,
  30:15,
  30:18,
  30:19,
  30:20, 31:5,
  31:17,
  31:22,
  32:17,
  32:18,
  32:19,
  32:24,
  33:20,
  33:20,
  33:21, 34:4,
  34:18, 35:4,
  35:17,
  36:20,
  36:25,
  37:17, 38:9,
  38:16,
  39:20,
  39:21,
  39:24, 41:23
case  21:12,
  31:1
cause  1:18,
  3:17
center  14:5,
  14:20
certain
  29:24
CERTIFICATE
  43:5, 44:2
certified
  5:6, 15:8
certify
  43:7, 44:7,
  44:14
cetera  10:18
Chapman
  19:3, 19:11,
  19:12,
  19:20,
  19:22, 20:4,
  20:7, 20:10,
  21:5, 21:16,
  21:25, 22:3,
  22:7, 22:11,
  24:11,
  30:23,
  35:14,
  36:17,
  36:18, 39:22
Chapman's
  20:8, 34:7
chance  6:22
charge
  11:22, 33:10
charges
  33:2, 33:5,
  33:7, 38:8,
  38:10
check  32:18,
  35:22, 39:21
checked
  10:17,
  11:17, 27:4
checking
  21:8, 22:17
choice  42:11
choose  42:10
circumstances
  29:15
city  7:3,
  7:5, 7:7,
  7:16, 11:4
Civil  1:3,
  1:17, 5:19
clarification
  14:18
clarify
  18:10
Cleveland
  21:22, 36:18
close  41:18
closing
  31:25
coming  31:21
commenced
  5:14, 5:16
comments
  42:10
Commission
  44:24
commissioned
  44:6
committed
  37:11,
  37:12, 37:19
committing
  34:3
Commonwealth
  2:18
communication
  27:9
compare
  30:11
compared
  41:22,
  41:24, 42:1
compel  8:14
compensated
  22:12
compensation
  21:11
complaint
  32:19
complete
  8:5, 11:14,
  13:19, 31:7
completed
  9:3, 15:9,
  31:1, 36:2
Complex  2:19
computer-assist
  3:13
concerned
  35:5
conclude
  24:18, 37:8

concluded
21:9
conclusion
6:20
conduct
15:21, 19:2,
21:24,
23:13, 25:8
conducted
16:20
confined
36:1
confirm
19:21, 30:7
confirmed
20:11
confronting
40:13
constituted
33:21
contact
9:24, 10:1,
12:3, 12:13,
14:5, 14:20,
17:17,
17:25,
18:11,
18:22,
26:24,
28:11,
28:18, 32:1,
35:25, 37:7,
38:13
contacted
11:18, 12:4,
18:5, 18:15,
18:21,
19:14,
25:23, 26:1,
26:3, 26:3,
27:5, 27:11,
27:13,
27:15, 28:3,
28:9, 28:12,
30:23
contacting
12:16, 18:12
contacts
27:24, 32:8
contained
9:3
contemporaneous
38:25
conversation
14:9, 41:2
copies  8:20,
26:22
correct  8:2,
14:22,
14:24, 15:8,
15:18,
15:19,
16:17, 17:5,
18:14,
18:17, 20:2,
20:5, 21:10,
21:22,
22:13, 23:2,
23:3, 25:6,
26:13,
28:21, 29:1,
32:20,
32:21,
32:24,

32:25, 33:3,
33:4, 33:8,
33:9, 33:15,
34:1, 34:10,
34:19, 35:3,
35:8, 35:18,
35:23,
36:19, 37:6,
37:10,
38:18,
38:22,
38:23,
39:10,
39:16,
41:21, 43:8
counsel
1:18, 3:5,
3:10, 44:12,
44:15
County  44:3,
44:6
couple  13:5
course  14:1,
17:12,
25:24, 34:16
Court  1:1,
1:19, 5:15
courtesy
25:4
cover  38:5
credit  10:4,
15:20, 19:3,
22:14,
22:19,
26:11,
29:24,
29:25, 30:2,
30:9, 30:19,
31:4, 32:17,
33:21, 34:4,
34:18, 35:4,
36:20,
36:24,
37:17, 38:9,
38:16,
39:20, 39:24
credit/bank
22:16
crime  37:3,
37:10,
37:12, 37:19
criminal
23:11, 33:22
crisscross
20:12, 21:8
custody
28:15, 31:12
customary
11:6, 11:9
cut  24:2
CV  5:16

