1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
   TANIELLE SHURNEY,                          :
3          Plaintiff                          :
                                              :
4          v.                                 : Case No. 05-196 Erie
                                              :
5  SCOTT'S ECONO INN, INC.,                   :
   SCOTT'S SPLASH LAGOON, INC.;               :
6                                             :
   SEAN PIERCE, INDIVIDUALLY AND IN           :
7  HIS CAPACITY AS A TROOPER OF THE           :
   PENNSYLVANIA STATE POLICE;                 :
8                                             :
   JOHN DOE, INDIVIDUALLY AND IN HIS          :
9  CAPACITY AS THE SUPERVISOR OF              :
   TROOPER SEAN PIERCE OF THE                 :
10 PENNSYLVANIA STATE POLICE,                 :
           Defendants                         :
11

12

13

14

15          Deposition of SEAN PIERCE, taken before

16      and by Sondra A. Black, Notary Public in and for

17      the Commonwealth of Pennsylvania, on Tuesday,

18      February 21, 2006, commencing at 9:29 a.m., at the

19      offices of A.J. Adams, 602 West Ninth Street,

20      Erie, Pennsylvania 16502.

21

22

23

24                    Reported by Sondra A. Black
25              Ferguson & Holdnack Reporting, Inc.

1                          A P P E R A N C E S

2

3      For the Plaintiff:

4          A.J. Adams, Esquire
           602 West Ninth Street
5          Erie, PA 16502

6      For Scott's Econo Inn, Inc.:

7          Gerald J. Hutton, Esquire
           Bashline & Hutton
8          One Oliver Plaza
           Suite 3500
9          210 Sixth Avenue
           Pittsburgh, PA 15222
10

       For Scott's Splash Lagoon, Inc.:
11
           Gary D. Bax, Esquire
12         Murphy Taylor, LLC
           900 State Street, Suite 202
13         Erie, PA 16501

14     For Sean Pierce and the Pennsylvania State Police:

15         Susan Malone, Esquire
           Office of Attorney General
16         Fifth Floor, Manor Complex
           564 Forbes Avenue
17         Pittsburgh, PA 15219

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    SEAN PIERCE

4        Direct Examination by Mr. Adams........................5

5        Cross-Examination by Mr. Bax..........................37

6        Cross-Examination by Mr. Hutton.......................48

7        Cross-Examination by Ms. Malone.......................58

8        Redirect Examination by Mr. Adams.....................60

9        Recross-Examination by Mr. Hutton.....................64

10

11   EXHIBITS

12       Pierce Deposition Exhibit No. 1.......................43

13

14

15

16

17

18

19

20

21

22

23

24

25

1    S E A N  P I E R C E, first having been

2    duly sworn, testified as follows:

3

4    MR. BAX:  We can all agree that this is a discovery

5    deposition conducted pursuant to the Federal Rules

6    of Civil Procedure, and also the local rules of

7    procedure to the Western District of Pennsylvania

8    for the lawsuit commenced in the United States

9    District Court by Tanielle Shurney against Scott

10   Enterprises, et al., at Docket No. 05 CV 196.

11       My name is Gary Bax, and I represent Scott's

12   Splash Lagoon, Incorporated, and I guess other

13   counsel will be identifying themselves.  But for

14   this deposition, and for all of the depositions

15   today, including the deposition of Patty Purchase

16   and Tanielle Shurney, can we agree that objections,

17   except as to the form of the question, are reserved

18   until time of trial?

19   MR. ADAMS:  Yes.

20   MR. BAX:  That's it for me.

21   MR. HUTTON:  My name is Jerry Hutton, I represent

22   Scott's Econo Lodge, the Defendant in this case.

23   MR. ADAMS:  I'm A.J. Adams, and I, obviously,

24   represent the Plaintiff, Tanielle Shurney.

25

<pre>
 1                         DIRECT EXAMINATION

 2    BY MR. ADAMS:

 3

 4        Q.    Trooper Pierce, could you state your full name,

 5    please.

 6        A.    My name is Trooper Sean Pierce, S-E-A-N,

 7    P-I-E-R-C-E.

 8        Q.    How long have you been employed as a member of the

 9    Pennsylvania State Police?

10        A.    As of today, approximately two years.

11        Q.    And prior to working with the Pennsylvania State

12    Police do you have any other law enforcement experience?

13        A.    No.

14        Q.    So this incident that occurred July 3rd of 2004, you

15    had been, then --

16        A.    I was still on coach training.

17        Q.    You were still on coach training.  And who was your

18    supervisor?

19        A.    My coach?

20        Q.    Or coach, I should say.

21        A.    Trooper Szymanski, S-Z-Y-M-A-N-S-K-I.

22        Q.    Now, when is the first notice that you received of

23    any issue involving the apparent use of a stolen debit card

24    involving the Econo Lodge?

25        A.    Scope message was sent.
</pre>

1      Q.    When was the scope message sent to you?

2      A.    It wasn't sent to me specifically.  It was sent to

3  the barracks.

4      Q.    And I'm assuming that there was an officer by the

5  name of -- what's that officer's name.

6            MR. HUTTON:  Hurley.

7      Q.    Officer Hurley of the, I believe it's the Statesboro

8  or Stonesboro Police Department --

9      A.    Streetsboro.

10     Q.    Is that correct?

11     A.    Who was involved in the message?

12     Q.    Yes.

13     A.    Yes.

14     Q.    And was he the author of the scope message that was

15  sent?

16     A.    I have no idea.

17     Q.    What was your indication as to what the scope

18  message indicated?

19     A.    I didn't read the scope message prior to shift.

20  Basically said that they were looking at somebody coming into

21  the Econo Lodge.

22     Q.    Was that person given a name?

23     A.    Tanielle Shurney.

24     Q.    What was your understanding, separate and apart from

25  the scope message, as to what was going on with that credit

1    card situation?  Or was your information limited to what was

2    in the scope message?

3         A.   I didn't read the scope message prior to shift.  So

4    it was basically -- I think it was brought up in roll call

5    maybe.  I was working first shift at the time, and it was, I

6    don't want to say the luck of the draw, but depending on

7    which zone or trooper was working that zone at the time of

8    the check-in, that's who would have been responding.

9         Q.   So as soon as Ms. Shurney was to check in, Econo

10   Lodge was to notify the State Police; is that your

11   understanding?

12        A.   Correct.

13             MR. HUTTON:  Objection to form.

14        Q.   You said correct to that?

15        A.   Correct.

16        Q.   What is the basis of that knowledge?

17        A.   I'm sorry?

18        Q.   How do you know that Econo Lodge was supposed to

19   contact you when Ms. Shurney arrived at the hotel?

20        A.   I just think I heard it in roll call.  I didn't get

21   a chance to read the scope message prior to shift.