**D**

date  7:6,
10:5, 12:6,
23:5, 41:1
dated  10:22,
38:22
debit  22:14
Defendant
2:6, 2:11,
2:16
Defendant's

4:20, 8:11,
8:22, 8:24
Defendants
1:11
demographic
26:9
department
3:7, 7:5,
7:8, 9:10,
9:20, 10:2,
10:3, 13:23,
14:2, 18:7,
21:18, 25:4,
27:2, 28:24,
31:16,
32:19,
33:13, 37:4,
39:12
department's
21:17
departments
8:4
deponent
44:8
deposes  5:6
deposition
1:8, 1:13,
3:5, 3:10,
3:15, 3:16,
5:18, 8:13,
8:14, 8:15,
42:7
describe
38:4
desk  16:15
determine
23:10
difficult
6:19
direct  22:20
directions
6:5
Director
2:18
directory
21:8, 21:16
discovery
5:18
discussion
42:5
dispatcher
26:3, 27:13,
27:15,
27:19,
27:24,
27:25, 28:4,
28:9
District
1:1, 1:2,
1:19, 1:20,
5:15, 5:15,
5:20
Docket  5:16
document
8:25, 13:23,
38:1
documentation
22:23
documents
8:25, 9:8,
9:13, 13:23,
13:25
driver's
36:13

duly  5:3,
44:6, 44:8
duplicated
9:16
duties  11:6,
11:9
duty  10:24,
11:2

**E**

Econo  1:10,
2:6, 26:25,
30:6, 32:16,
33:11, 34:16
either  44:15
employed
7:4, 7:7
employment
7:14, 8:8
ended  22:11
enforcement
7:17
enforcing
11:4
Enterprises
26:24, 34:15
entire  17:1
entries
11:18,
11:19, 23:22
entry  24:21
Erie  1:3,
2:5, 2:14,
9:18, 12:11,
12:21,
17:17,
17:20,
17:25, 31:8
et  1:10,
10:17
event  44:16
eventually
34:8, 37:7
everything
29:17
evidence
29:6, 29:11,
31:16
exact  26:2
exactly
26:17
exam  15:11
EXAMINATION
4:5, 4:6,
4:7, 5:6,
15:5, 32:13
except  13:19
Excuse  34:6
exhibit
4:21, 4:22,
8:11, 8:13,
8:22, 8:24,
9:9, 9:14,
10:14,
13:18,
16:24,
37:24, 38:24
EXHIBITS
4:20
experience
15:25
Expires
44:24

extent  3:18

**F**

facts  29:6
fair  37:15
falls  37:3
familiar
8:16, 19:15,
19:16,
23:22, 32:3,
32:5, 32:7
fax  9:6,
14:12, 28:17
faxed  25:4,
25:8, 26:6,
28:16
Federal  5:19
female  35:15
fictitious
35:7
field  7:20
file  9:10,
9:13, 13:19,
32:19
filing  29:15
fill  10:3,
12:14, 20:15
filling
9:19, 11:13,
12:17, 14:24
finished
3:14
five  39:3
Floor  2:19
follow-up
18:9, 19:6,
31:1, 41:10
follow-ups
40:7
follows  5:7
Forbes  2:19
foregoing
43:7, 44:10
forgive  16:4
forth  10:13
forward  27:1
fourth  38:8
fraud  33:22,
34:4, 36:20,
38:16
fulfill  12:5
fulfilled
31:24
fulfilling
11:8
fully  3:18