22        Q.   So then, was your coach with you in your State

23   Police vehicle for purposes of your shift?

24        A.   Yes.

25        Q.   So at what time, approximately, did you receive

1   notice that Ms. Shurney had checked into the hotel?

2       A.   Without looking at the incident memo right now, I

3   don't know right now.  I know it was towards the end of

4   shift.

5       Q.   What shift were you working?

6       A.   First shift.

7       Q.   What is first shift?

8       A.   It depends.  It could be 6:00 to 2:00, 7:00 to 3:00,

9   or 8:00 to 4:00.

10      Q.   So it was sometime during the end of your first

11  shift?

12      A.   Correct.

13      Q.   What was the message that was received by you?

14      A.   We were just dispatched to the Econo Lodge.

15      Q.   Now, was this from the dispatcher at the

16  Pennsylvania State Police telling you to go to the Econo

17  Lodge?

18      A.   Correct.

19      Q.   What exactly did the dispatcher tell you?  If you

20  can recall.

21      A.   Just to -- we were dispatched to the Econo Lodge.  I

22  can't remember exactly what was said on the radio.

23      Q.   But when you got that dispatch, were you made aware

24  of the fact that this was the same situation that was decided

25  at roll call where Ms. Shurney would be at least questioned

1    regarding this incident?

2        A.    I guess I assumed.

3        Q.    So they didn't say specifically that you were going

4    there on the Tanielle Shurney matter, but because you just

5    learned about it at roll call you guessed that was what was

6    going on?

7        A.    I can't say that.  That's what they -- they

8    dispatched us to the Econo Lodge, I do remember that.  As far

9    as specifically saying for what, I don't know.  They just

10   tell us, go to the Econo Lodge and speak to whatever clerk at

11   the desk.

12       Q.    Now, how many State Police vehicles arrived on

13   scene?

14       A.    Just one.

15       Q.    And you're sure there was only one vehicle?

16       A.    Positive.

17       Q.    And in that one vehicle your coach and yourself --

18   were you driving the vehicle?

19       A.    Yes.

20       Q.    Now, on the way over to the Econo Lodge, did you and

21   your coach discuss what you were going to do when you got

22   there?

23       A.    No.

24       Q.    Did anybody decide who was going to lead the

25   investigation?

1     A.   As the -- as the, I guess, the student -- I guess it

2   was assumed that I lead the investigation, and he just looks

3   over my shoulder during that period.

4     Q.   Did you ask him any questions prior to arriving at

5   the Econo Lodge as to how you might better conduct the

6   investigation?

7     A.   I don't think so because I think we were up at

8   Robison Road and Peach.  So we were there already.  I don't

9   usually ask until we go in and see what's at hand before

10   questioning starts coming out.

11     Q.   Were you at another call or were you just on patrol?

12     A.   On patrol.

13     Q.   So it didn't take you too long to arrive at the

14   parking lot?

15     A.   Hum-um.

16     Q.   When you arrived at the parking lot, what were your

17   first observations?

18     A.   Just pulled into the Econo Lodge and we walked

19   inside.

20     Q.   When you walked inside, do you remember who you

21   spoke to?

22     A.   I spoke with one of the clerks at the desk.  I can't

23   remember which one.

24     Q.   Could her name have been Patty O. Purchase?

25     A.   No.

 1      Q.   Based upon the conversation you had with that clerk,

 2   what's the next thing that you did?

 3      A.   I just got --

 4           MR. HUTTON:  Object to the form of that question.

 5           Because it assumes that he's asking -- on what

 6           information he received from the clerk.  That's the

 7           problem with that question.

 8           MR. ADAMS:  I understand.

 9      Q.   Did you, in fact, have a conversation with the clerk

10   at the Econo Lodge?

11      A.   Yes.

12      Q.   Did you do anything pursuant to that conversation?

13           MR. BAX:  I'm going to object to the form of that

14           question also.

15           MR. HUTTON:  Renew my objection to the form.

16      Q.   You can answer the question.

17      A.   I don't understand.

18      Q.   You did have a conversation with someone at the

19   Econo Lodge, correct?

20      A.   Yes.

21      Q.   And as a result of that conversation, did you do

22   something?

23           MR. HUTTON:  I'm going to object to the question.

24           There's no foundation.  If he doesn't remember what

25           the information was, you're assuming then he acted

1          on that.  That's inappropriate.

2      Q.   You can answer the question if you understand the

3  question.

4      A.   It seems to me like it's an open-ended question.

5      Q.   Okay.  What's the next thing that you did after you

6  talked to the clerk at the Econo Lodge?

7      A.   I spoke with Tanielle Shurney.

8      Q.   And where did you speak with Ms. Shurney at?

9      A.   Inside the -- the front space of the hotel.

10     Q.   Where you --

11     A.   Inside the hotel, in the lobby.

12     Q.   By the check-in area?

13     A.   Yeah, approximately.  Not right at the counter, no.

14     Q.   How did you know it was Tanielle Shurney?

15     A.   They pointed her out to me.

16     Q.   When you approached Tanielle Shurney, who was she

17 with?

18     A.   No.  I -- I -- strike that.  She wasn't at the hotel

19 at the time.  She was outside by the vehicle.  She wasn't

20 inside at the time because they pointed to her out in the

21 parking lot.

22     Q.   How long did you speak with the clerk in the Econo

23 Lodge before you went outside to confront Ms. Shurney?

24     A.   I stayed in once they identified her.  Trooper

25 Szymanski went out and, I guess, kept them from leaving the

1    parking lot so we could further the investigation.

2         Q.    When you were inside the Econo Lodge, did you obtain

3    any documentation, for example, the copy of the driver's

4    license that Ms. Shurney provided and her signature on the

5    registration card?

6         A.    Yes.

7         Q.    And you did that prior to going back out into the

8    parking lot, correct?

9         A.    Yes.

10        Q.    And at that time you learned that Ms. Shurney lived

11   somewhere in Cleveland, Ohio?

12        A.    Correct.

13        Q.    And when she had come to the hotel she, in fact,

14   provided that driver's license and signed what turns out to

15   be her real name?

16        A.    Correct.

17        Q.    When you went back, then, out into the parking lot,

18   did you have any conversation with Ms. Shurney there?

19        A.    I don't know if I spoke with her or I spoke with my

20   coach.

21        Q.    What did you and your coach talk about?

22        A.    What was provided to me inside, the information I

23   obtained from the clerks, and -- because Ms. Purchase also

24   came over at that time, I spoke with her, and explained to

25   him what we had, and he proceeded to handcuff Ms. Shurney.

1      Q.   "He" you're referring to?

2      A.   Trooper Szymanski.

3      Q.   So what was the sum total of your investigation

4  regarding this incident?