**G**

Garrettsville
7:23, 7:24
Gary  2:13,
5:12, 32:15
gave  12:11,
18:24,
18:25, 19:7,
23:25, 24:1,
33:7
General  2:17
Gerald  2:8
Gilson  13:7,
28:14, 28:14
given  14:11,

39:9, 39:11,
39:18, 39:19
governs  8:3
guess  6:7,
36:1
guidance
17:11

**H**

handled
13:10
handwritten
10:16, 39:8
happened
14:15,
14:16,
15:16,
37:23, 38:13
happens  39:2
having  32:1,
33:2
hear  5:23,
23:16
heard  6:1,
19:7, 23:8
hereby  3:15,
43:7, 44:7
hereinafter
5:6
hereto  3:5
hereunto
44:19
hired  7:19
his/her  3:14
holder  32:18
hotel  13:14,
20:16,
20:19,
25:23, 27:4,
35:2, 35:22,
35:25, 36:4
huh-uh  6:19
Hurley  1:10,
5:2, 5:11,
5:12, 15:7,
27:1, 32:12,
38:20
Hutton  2:8,
4:7, 4:14,
15:2, 29:7,
29:13,
32:14,
32:15, 40:2,
40:17

**I**

i.e  35:22
idea  35:15
identification
31:7, 35:19,
36:7, 36:14
identified
34:3, 35:20,
36:1, 38:1
identify
8:24, 9:18,
12:17,
13:15,
17:21,
26:25, 36:6
identity
35:1, 35:1

imagine 28:7
immediately
20:1
Improper
37:17
improperly
32:20, 33:2,
33:20, 34:18
in-depth
38:14
incident
7:17, 9:3,
9:10, 22:4,
38:17
included
17:3, 29:16,
33:10
INDEX 4:2
indicate
26:14
indicated
15:7, 19:19
indication
30:18
indications
24:10
individual
9:24, 33:6,
33:21, 34:3,
35:25
individuals
19:1, 33:7,
33:21, 34:3,
40:14
information
8:18, 9:20,
9:21, 12:18,
14:12, 17:2,
18:25, 19:5,
19:8, 20:9,
20:21,
24:17,
25:22, 26:5,
26:6, 26:9,
27:1, 27:18,
28:1, 28:25,
31:9, 33:7,
33:12,
33:16,
33:18,
37:21, 38:6,
38:14, 39:6,
39:7, 39:15,
41:19
initial 9:1,
9:6, 18:4,
18:8, 28:11,
38:3
initially
13:14, 14:6,
40:10
initiate
20:13
initiated
11:13
Inn 1:10,
2:7
inquiry
32:23, 33:24
instituted
34:14
instructed
14:19
instructions

5:22
interested
44:16
interpose
6:21
interrupt
19:17
interview
16:20
introduced
4:20, 43:9
investigate
20:7
investigating
22:7, 36:21
investigation
17:12, 18:2,
19:2, 19:11,
21:9, 21:12,
21:24,
22:11,
23:14,
24:24, 25:2,
25:8, 28:10,
28:20,
33:25, 34:7,
34:17, 36:2,
36:17, 37:9,
37:13,
39:17, 40:11
investigations
15:21, 22:3,
28:23
investigative
38:12,
38:15, 41:14
investigator
17:7
involve
24:10
involvement
23:11
involving
18:25,
25:11, 25:14
itself 38:7

J

January
1:15, 3:6,
44:21
Jeffrey 32:6
job 6:17,
7:17
Jodie 1:13,
3:11, 43:14,
44:5, 44:24
Jon 1:10,
5:2, 5:11,
38:19
July 7:8,
8:6, 8:6,
15:10, 41:4
June 7:8,
10:7, 10:21,
10:24, 11:9,
15:7, 41:16
jurisdiction
12:8, 12:9,
12:11,
12:15,
21:17,
21:19,