5      A.   I believe it was like --

6          MR. BAX:  I'm going to object to the question.  You

7          can answer.

8          MR. HUTTON:  I'll join in that objection.

9      Q.   Go ahead.

10     A.   190 maybe.  Something like that, I believe.  $190.

11     Q.   No.  What did you do -- after you went out into the

12  parking lot and you saw Trooper Szymanski handcuff

13  Ms. Shurney, what's the next thing that you did?

14     A.   I just -- I guess I further gathered the information

15  I needed, the information I was provided by the Econo Lodge,

16  and that's all I remember after that.

17     Q.   What information did you obtain from the Econo

18  Lodge?

19     A.   Just the documentation you just explained.

20     Q.   And that documentation again being a copy of her

21  driver's license and a copy of her registration where she

22  signed her name as Tanielle Shurney?

23     A.   Correct.

24     Q.   Did you happen to see any other individuals that

25  would have appeared to be in Ms. Shurney's party --

1    A.   Yes.

2    Q.   -- when you went to the parking lot?  Who were

3    there -- strike that.  How many people did you see?

4    A.   I know it was two.  I know they were adults, a male

5    adult and a female, I don't know how old, I assume they were

6    over 16, and then a couple kids.

7    Q.   Do you recall how many vehicles were in the Shurney

8    party?

9    A.   I believe two.

10   Q.   Now, after Ms. Shurney was handcuffed, she was

11   placed in the cruiser -- the State Police vehicle; is that

12   correct?

13   A.   Correct.

14   Q.   Did you have any conversations with any of the other

15   adults or children that were part of the Shurney party before

16   Ms. Shurney was transported away from the scene?

17   A.   Yes.

18   Q.   What was that conversation?

19   A.   It was just a female adult, she asked me what was

20   the steps that we were taking next, and we got her phone

21   number information regarding contact information for us.

22   Q.   Do you remember that person's name?

23   A.   No.

24   Q.   It wasn't Tracey Smith, correct?

25   A.   No.

1          Q.    So then you and your coach and Ms. Shurney left the

2    scene.   Where was your destination from Econo Lodge then?

3          A.    The barracks.

4          Q.    I'm assuming that you went immediately to the

5    barracks, you weren't stopped for another call?

6          A.    Correct.

7          Q.    Did you have any conversations with Ms. Shurney in

8    the vehicle while you were en route to the barracks?

9          A.    No.   I don't speak.

10         Q.    At any point in time was Ms. Shurney Mirandised

11   either by you or Trooper Szymanski?

12         A.    She was at the barracks.

13         Q.    At the barracks.   Okay.   Now, when you got to the

14   barracks, who participated in the statement taking of

15   Ms. Shurney?

16         A.    It was myself, and there was another trooper there.

17   Unfortunately, Trooper Szymanski had a class reunion, and he

18   had left immediately after shift.   So I was there along with

19   the assistance of the incoming troopers, I guess.

20         Q.    So you basically led the interrogation of

21   Ms. Shurney with the assistance of somebody that was coming

22   onto the second shift?

23         A.    Correct.

24         Q.    I'm assuming this took place in the interrogation

25   room of the barracks -- was this Girard or Lawrence Park?

16

1      A.   Erie, Lawrence Park.  And the assisting trooper,

2    it's Trooper Carrie Bailey.

3      Q.   Now, did Ms. Shurney sign a Miranda Rights Waiver?

4      A.   Yes.

5      Q.   And as a result of -- after signing the Miranda

6    Rights Waiver, what did she indicate as to what happened

7    regarding this case?

8      A.   She said she showed up at the Econo Lodge to stay

9    the night, I guess they were in town on vacation purposes or

10   for the evening anyway, and they were going to go use --

11   specifically for the Splash Lagoon.

12     Q.   Did you question her regarding how the room was

13   going to be paid?

14     A.   She told me that the room was reserved by a Tracey

15   Smith.

16     Q.   Did she indicate that Tracey Smith was her cousin?

17     A.   She said it was her sister at first.

18     Q.   And then she said cousin after?

19     A.   I don't remember her saying cousin.  She told me,

20   specifically, it was my sister, and then further on she said,

21   well, she's really not my sister, but we're so close I call

22   her my sister.

23     Q.   Having been to your barracks before on criminal

24   cases, was this the interrogation room where the video

25   cameras are set up?

1     A.   No.

2     Q.   Where was this one?

3     A.   In the patrol room.

4     Q.   Where the kitchen is?

5     A.   No.  That's the canteen area.

6     Q.   I know what you're talking about.  So there was no

7  video or audio?

8     A.   No.

9     Q.   Now, other than indicating that her sister made the

10  reservation, what else did Ms. Shurney indicate during the

11  course of the interview?

12     A.   That's it.  She kept telling me that it was this

13  Tracey Smith that did it.  She gave me her address, couldn't

14  give me a phone number to Tracey Smith.

15     Q.   Do you happen to recall what address she gave for

16  Tracey Smith?

17     A.   No.  It's in my report.  It's in Cleveland.

18     Q.   But she didn't know the phone number?

19     A.   No.

20     Q.   Now, was there any reason to disbelieve Ms. Shurney

21  regarding the fact that Tracey Smith made the reservation?

22     A.   I guess I can't believe everybody that I arrest.

23     Q.   Prior to doing the interview did you do an NCIC on

24  Ms. Shurney to see if there's any outstanding warrants, for

25  example?

1      A.   Yes.

2      Q.   Was there any outstanding warrants?

3      A.   No.

4      Q.   Did you also check NCIC to see if she had a prior

5  record?

6      A.   Yes.

7      Q.   And she had no prior record, correct?

8      A.   I don't believe so.  I believe she did.

9      Q.   In fact, she had probably indicated during the

10  course of the interview she had never been arrested before.

11  Do you recall that?

12      A.   I believe she said that.

13      Q.   So after saying she had never been arrested before,

14  using her own identification, citing her own name, and

15  indicating that Tracey Smith was the person responsible, what

16  led you to file the Criminal Complaint in this matter --

17          MR. HUTTON:  Objection to form.

18      Q.   -- against Tanielle Shurney?  And you can answer the

19  question.

20      A.   I was told to.

21      Q.   Who were you told to do it by?

22      A.   Well, my coach said she's under arrest for Theft by

23  Deception, Access Device Fraud, so I filed the charges

24  accordingly.

25      Q.   So did you get the impression from Trooper Szymanski

1      that he interviewed Ms. Shurney before you got out to the

2      parking lot?

3              MS. MALONE:  I'll object to the form of that

4              question.

5      A.   I don't know.

6              MS. MALONE:  Did he get the impression that the

7              coach interviewed her?

8      Q.   Did you have a conversation with Trooper Szymanski

9      about what Trooper Szymanski may have asked Ms. Shurney

10     prior to being handcuffed?