21:21, 37:4,
37:5
jurisdictional
36:22
justice
23:11

K

Key 10:17
knowing 16:4
knowledge
6:4, 6:8,
9:24, 27:24,
37:10
Kristen 32:1

L

labeled 9:9,
9:14
lady 12:9
Lagoon 2:12,
5:14, 11:23,
12:1, 12:4,
12:4, 12:10,
12:16,
12:23,
13:15,
14:19,
18:12,
18:13,
22:21,
24:19, 30:1,
30:6, 32:2,
33:11,
34:16, 40:24
Lane 35:6
Lastly 40:19
law 2:4,
2:8, 2:8,
2:13, 2:17,
7:17
lawful 5:3
laws 11:4
lawsuit
5:14, 5:16
lead 17:7,
17:9, 19:9,
20:17
LEADs 9:16,
13:20, 34:25
learn 39:18
learned
11:25, 23:1
least 32:24,
36:11
led 24:18,
29:15
linking
31:17
Lisa 19:3,
19:11,
19:12,
19:19,
19:22, 20:4,
20:7, 20:8,
20:9, 21:4,
21:16,
21:25, 22:3,
22:7, 22:11,
24:11, 30:22
listed 19:3
lives 37:1

lobby 16:2
local 5:20,
16:5, 21:15
locale's
37:4
Lodge 26:25,
30:6, 32:16,
33:11, 34:16
looking 19:4
loss 22:12
lost 29:4

M

M-O-N-A 32:6
MAHONING
44:3
maintained
28:23
male 35:15
Malone 2:17,
40:4
manager
40:24
Manor 2:19
marked 8:11,
8:12, 8:22,
16:25
marketing
22:20
matter
25:17,
32:17, 43:10
maybe 28:13
means 25:24
members
31:16
messages
14:9
mine 16:10
misplaced
29:9, 29:20
mode 27:8
Mona 32:6
month 15:17
months 16:9
Mooney 32:2
motel 35:2,
35:21, 36:11
motels 35:6
MOTIONS 4:13
multi 36:21
myself 16:22

N

named 5:17,
9:24, 32:1
names 13:6,
19:22,
23:16,
24:21, 33:1,
33:6, 34:7,
35:5, 38:7,
39:24,
39:25, 40:1,
40:13, 41:25
narrative
38:6, 38:12,
38:12, 41:15
nature 26:12
NCIC 23:10,
25:11
needed

17:10, 26:4,
26:5, 31:2,
31:9, 31:14
Nodding
18:16
none 28:22,
36:24
normal 11:8
Notary 1:14,
3:11, 3:20,
44:2, 44:5,
44:24
notations
42:9
note 19:18
notes 43:11
nothing 5:5,
21:6, 41:9,
44:9
notice 1:15,
8:13
noticed
11:17
noting 19:1,
21:15
numbers
30:12,
41:23,
41:25, 42:1

O

oath 15:12
Object 29:5,
29:7, 29:10,
29:21,
40:15, 40:17
objecting
29:11
Objection
29:13, 37:14
objections
4:13, 6:22
obviously
15:16, 26:9,
41:1, 41:5
occupation
7:2
occur 36:22
off-the-record
42:5
offense
33:22
offer 29:19
office 2:8,
2:17, 34:15,
44:20
officer
5:11, 5:12,
7:15, 15:7,
15:13, 16:5,
17:22,
17:23, 27:1,
28:13,
32:12,
33:13,
37:18, 40:3,
42:6
officer/trooper
36:5
officers
8:1, 13:6
offices 3:7
official

9:9, 13:22,
41:15
Ohio 1:14,
3:8, 3:12,
7:24, 8:1,
15:11,
21:20,
21:22,
21:23, 44:2,
44:20
ongoing
22:3, 34:17
OPOTA 8:2
opportunity
42:7
opposed
27:20
ORC 11:4
ordinances
11:5
ordinary
14:1
otherwise
44:16
outcome
31:13
outside 37:3
overdrawn
11:17