11     A.   No.

12     Q.   You said that she was not Mirandised at the scene.

13     A.   Correct.

14     Q.   Is it your understanding that Trooper Szymanski

15     simply handcuffed her without interviewing Ms. Shurney?

16     A.   He handcuffed her after I told him what we had as

17     far as the information was concerned.

18     Q.   So you went into the Econo Lodge, got the

19     information from the clerk, you told Trooper Szymanski,

20     Trooper Szymanski then cuffed Ms. Shurney?

21     A.   I came out, I said, this is what we have.  He said,

22     well, she's under arrest for Theft by Deception.  I

23     specifically remember him saying that.  And at that time he

24     handcuffed her.

25     Q.   And then, everything else that happened that we just

1    talked about in the deposition leading up to you filing the

2    criminal charges in this case?

3        A.   Um-hum.

4        Q.   Now, what is the process at PSP for you to file the

5    criminal complaint as a -- are you a probationary trooper at

6    that point?  Is that what it's called?

7        A.   Yes.  Well, irregardless, I still have the powers of

8    arrest.  I'm on coach pupil, but as far as "filing charges,"

9    I don't know what you mean by that.

10        Q.   By drafting the complaint, going out to the

11    arraignment.

12        A.   Yeah.  That's totally my responsibility.

13        Q.   Isn't there someone that supervises after you draft

14    the complaint to make sure the complaint is okay before you

15    take somebody to arraignment?

16        A.   No.

17        Q.   You don't show what you typed to anybody else?

18        A.   Usually on coach, yeah, I show what I have.  That

19    way, you know, it eliminates errors when you go to the DJ

20    office.

21        Q.   But you didn't get to do that because Trooper

22    Szymanski --

23        A.   Like I said, Trooper Carrie Bailey was --

24        Q.   Helping you?

25        A.   Correct.

1        Q.   But Trooper Szymanski had to go to his class

2   reunion?

3        A.   Right.  He was gone for the day.

4        Q.   So how did you produce the Criminal Complaint

5   against Ms. Shurney?  How is it actually typed up?

6        A.   On a computer.

7        Q.   You did that for yourself?

8        A.   Correct.

9        Q.   How did you decide which charges to file?

10        A.   The charges I was instructed to file.

11        Q.   And that was done while you were in the cruiser with

12   Trooper Szymanski --

13        A.   Um-hum.

14        Q.   -- prior to interviewing Ms. Shurney at the

15   barracks?

16        A.   Based upon the information that we had at hand.

17        Q.   Okay.  The information --

18        A.   Those were the charges we were going for.

19        Q.   So Econo Lodge gave you information, you gave the

20   information to Trooper Szymanski, Trooper Szymanski from that

21   then concluded what charges you should file?

22        A.   I guess you could say he helped me narrow it down.

23        Q.   And he helped you narrow it down to the point where

24   you chose those two particular statutes and charged

25   Ms. Shurney in that regard?

1    A.   Correct.

2    Q.   Now, you transport Ms. Shurney to District Justice

3  Abate's for arraignment?

4    A.   No.

5    Q.   Where did Ms. Shurney go next after the Pennsylvania

6  State Police Barracks?

7    A.   To the DJ's office.

8    Q.   What DJ's office did she go to?

9    A.   Frank Abate.  It was after hours, he was the

10  on-call.

11    Q.   So you had to drive out to North East?

12    A.   I didn't, no.

13    Q.   So you did not go to the arraignment?

14    A.   No.

15    Q.   You had the Complaint -- you typed up the Complaint,

16  correct?

17    A.   Um-hum.

18    Q.   And you signed the Complaint in the barracks?

19    A.   Um-hum.

20    Q.   And then you handed the signed Complaint to who to

21  process with the district justice?

22    A.   The only person I know in transport at the time, and

23  she's the one who supplemented my report, was Trooper Linda

24  Martin.

25    Q.   So Trooper Martin then, as far as you know, took

1    Tanielle out to the district justice for purposes of

2    arraignment?

3        A.    No.  She did take her out there.

4        Q.    You know that for a fact?

5        A.    Um-hum.

6        Q.    Now, did you make a decision as to whether or not

7    you were going to charge this case via warrant or via

8    summons?  Did that cross your mind at all?

9        A.    I don't understand that.

10       Q.    Do you agree with me that you would have been able

11   to charge Ms. Shurney via summons in this case as opposed to

12   having her arraigned on an arrest warrant?

13       A.    Correct.

14       Q.    And why did you decide not to charge her via

15   summons?

16       A.    Because if you look at the charges that were, I

17   guess, charged against Ms. Shurney, I can't remember the

18   gradings of the offense, but I believe one was an M1 offense,

19   and Rule 519 of the Crimes Code, being an M2 or less, if it's

20   Commonwealth citizen, it is under my discretion whether or

21   not -- I guess I call it a catch and release, catch them, do

22   the interview, do the arrest, and I can release and file

23   charges later if I assume they're going to appear at the

24   trial.  But Ms. Shurney, being an out-of-state resident, and

25   it being an M1 offense, she had to be arraigned.

1      Q.   Did you ask Ms. Shurney's permission to check her

2   belongings, that is her purse, for perhaps the stolen credit

3   card?

4      A.   No.  We typically look for any weapons, to pull

5   stuff like that.

6      Q.   Did you say, we would like your permission to search

7   your purse?

8      A.   I never asked her to look through her purse for the

9   stolen credit card.

10     Q.   When she's processed at the State Police Barracks

11  under arrest you can obviously make an inventory search of

12  her purse.  Was that done?

13     A.   Not under those circumstances, no.

14     Q.   Are you saying that the purse was not searched?

15     A.   It might have been looked through for weapons,

16  knives, contraband, stuff like that.  But as far as doing a

17  detailed inventory search, no.

18     Q.   Prior to making the decision to charge, did you

19  think it may be relevant to see whether she had in her

20  physical possession the alleged stolen debit card?

21     A.   She said she didn't have the card.

22     Q.   And you just took her face value for that?

23     A.   I guess, due to a lack of experience, I didn't look

24  at it any further.

25     Q.   What exactly could you observe -- what evidence did

1    you have before you that led you to believe that Ms. Shurney

2    had done anything criminally wrong?

3        A.    I wouldn't say that it led me to believe, but it led

4    my coach to believe that she did something wrong.

5        Q.    Obviously, before you affix your name on a criminal

6    complaint you understand that you have the responsibility to

7    affirm that the facts contained therein are true to the best

8    of your knowledge, information, and belief, correct?

9        A.    And they were.

10       Q.    So based upon that, what evidence did you have,

11   specifically, that would lead you to believe that Ms. Shurney

12   did anything wrong?