P

PAGE(S 4:14,
4:15, 4:16
pages 8:16,
9:15, 13:20,
37:25, 38:3,
38:7, 38:11,
39:3, 39:14
paid 35:17
parking
25:22
particular
22:8
parties 3:5,
3:16, 3:17
party 44:15
Patricia
14:5
patrol 11:4
patrolman
7:3, 7:10,
11:3, 15:24,
16:7, 16:10,
16:13,
16:22,
16:23, 17:9,
38:21
Patty 12:10,
12:12,
12:22, 14:8,
14:19, 18:6,
18:8, 19:8,
20:14, 30:8,
31:23,
34:11,
40:23, 41:19
pending 1:19
Pennsylvania
1:2, 1:20,
2:5, 2:10,
2:14, 2:18,
2:20, 5:15,
5:21, 9:5,

9:22, 13:2,
13:10,
14:20, 23:7,
23:9, 24:23,
25:2, 25:18,
26:7, 26:18,
28:5, 28:25,
31:8, 37:8,
39:15
**perfectly**
6:12
**period** 16:6,
16:9
**personal**
6:4, 6:8
**persons** 19:2
**photocopy**
13:19
**Pierce** 2:16,
13:4, 13:7,
13:9, 27:6,
27:14,
27:24, 28:3,
32:9
**Pittsburgh**
2:10, 2:20
**placed**
24:24, 33:2
**places** 23:21
**plaintiff**
1:8, 2:3,
5:17, 15:3
**please** 5:10,
5:24
**point** 7:10,
20:16,
36:10, 41:23
**police** 3:7,
7:5, 7:8,
7:15, 7:23,
7:25, 8:4,
9:2, 9:2,
9:6, 9:10,
9:18, 9:20,
9:22, 10:2,
10:3, 12:8,
12:11,
12:13,
12:15,
12:20, 13:2,
13:11,
13:23, 14:1,
14:21,
15:12,
16:16,
17:18,
17:20,
17:25, 18:6,
18:15,
21:17,
21:18,
21:20,
21:24, 22:6,
23:7, 24:23,
25:1, 25:18,
26:7, 26:15,
26:18, 27:2,
27:17, 28:6,
28:24,
28:25,
29:16,
31:10,
31:11,
31:16,

31:21,
32:18,
33:13,
34:21,
35:25, 36:5,
36:5, 36:12,
37:1, 37:4,
37:8, 39:11,
39:15
**possible**
35:14
**post** 12:11,
12:15
**PPG** 2:9
**prepared**
13:25,
38:25, 41:15
**presence**
3:19, 3:20,
44:11
**presupposing**
30:17
**printouts**
9:16
**prior** 15:21,
16:11,
23:10, 40:20
**problem**
27:18
**procedure**
1:17, 5:19,
5:20, 16:5
**proceeded**
31:13
**proceeding**
31:12, 44:17
**proceedings**
43:9
**Professional**
43:15
**program** 7:20
**provide**
7:13, 10:10,
34:22
**provided**
8:14, 10:20,
33:12, 35:5,
41:19
**Public** 1:14,
3:11, 3:20,
44:5, 44:24
**purchase**
12:1, 12:10,
12:22, 14:5,
14:8, 14:19,
18:6, 18:9,
18:22,
18:22, 19:8,
20:14,
20:24,
22:21, 30:8,
30:11,
31:23,
34:12,
40:23, 41:3,
41:20
**purchases**
22:21,
24:15,
36:24, 36:25
**purposes**
22:20
**pursuant**
1:15, 1:17,