13       A.    Like I said, due to the fact that the -- I guess

14   limited time on my job, my coach at the time -- I thought at

15   the time I did have significant evidence against Ms. Shurney,

16   I guess not to just say that she was not guilty of the

17   charges that I had filed against the district justice -- or

18   in front of the district justice anyway.

19       Q.    But isn't it safe to say, and correct me if I'm

20   wrong, that the only information that your coach had was the

21   information that you provided your coach from the Econo Lodge

22   when you walked out into the parking lot?

23       A.    Yeah.

24           MR. HUTTON:  Objection to that.

25           MR. BAX:  Objection.

1          MR. HUTTON:  The record starts with Streetsboro

2          police, not with Econo Lodge.

3          MR. BAX:  Same objection.

4     Q.   But the information that you provided to Trooper

5 Szymanski was the information that you received from the

6 Econo Lodge, correct?

7     A.   Correct.

8     Q.   To the best of your knowledge, did Trooper Szymanski

9 indicate to you, in supplement of those facts, that he had

10 information outside of what Econo Lodge had told you?

11     A.   I -- you --

12     Q.   You told Trooper Szymanski various facts that you

13 learned at the Econo Lodge, and then, did Trooper Szymanski,

14 upon hearing that, supplement what you learned from Econo

15 Lodge by saying I also know that -- some fact that tends to

16 show Ms. Shurney is guilty of something?

17     A.   I can't recall that.  I mean, I don't recall him

18 stating that to me, no.

19     Q.   And, in fact, he did not handcuff or place her under

20 arrest until you recited the information you learned from the

21 Econo Lodge clerk?

22     A.   I wouldn't say that I recited the information I got.

23 I said, that, you know, based upon the information that I

24 had, the documents in hand, yes.

25     Q.   What exactly did you tell your coach, then, when you

1    got out in the parking lot?

2        A.    To the best of my knowledge, I asked him -- well, I

3    didn't ask him.  I told him the circumstances, she came in,

4    we obviously knew at that time, once they identified her as

5    Tanielle Shurney, that the credit card was stolen,

6    Ms. Purchase showed up saying that the room and all the -- I

7    guess every time somebody calls into the Econo Lodge they

8    annotate the comments.  I can't confirm or deny that.  But

9    she's the one who basically had the sole representation of

10    checking in, is room available, and everything was attached

11    to Tanielle Shurney's name.

12        Q.    Just going around the table here, for example, if

13    you were called to the hotel and it turned out that I

14    appeared and I provided my driver's license and signature,

15    and it was learned that there was, perhaps, a stolen credit

16    card or debit card used, are you indicating that you would

17    have arrested me?

18        A.    Well, you're asking me two years --

19              MR. BAX:  Object to the form.

20              MS. MALONE:  I object to the form of that question.

21        A.    Can I answer that?

22        Q.    Yes.

23        A.    You're asking me two years after the fact.  If you

24    were to ask me when I had less than 30 to 60 days on that

25    job, I can answer that question differently.

1    Q.    So I guess you've learned that, perhaps now that

2    you're more experienced as a State Police Officer, you may

3    have not arrested at that time, you might have just kept it

4    open for investigation?

5    A.    I wouldn't say that, no.

6    Q.    Then why do you feel that Ms. Shurney did anything

7    wrong that justified you swearing that, in fact, she

8    committed criminal offenses?

9    A.    Inexperience.

10    Q.    Okay.

11    A.    I mean, I don't understand the question.

12    Q.    Okay.

13    A.    I'm telling you that I was on a second coach, I

14    relayed the information from what I had at hand to my coach.

15    My coach said, this is what she's guilty of.  I said, okay.

16    He arrested her, and we brought her to the station.  As --

17    since I'm the --

18    Q.    Affiant?

19    A.    Right -- or the student, I'm the one who types the

20    charges, they get reviewed, yes, and they get filed.

21    Q.    Now, you said they get reviewed.  Who did they get

22    reviewed by?

23    A.    At the time, it was probably Trooper Bailey.

24    Q.    Because I thought I might have asked you that

25    question before, and maybe you misunderstood me, the charges

1    were, then -- after you typed up the charges, somebody

2    reviewed them?

3        A.    Right.  Yeah, last time I stated that it gets

4    reviewed for error because I was on coach.

5        Q.    So somebody did, in fact, then review your Complaint

6    after you signed and swore to it, and then said, okay,

7    Trooper Martin, go transport this woman for arraignment?

8        A.    Yes.  The corporal told her to transport.  I don't

9    tell the troopers to do anything.

10       Q.    Do you know who the corporal is?

11       A.    At the time I believe it was Corporal Normandy that

12   was on the -- I don't know.  It was shift change, so I think

13   there was three troopers -- three corporals in the office.  I

14   know Corporal Normandy specifically was there.  Whether or

15   not he was first or second shift corporal, I can't tell you.

16       Q.    Now that charges are filed, what's the next step you

17   take in the investigation?

18       A.    I wait for the preliminary hearing.

19       Q.    Do you do anything at all or do you receive any

20   information from any source prior to the preliminary hearing?

21       A.    The only other information I try to confirm is the

22   information that Ms. Shurney gave me as far as this Tracey

23   Smith individual.

24       Q.    Okay.  Now, the preliminary hearing was conducted

25   out at District Justice Dwyer's office, correct?

1       A.    Um-hum.

2       Q.    What witnesses, if any, did you decide to subpoena

3    for purposes of this preliminary hearing?

4       A.    I believe it was Econo Lodge.  I think Ms. Purchase

5    showed up.

6       Q.    Did you make any attempts at locating Ms. Tracey

7    Smith?

8       A.    Yeah.  There was -- I could not -- all I had was

9    Tracey Smith and an address.  Might have well just been John

10   Doe and an address.  I called Cleveland police, I gave him

11   the address, and they query that address to that house, they

12   don't have any Tracey Smith registered to that house, and

13   they hadn't had any incidents at that residence that would

14   allow them to check reports as to identify people associated

15   with that residence.

16      Q.    Is that the sum total of investigative time that you

17   put into trying to locate Tracey Smith?

18      A.    Yes.

19      Q.    Other than that, did you take any other steps to

20   confirm any other evidence that could be used at the

21   preliminary hearing against Ms. Shurney?  For example,

22   contacting the credit card company, contacting the owner of

23   the debit card?

24      A.    I didn't feel it was necessary.

25      Q.    Now, we get to the preliminary hearing.

1      A.    Um-hum.

2      Q.    And do you recall the preliminary hearing?

3      A.    Um-hum.

4      Q.    Do you agree with me that at the preliminary hearing

5   District Justice Dwyer dismissed the charges for basically

6   lack of evidence?

7      A.    Correct.

8      Q.    At that point in time do you recall having a

9   conversation with me regarding whether or not you had ever

10  been sued before?