5:18

# Q

**qualified**
44:7
**quote** 41:17,
41:19

# R

**rather** 6:18
**RE-EXAMINATION**
4:8, 4:9,
40:8, 41:12
**Real** 38:6
**realized**
11:16
**reason** 21:3,
30:22, 34:2
**reasonable**
39:3
**reasonably**
37:20
**received**
27:20,
28:11,
28:24, 33:17
**recognize**
11:18, 39:25
**recommended**
17:17, 17:25
**record**
26:22, 42:4
**records**
38:24
**reference**
30:3, 37:11,
39:5
**references**
24:5, 24:6
**referral**
21:23
**referred**
25:17
**referring**
17:22,
41:14, 41:16
**reflected**
22:19
**reflects**
15:23, 23:7
**regard** 19:2,
22:7, 28:20
**regarding**
9:10, 19:11,
21:4, 21:25,
22:3, 22:11,
22:12,
22:24,
23:14, 25:8,
28:9, 29:15
**Region** 2:18
**Registered**
43:15
**registration**
14:21
**relationship**
30:24
**relative**
44:15
**release** 28:1
**rephrase**
5:25

**report** 9:2,
9:2, 9:5,
9:6, 10:3,
10:6, 12:7,
13:5, 13:10,
13:11,
13:11,
14:11,
15:23, 16:1,
16:24, 17:1,
17:4, 17:6,
18:8, 23:7,
24:22,
24:23,
24:25, 26:5,
27:22,
28:16,
28:17,
29:16,
29:18,
31:10,
34:25,
36:12, 37:1,
37:11, 38:6,
38:8, 38:9,
38:16,
38:25, 39:5,
39:5, 41:15
**reported**
11:22
**Reporter**
43:15
**REPORTER'S**
43:5
**reports**
11:3, 39:4
**represent**
5:13, 32:15,
39:7
**representative**
12:16,
26:23, 36:4
**request**
34:15, 34:25
**requested**
12:20, 18:6,
28:16, 31:6,
34:20, 35:24
**requesting**
9:18, 35:18
**required**
7:24, 7:25,
9:22
**reservation**
9:19, 12:6,
12:14,
12:18, 14:5,
14:20,
14:24,
20:16,
20:19, 21:4,
23:17,
24:20, 31:9,
31:19,
31:23, 35:2,
40:20,
40:25,
41:17, 41:18
**respond** 6:17
**responsible**
31:4
**restate** 5:25
**result** 25:3,
25:7

**review** 42:7,
42:11
**road** 16:18
**Route** 3:8
**rules** 1:17,
5:19, 5:20
**run** 23:9,
25:11

# S

**safe** 19:24,
21:7, 22:2,
22:10,
22:24, 31:15
**sake** 14:18
**Sandy** 32:4
**saying** 6:18,
11:15,
14:15, 18:5,
27:14, 30:8,
31:21
**says** 5:7,
11:16, 38:9,
38:15
**Scott** 12:1,
26:23
**Scott's**
1:10, 2:6,
2:11, 5:13,
11:23,
32:16,
34:15, 34:20
**seal** 44:20
**Sean** 2:16
**section**
24:22, 24:25
**seems** 40:12
**send** 12:18,
27:17, 27:17
**sent** 9:17,
13:16, 31:9,
35:19
**separate**
16:24, 42:8
**sergeant**
17:14,
17:14,
17:24, 17:24
**series** 13:23
**service**
35:16, 35:22
**shaking** 6:18
**she's** 21:18,
21:20
**sheet** 42:8
**shift** 16:11,
16:12, 17:14
**shorthand**
3:11
**showed**
24:22,
31:18,
33:17, 35:1
**showing**
23:20, 31:22
**shown** 43:10
**shows** 24:14,
26:6
**Shurney** 1:7,
5:17, 14:21,
19:23,
20:20, 23:2,
23:5, 23:9,