11     A.    No.

12     Q.    Have you ever been -- just in terms of your law

13  enforcement aspect, not in terms of your personal life, have

14  you ever been a party to any civil litigation?  Have you ever

15  been sued?

16     A.    No.

17     Q.    Has there been any complaints filed against you by

18  any citizens regarding your conduct as a State Trooper

19  regarding anything?

20     A.    No.

21     Q.    So did you receive any disciplinary proceedings

22  regarding this particular case in that the charges were

23  dismissed at the preliminary hearing?

24     A.    No.

25     Q.    Subsequent to District Justice Dwyer's dismissal of

1    the charges at the preliminary hearing, did you decide to

2    conduct a further investigation to see if you could obtain

3    additional information with an eye toward refiling the

4    charges?

5        A.   I spoke with Corporal Pulson in crime.  He said I

6    could continue with the investigation.

7        Q.   What did you do to continue with the investigation?

8        A.   I tried to pursue the fact of the whole Tracey Smith

9    issue, but I could not find Tracey Smith.

10        Q.   Now, did you contact the reservation center at Econo

11    Lodge to get the phone number that was being used to reserve

12    under the name of Tanielle Shurney?

13            MR. BAX:  Object to the form of the question.

14            Assumes facts not in evidence.

15        Q.   Go ahead.  If you can answer.

16        A.   I don't recall.  There was a number provided, yes.

17        Q.   Did you call that number?

18        A.   I can't recall if I did or not.

19        Q.   Chances are, if you were looking for Tracey Smith

20    and that was the number given, you probably would have called

21    that number?

22        A.   Probably, yes.

23        Q.   Did you also learn that that debit card was also

24    used for four other transactions involving the acquisition of

25    clothing and cable television services?

1       A.    No.  I didn't have that information.

2       Q.    As of today did you know that information?

3       A.    No.

4       Q.    Other than, again, trying to locate Tracey Smith,

5    did you take any other steps, after the charges were

6    dismissed, in furtherance of the investigation?

7       A.    No.  I guess without the -- no, I didn't.

8       Q.    Did you fax any information to Cleveland PD or the

9    Ohio State Police regarding the possibility of locating this

10   Tracey Smith?

11      A.    I faxed the information to the Streetsboro Police,

12   Mr. Hurley, and he told me that basically his investigation

13   was concluded, and that was it.

14      Q.    So as of today's date, then, you have no knowledge

15   or evidence linking Ms. Shurney to any of the two crimes that

16   were charged --

17      A.    Other than the --

18            MS. MALONE:  Object to the form of the question.

19            MR. HUTTON:  Objection.

20            MS. MALONE:  Did you say he had no evidence linking

21            her to the crime?

22            MR. ADAMS:  Yes.  As of today's date.

23            MS. MALONE:  No other evidence, other than what was

24            in the Complaint?  I don't understand the question.

25      Q.    What evidence, if any, do you have as of today's

1    date linking Ms. Shurney to the two crimes that were charged

2    against her?

3            MR. HUTTON:  Object to the form.

4        Q.   You can answer.

5        A.   Other than the fact that she showed up to, I

6    guess -- I guess, for lack of a better way of saying it,

7    obtain the services from the use of the stolen credit card at

8    the Econo Lodge.

9        Q.   You would agree with me that she obviously would

10    have made your job easier in the investigation by providing

11    her name and her photo identification if, in fact, she was

12    responsible criminally for anything down the line?

13            MR. BAX:  I object to the form of the question.

14        A.   Who?  Ms. Shurney?

15        Q.   Right.

16        A.   As far as helping my investigation?

17        Q.   Right.

18        A.   She helped my investigation to the fact that she

19    identified herself, correct.

20        Q.   And, obviously, you would agree that Econo Lodge, or

21    Splash Lagoon, were not out anything from the standpoint that

22    nobody in the Shurney party spent the night, utilized the

23    Splash Lagoon, or any of the services of the hotel?

24            MR. HUTTON:  I'm going to object to the question.

25            MR. BAX:  Object to the form of the question.

1          MR. HUTTON:  Misstates evidence.

2      Q.   You can answer the question.  If you understood what

3   we just said.

4      A.   You're asking if they obtained services rendered, I

5   guess?

6      Q.   Right.

7      A.   I don't think so.

8      Q.   Did that play into your decision whether to charge

9   or not?  The fact that actually at that point no services had

10  been rendered.

11         MR. BAX:  I'm objecting to the form of the

12         question.  It assumes facts not in evidence.

13         MR. HUTTON:  I'm going to object to it, too,

14         because it assumes that there was no loss.  There's

15         only so many rooms, and you can only reserve so

16         many facilities.

17     Q.   You can answer the question.

18     A.   Well, I guess I'll give you an example.  Retail

19  theft, if somebody tries to leave the store, they don't get

20  the goods, I'm still arresting them for retail theft.

21         MR. ADAMS:  I got you.

22              I have no further questions of this witness.

23

24

25

1                           CROSS-EXAMINATION

2    BY MR. BAX:

3

4         Q.   Trooper Pierce, my name is Gary Bax, and I represent

5    Scott's Splash Lagoon.  I'm an attorney.  I don't want you to

6    guess about anything or speculate about anything, but answer

7    the questions based on your own personal knowledge.  Okay?

8         A.   Okay.

9         Q.   Just a little background for you first of all.  How

10   old are you?

11        A.   I'm 28.

12        Q.   Are you a high school graduate?

13        A.   Correct.

14        Q.   From what high school did you graduate?

15        A.   Iroquois.

16        Q.   So you're right next to the Lawrence Park Barracks.

17        A.   Correct.

18        Q.   Did you have any education, any schooling beyond

19   high school?

20        A.   College courses through Marine Corp.  I went to

21   Gannon for a year prior to being picked up on the job.

22        Q.   Do you have military service?

23        A.   Yes.

24        Q.   What's the military service?

25        A.   Infantry service in the Marine Corp. in California.

1    Q.    What was your rank in the Marine Corp.?

2    A.    Sergeant.

3    Q.    Were you discharged from the Marine Corp.?

4    A.    Correct.

5    Q.    When were you discharged?  Approximately.

6    A.    September 22nd of 1999 -- no.  I'm sorry.  It would

7  have been July -- July something of '99.

8    Q.    You received an honorable discharge?

9    A.    Correct.

10    Q.    And you're a graduate of the Pennsylvania State

11  Police Academy?

12    A.    Correct.

13    Q.    When did you graduate from the Academy?

14    A.    End of April of 2003.  The year --

15    Q.    2003 or 2004?

16    A.    2004, yeah.

17    Q.    At the time of the arrest of July 3, 2004, was your

18  only posting a posting to the Lawrence Park Barracks?