23:14,
25:21, 26:4,
26:15,
26:19, 27:3,
28:15,
30:24,
31:17,
35:13,
36:10,
39:21,
40:12,
40:25, 41:6,
41:17
**Shurney's**
21:3, 23:18,
34:8, 40:20
**signature**
3:14, 42:15,
44:12
**signed** 31:18
**simply** 36:23
**single** 37:25
**situation**
17:17, 22:8
**six** 16:9
**Smith** 23:19,
24:14,
24:18,
24:21, 25:3,
25:9, 25:12,
25:15, 39:21
**Smith's**
24:5, 34:8
**Somebody**
28:5
**somehow** 25:3
**someone**
10:4, 21:16
**sorry** 19:23,
38:11
**sort** 23:13
**speak** 12:21,
13:1
**speaking**
14:7, 20:13,
20:14
**specified**
1:16
**speculate**
6:7
**Splash** 2:11,
5:13, 11:23,
12:1, 12:4,
12:4, 12:10,
12:16,
12:23,
13:14,
14:19,
18:11,
18:12,
22:21,
24:19, 30:1,
30:6, 32:2,
33:11,
34:16, 40:24
**spoke** 16:14,
12:9, 12:12,
13:9, 13:13,
16:1, 16:2,
23:23, 30:8,
40:23
**SS** 44:2
**started**
16:11, 25:2

state 1:14,
2:13, 3:7,
3:12, 5:10,
7:24, 7:25,
8:3, 9:6,
9:17, 9:18,
9:22, 11:4,
12:11,
12:13,
12:14,
12:20, 13:2,
13:11,
14:20,
15:11,
15:11,
17:17,
17:20,
17:25,
21:20,
21:24, 23:7,
24:23, 25:1,
25:18, 26:7,
26:14,
26:18,
27:17, 28:5,
28:25,
31:11,
34:21,
35:25, 36:4,
36:5, 36:12,
37:8, 37:15,
39:15,
41:16,
41:17, 44:2,
44:6
stated
12:19,
13:14,
14:12, 39:23
statement
10:11,
10:13,
10:16,
10:18,
10:20,
11:13,
11:14,
11:15,
11:16, 18:3,
18:4, 18:19,
18:25,
19:18,
19:25, 20:1,
22:19,
22:24, 24:9,
24:13,
24:16, 29:3,
29:16, 30:3,
31:21,
37:22, 39:8,
39:9, 40:23
statements
9:4, 12:2
states 1:1,
1:19, 5:14,
18:18
stating
12:3, 26:3,
28:14, 38:13
station
11:3, 11:12,
16:16, 31:21
stenotype
43:11, 44:11

steps 20:7
stipulated
3:4, 3:9
STIPULATIONS
3:2
stopped 27:4
stores 35:6
Street 2:4,
2:13
Streetsboro
3:7, 3:8,
7:3, 7:5,
7:8, 7:16,
7:19, 7:21,
8:9, 9:2,
9:10, 9:20,
10:3, 13:22,
14:1, 15:14,
15:25, 27:1,
32:18,
33:13,
36:23,
36:25, 37:1,
37:2, 37:11
Streetsboro's
22:5
subpoena
1:16, 8:14,
8:19
subscribed
3:19
subsequent
14:4, 28:23,
40:11
subsequently
19:7, 25:23,
31:10
suggest
29:12
Suite 2:9,
2:14
sum 19:10
supplemental
12:2, 18:19,
39:4, 39:6
Susan 2:17
suspect
26:24,
26:25, 31:11
sworn 5:4,
44:8
system 23:11

**T**

taken 1:13,
3:6, 3:10,
5:18, 43:11,
43:12
taking 43:9
Tanielle
1:7, 5:17,
14:21,
19:23,
20:20, 21:3,
23:2, 23:4,
23:9, 23:14,
23:17, 26:4,
28:15,
30:24,
36:10,
40:20,
40:25, 41:17
Taylor