19    A.    Correct.

20    Q.    What was your duty assignment at the time of the

21  arrest?  Was it a highway patrol-duty assignment or how would

22  you characterize that?

23    A.    Trooper.

24    Q.    Were you assigned to any particular division?

25    A.    Patrol.

1      Q.    Prior to you being assigned to the patrol division,
2  had you been assigned to any other divisions?
3      A.    No.
4      Q.    What is a scope message?
5      A.    Scope message is similar to like a -- from my
6  understanding, because I don't work desk that often, it's
7  basically a BOLO, be on the look out, this is what we have,
8  this might be coming your way, information as such, and any
9  other pertinent information or detailed facts they might
10 have.
11     Q.    So when you described the scope message early in
12 your testimony today, you were describing a message from the
13 Streetsboro Police Department, an Officer Hurley, to the
14 Pennsylvania State Police; is that correct?
15     A.    It's from the Streetsboro Police Department.  He
16 might have been dictating to an individual as far as what to
17 write, but it's from Streetsboro, I guess authorized by
18 officer Hurley, sent to PSP Erie.
19     Q.    Did the scope message contain information that a
20 woman named Tonya Traylor had reported an unauthorized use of
21 her debit card?
22     A.    I can't say yes or no to that.  I know it's -- it
23 said something about a stolen credit card.  I can't testify
24 as to what exactly the scope message specifically said
25 anyways.  It did indicate that they -- Tanielle Shurney, you

39

1    know, Econo Lodge, and stolen credit card for use, reserved.

2         Q.    Prior to the arrest of Tanielle Shurney did you have

3    any telephone conversation with Patty Purchase?

4         A.    No.  Because, like I said, it was basically the --

5    whoever -- whenever Tanielle Shurney showed up at the Econo

6    Lodge is basically the trooper going to be assigned at the

7    time.  So you can't dictate to a specific car for an incident

8    because -- for those reasons we could have been tied up on an

9    incident.

10        Q.    With regard to the time of the arrest of Tanielle

11   Shurney and thereafter until you had completed your business

12   with her that day, did she ever make any complaints to you of

13   any physical injury or not?

14        A.    As far as -- what do you mean physical injury?

15        Q.    Did she have any complains of any physical injury?

16        A.    No.

17        Q.    Did she have any complaint of sickness or illness?

18        A.    No.

19        Q.    Did she have any complaint of emotional distress?

20        A.    No.

21        Q.    What was the length of the first shift?  When did

22   that begin, and when did that end?  And if you can't

23   recall --

24        A.    Let me see.  The incident came in at 13:57, so we

25   had to have been 7:00 to 3:00 car.  Because if we were 6:00

1    to 2:00, then they would have sent somebody else.

2         Q.    So first shift, to the best of your knowledge, was

3    7:00 a.m. to 3:00 p.m.?

4         A.    For myself in particular, yes.

5         Q.    What was the time of the arrest?  And you can

6    approximate if you don't recall specifically.

7         A.    13:57.

8         Q.    Was it your understanding, at the time of the

9    arrest, that Tanielle Shurney had arrived at Econo Lodge to

10   claim a reservation that was placed through the use of a

11   stolen or fraudulently obtained debit card number or credit

12   card number?

13        A.    Yes.

14             MR. ADAMS:  Objection to the form of the question.

15             MR. BAX:  What's wrong with the question?

16             MR. ADAMS:  The fact that it presumes that she knew

17             the card was stolen.

18        Q.    Was there a transcribed statement made of the

19   interrogation of Tanielle Shurney at the Pennsylvania State

20   Police Barracks?

21        A.    As far as her writing a statement?

22        Q.    As far as her writing a statement or having a

23   stenographer present.

24        A.    No.

25             MR. BAX:  Off the record.

1          (Discussion held off the record.)

2      Q.   Did you interview any of the other persons who

3  appeared to be with Tanielle Shurney?

4      A.   Unfortunately not.

5      Q.   Would you agree that the basis for proceeding with

6  the arrest of Tanielle Shurney was the scope message received

7  from the Streetsboro, Ohio Police Department?

8      A.   Would I say that's the basis for my arrest?

9      Q.   Yes.

10     A.   No.

11     Q.   What was the basis for your arrest?

12     A.   The information, like I said, I had at hand.

13  Ms. Shurney came to the Econo Lodge, the room was reserved on

14  a stolen credit card, Ms. Shurney signed for the room to

15  render services with that credit card, and like I said,

16  that's the basis of my arrest.

17     Q.   And the basis for your understanding that a stolen

18  credit card was used was the scope message from Ohio; would

19  that be correct?

20     A.   Correct.  And then, later on, the Econo Lodge

21  advised us as such, too.

22          MR. BAX:  Off the record for a minute.

23          (Discussion held off the record.)

24     Q.   Trooper, I'm asking you to take a look at what we

25  marked as Pierce Exhibit 1.  And if you could just identify

1   this group exhibit -- just identify the individual documents

2   that are in the exhibit.  On the face of it we have an

3   incident report; is that correct?

4           (Pierce Deposition Exhibit No. 1 marked for

5            identification.)

6       A.  Yes.

7       Q.  Is that incident report authored by you?

8       A.  Yes.

9       Q.  Is the narrative authored by you in Block 93?

10      A.  Yes.

11      Q.  When did you complete that incident report?

12      A.  It says the report was submitted on 07/05.  Two days

13  after the incident.

14      Q.  Is it correct that, with regard to the information

15  in the narrative, you had that information at the time of the

16  arrest?

17      A.  In regards to what information?

18      Q.  In the narrative.

19      A.  You're saying everything that's in the narrative is

20  everything I had at the time?

21      Q.  Yes.

22      A.  No.

23      Q.  What did you know at the time of the arrest with

24  reference to the narrative?

25      A.  With reference to this or with reference to the

1    information at hand?  Do you want me to dictate off --

2        Q.    No.  I want you to look at the narrative and tell me

3    what you had knowledge of at the time of the arrest and what

4    you subsequently learned.

5        A.    I see.

6            MS. MALONE:  Do you understand the question?

7            THE WITNESS:  He wants me to look over my narrative

8            and basically say this is what I had prior to

9            arrest.

10           MS. MALONE: This is what you had, right.

11       A.    Well, I had the information in regards to it was a

12   stolen credit card and the MasterCard number.  I guess

13   essential reservation, which would come from the Econo Lodge.

14   I guess that's what -- who takes the reservation, I'm not

15   sure.  I had notification from the Streetsboro Police

16   Department that Ms. Tanielle Shurney is going to be showing

17   up at the Econo Lodge and for the investigation.  The

18   information that was brought over to the Econo Lodge from

19   the Splash RV reservation -- or the central reservation

20   place.