32:22, 33:7,
33:17, 34:4,
39:9, 39:18
Taylor's
33:3, 33:19
telephone
25:24, 27:9,
27:20
teletype
9:17, 9:21,
12:19, 26:6,
26:20,
27:20,
27:21,
28:25, 40:14
terms 18:2
testified
32:9
testify 5:4,
40:18, 44:8
testimony
32:16, 43:8,
43:10,
43:11, 44:10
testing 15:9
Thank 15:4,
32:11, 40:3,
41:8
there's
13:7, 17:2,
22:2, 27:18
therein 1:16
thereupon
3:16
They're 39:1
thing 6:16,
18:1, 31:20
third 17:23
Thirty-five
7:1
title/subject
38:16
today's 23:5
Tonya 9:24,
10:1, 10:10,
11:11,
11:21, 14:7,
16:2, 18:5,
19:7, 19:14,
19:22,
20:13,
20:22,
20:23,
21:10,
22:11, 23:1,
23:20, 24:1,
24:6, 24:9,
26:5, 27:17,
30:9, 30:14,
30:21, 34:4
Tonya's
10:18
total 19:10,
28:20
touch 18:5
Tracy 23:19,
24:5, 24:14,
24:18,
24:21, 25:3,
25:9, 25:11,
25:14, 34:8
training
7:14, 7:20,
8:3, 8:5,

16:5, 16:8
transaction
22:24
transcribed
3:12
transcript
3:14, 6:20,
26:22, 42:7,
42:11, 43:8
transcription
3:13
Traylor
9:25, 10:1,
10:10,
11:11,
11:22, 14:7,
16:3, 16:16,
16:21, 18:5,
18:12, 19:7,
19:14,
19:22,
19:25,
20:14,
20:22,
20:24,
21:11,
22:12, 23:2,
23:20, 24:1,
24:6, 26:5,
29:2, 29:14,
29:23,
29:24,
30:14,
30:17,
30:21, 34:5,
34:6, 36:21,
40:13
Traylor's
24:9, 27:17,
30:9, 34:17,
41:18
trooper
13:3, 13:6,
13:6, 13:7,
13:8, 13:9,
13:13, 17:3,
17:8, 27:4,
27:5, 27:6,
27:14,
27:24, 28:3,
28:14, 32:8,
38:19
Troy 15:24
true 13:19,
36:14, 43:8
truth 5:4,
5:5, 5:5,
44:9, 44:9,
44:9
turn 15:2
type 37:3

**U**

uh-huh 6:18
unauthorized
11:22, 12:1,
33:8
understand
5:23, 6:2,
6:4, 32:16,
36:17
understanding
18:11,

20:23, 27:7,
33:19, 36:9
United 1:1,
1:19, 5:14
upon 13:10
usages 31:4
uses 28:22,
32:24
using 19:3,
33:6, 34:17

**V**

various
33:1, 33:6,
35:6
vehicle 16:1
verbally
6:17
verify 35:1
version 8:17
via 25:23
victim 9:4,
9:21, 16:2,
21:10, 26:4,
28:2, 34:4,
37:1
victim's
31:20, 37:22
vis-a-vis
26:18

**W**

wait 6:20
waive 42:10,
42:13
waived 3:15,
42:15, 44:12
wanted
19:21, 31:12
wanting
27:15
we'll 26:22,
29:23
we're 38:10,
42:4
weeks 16:12,
16:13
welcome
26:20
West 2:4
Western 1:2,
1:20, 2:18,
5:15, 5:20
what's 8:12,
29:18
whatever
21:3, 22:20
whenever
14:23,
23:21, 30:7
WHEREOF
44:19
whereupon
5:1, 8:11,
8:22, 42:5
whether
23:10, 33:5,
39:18, 39:21
whole 5:4,
44:9
wilson
17:14,

17:24, 17:24
wish 6:21
within 1:14,
3:11, 21:16,
21:20, 39:2,
44:6
within-named
44:7
witness
3:19, 3:19,
42:13,
44:11, 44:19
witness's
3:14
written
3:18, 10:11,
10:13,
10:18,
18:25,
19:18,
19:25, 44:10

**Y**

Yeah 8:20,
13:8
yet 27:10
young 35:15
Youngstown
44:20
yours 38:20
yourself
31:15, 33:13