21           The other documentation, as far as the signing for

22   the room and the other information provided by the hotel as

23   far as identification purposes of Ms. Shurney.  It says right

24   here, Ms. Emery -- I believe she was the counter attendant at

25   the time that Ms. Shurney arrived, and she was the one at the

1    time that advised me that -- or informed me of Ms. Shurney,

2    and she was the one who signed for the room.  And I believe

3    that's it.

4        Q.   The third page of that group exhibit, that's also --

5    actually, why don't you just tell me how many of the pages of

6    this incident report constitute the incident report.

7        A.   All the way back until Page -- I believe, Page 6.

8        Q.   Page 7, can you identify that document.

9        A.   That's the -- it's the signature of Tanielle

10   Shurney.

11       Q.   On the Rights Warning and Waiver?

12       A.   It's Rights and Warning, correct.

13       Q.   That's where she waived her right to remain silent?

14       A.   Right to counsel, correct.

15       Q.   Right to counsel.  What's the next page?

16       A.   It's just stuff we have to give as far as victim --

17   I don't know who's signature that is.  That might be

18   Ms. Purchase's signature, in regards to, this is the

19   incident, the incident number, my name is Trooper Pierce,

20   I'll be handling the information, yada, yada, yada, and they

21   sign for this, and this is basically saying they receive that

22   booklet.

23       Q.   The next page, the public information police report,

24   what is that?

25       A.   Every time there's an incident we have to put up a

1    news release.

2         Q.    The next page appears to be a Pennsylvania State

3    Police investigative report transmittal sheet.  What is that?

4         A.    This is the sheet that was sent to Mr. Hurley in

5    regards to this investigation.

6         Q.    Was anything sent along with the transmittal sheet?

7         A.    A copy of the report we just went over.

8         Q.    Did you also send a copy of the Criminal Complaint?

9         A.    I don't believe I had that ready at the time, no.

10        Q.    And the next document, which at the bottom says,

11   "Page 11 of 12," what is that?

12        A.    That's the start of the Criminal Complaint.

13        Q.    Did you author the Criminal Complaint?

14        A.    Yes.

15        Q.    Let's go ahead to the fax sheet from Streetsboro

16   Police Department.  Can you identify what that is.

17        A.    I imagine it's the fax transmittal form.

18        Q.    And then we have the Streetsboro Police Department,

19   Uniform Incident/Offense Report.  Did that also come from the

20   Pennsylvania State Police records?

21        A.    I've never seen that.  This is the first time I've

22   seen this.

23        Q.    Does that comprise all of the documents in this

24   exhibit then?

25        A.    I believe, yes.  Something's messed up here.

1              MS. MALONE:  I think there's some duplicates at the

2              end of the police report.

3              THE WITNESS:  It's just a copy of the Page 1 again?

4              MS. MALONE:  Right.  And then there is this one

5              other message in there.

6              MR. BAX:  Off the record for a minute.

7              (Discussion held off the record.)

8         Q.    With regard to Page 11 of 16, can you identify what

9    that document is.

10        A.    It says it's a message routed.  It says, "The PA

11   State Police, Trooper Pierce, P-I-R-C-E," I guess that's

12   me -- I don't know what this is.  It's not the scope message

13   that I was describing.

14        Q.    You can't identify this document then?

15        A.    No.  Like I've said, everything after the Criminal

16   Complaint -- everything up to this page and behind I have not

17   seen.

18        Q.    Okay.

19        A.    Except for the duplicate Page 1 attached to the back

20   for some reason.

21             MR. BAX:  Those are all the questions I have for

22             you.  Thanks.

23             MR. HUTTON:  Good morning.  Do you want to take a

24             break?

25             THE WITNESS:  Yeah.

1          (Pause in the proceedings.)

2

3                    CROSS-EXAMINATION

4    BY MR. HUTTON:

5

6        Q.    Morning, Trooper.  My name is Jerry Hutton.  I

7    represent Scott's Econo Lodge.  I don't want to go over

8    what's already been said, but was it your understanding,

9    before Ms. Shurney was arrested, that, in fact, a credit card

10   had been improperly accessed?

11       A.    Correct.

12       Q.    And is it your understanding that the improper

13   access of the credit card by an individual who has no

14   authorization to use it constitutes a criminal offense with

15   the Commonwealth of Pennsylvania?

16       A.    Yes.

17       Q.    Was it your understanding that the use of this

18   particular credit card to make a reservation at the Econo

19   Lodge is indicia of a criminal offense occurring within the

20   Commonwealth of Pennsylvania?

21       A.    What's indicia mean?

22       Q.    Part of.  Indicates.

23       A.    Yes.

24       Q.    So you believed, from the information you received,

25   that a crime had occurred at the Econo Lodge; would that be

1    fair?  The improper use of a credit card?

2        A.   Yes.

3        Q.   And that first information you got about that

4    criminal activity was from the Streetsboro Police Department,

5    who had dispatched the scope message?

6        A.   Correct.

7        Q.   And your involvement became as part of your duties

8    as a patrol trooper; is that right?

9        A.   Correct.

10       Q.   A state patrol trooper at the time?

11       A.   Correct.

12       Q.   When you arrived at the Econo Lodge, did you have

13   the understanding that the -- I guess it was a MasterCard

14   account according to these police records from the

15   Pennsylvania State Police, had been used to make a

16   reservation?

17       A.   Yes.

18       Q.   And was it your understanding, and do you have

19   reasonable belief, that it was Tanielle Shurney who had made

20   that reservation to use the facilities at the Scott's Econo

21   Lodge that weekend in July of 2004?

22       A.   Yes.

23       Q.   And based on that information, did you reasonably

24   believe, sir, that Ms. Shurney had committed the crimes as

25   listed in the Criminal Affidavit that you signed, Theft by

1    Deception and Access Device Fraud, as of the time that you

2    signed the Affidavit?

3        A.    Yes.

4        Q.    And that's the reason that the arrest and

5    prosecution followed?

6        A.    Yes.

7        Q.    Now, you said you got some information from the

8    Econo Lodge.

9        A.    Um-hum.

10       Q.    And that information was that there was a

11   reservation, that Ms. Shurney appeared for the reservation,

12   and that the individual that they pointed out in the parking

13   lot was, in fact, Ms. Shurney, and then you got, I think,

14   license and reservation documents; would that be fair?

15       A.    Yes.

16       Q.    Anything else that you can think of?

17       A.    The only other thing I can think of, like I said,

18   was the central reservation -- or Econo Lodge, they keep

19   track of if somebody calls in, yada, yada, yada, and

20   apparently Tanielle Shurney did call in to check and make --

21   to confirm the reservation.

22       Q.    Did you get the information that the credit card had

23   been, I guess, illegally and improperly accessed from the

24   Streetsboro Police Department, and that was from the scopes

25   message?