1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

TANIELLE SHURNEY,                    :
3          Plaintiff                 :
                                     :
4          v.                        : Case No. 05-196 Erie
                                     :
5   SCOTT'S ECONO INN, INC.,         :
    SCOTT'S SPLASH LAGOON, INC.;     :
6                                    :
    SEAN PIERCE, INDIVIDUALLY AND IN :
7   HIS CAPACITY AS A TROOPER OF THE :
    PENNSYLVANIA STATE POLICE;       :
8                                    :
    JOHN DOE, INDIVIDUALLY AND IN HIS:
9   CAPACITY AS THE SUPERVISOR OF    :
    TROOPER SEAN PIERCE OF THE       :
10  PENNSYLVANIA STATE POLICE,       :
            Defendants               :

11

12

13

14

15         Deposition of PATRICIA PURCHASE, taken before

16      and by Sondra A. Black, Notary Public in and for

17      the Commonwealth of Pennsylvania, on Tuesday,

18      February 21, 2006, commencing at 11:02 a.m., at the

19      offices of A.J. Adams, 602 West Ninth Street,

20      Erie, Pennsylvania 16502.

21

22

23

24
                    Reported by Sondra A. Black
25            Ferguson & Holdnack Reporting, Inc.

```
 1                         A P P E A R A N C E S

 2

 3      For the Plaintiff:

 4          A.J. Adams, Esquire
            602 West Ninth Street
 5          Erie, PA 16502

 6      For Scott's Econo Inn, Inc.:

 7          Gerald J. Hutton, Esquire
            Bashline & Hutton
 8          One Oliver Plaza
            Suite 3500
 9          210 Sixth Avenue
            Pittsburgh, PA 15222
10
        For Scott's Splash Lagoon, Inc.:
11
            Gary D. Bax, Esquire
12          Murphy Taylor, LLC
            900 State Street, Suite 202
13          Erie, PA 16501

14      For Sean Pierce and the Pennsylvania State Police:

15          Susan Malone, Esquire
            Office of Attorney General
16          Fifth Floor, Manor Complex
            564 Forbes Avenue
17          Pittsburgh, PA 15219

18

19

20

21

22

23

24

25
```

1                            I N D E X

2

3    PATRICIA PURCHASE

4        Direct Examination by Mr. Adams.........................5

5        Cross-Examination by Mr. Hutton.......................37

6        Redirect Examination by Mr. Adams.....................44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         P A T R I C I A  P U R C H A S E, first having

2         been duly sworn, testified as follows:

3

4         MR. BAX:  For the record, my name is Gary Bax, and

5         I represent Scott's Splash Lagoon, Inc. and

6         Patricia Purchase.

7            This is a discovery deposition that was

8         requested by Plaintiff, Tanielle Shurney's counsel.

9         It's conducted pursuant to the Federal Rules of

10       Civil Procedure, and also the local rules of The

11       Western District of Pennsylvania for the lawsuit

12       commenced in the United States District Court by

13       Tanielle Shurney against Scott Enterprises, et al.,

14       at Docket No. 05 CV 196.

15           And as previously stated for the deposition of

16       Trooper Pierce, all counsel agreed that for the

17       three depositions that we're taking today that we

18       will reserve all objections, except as to the form

19       of the question, until the time of trial.

20           With that being the ground rules, you can

21       identify yourself and Mr. Adams can examine you.

22       THE WITNESS:  I'm Patricia Orlando Purchase.

23

24

25

```
 1                          DIRECT EXAMINATION

 2   BY MR. ADAMS:

 3

 4      Q.   Ms. Purchase, where do you reside?

 5      A.   818 Cherry, second floor.  Right around the corner.

 6      Q.   How were you employed in 2004?

 7      A.   2004, I worked for a division of Scott Enterprises,

 8   as the manager of the reservation center for Splash Lagoon.

 9      Q.   How long had you worked in that capacity?

10      A.   It'll be three years this June.

11      Q.   So you started in June of '03?

12      A.   Correct.

13      Q.   Now, can you briefly explain what the reservations

14   center does.

15      A.   We are an inbound call center, they -- the guest

16   will make their reservation with us, providing us with name,

17   address, phone number, probably e-mail, credit card

18   information, and we are predeposit so we charge a credit card

19   at the time of reservation.

20      Q.   What do you mean "predeposit"?

21      A.   Meaning, we do not hold the room.  We are not a

22   hotel, we are a reservation center.  A hotel may put it on a

23   6:00 or 4:00 hold, whereas we are predeposit.  Like most

24   water parks are in the industry, we charge your card when you

25   call us.
```

1      Q.    To your knowledge, is that something that's sort of

2    separate and apart for your industry as opposed to the

3    general hotel trade?

4      A.    I can't answer that.  I really can't.  Because a lot

5    of places, like even Peek 'N Peak, are going to charge your

6    credit card.  They're going to predeposit, they want their

7    funds.

8      Q.    Now, prior to this incident that occurred around the

9    4th of July weekend 2004, did you know Tanielle Shurney?

10     A.    No.

11     Q.    Did you ever meet her?

12     A.    Not that I'm aware of, no, sir.

13     Q.    So have you ever seen Tanielle Shurney in person?

14     A.    Only in the back of the squad car when I walked from

15   my office over to Econo Lodge.

16     Q.    Did you have any conversation with her --

17     A.    No.

18     Q.    -- in the back of the squad car?

19     A.    No.

20     Q.    Could you overhear her taking to anybody from the

21   squad car?

22     A.    No.  She was sitting alone in the squad card.

23     Q.    So you didn't hear her voice when it was outside?

24     A.    No.

25     Q.    And you didn't hear her voice when she was in the

1    Econo Lodge?

2        A.    No.  I was called after the fact.

3        Q.    So it's safe to say that you don't know what

4    Tanielle Shurney's voice sounds like?

5        A.    No.  I'm not --

6              MR. BAX:  I'm going to object to the form of the

7              question.

8        Q.    Now, obviously, in your interoffice memo, dated

9    August 16, 2005, you make reference, I believe, to

10   individuals that had contacted you regarding this particular

11   reservation; is that correct?

12       A.    Yes.

13       Q.    And you would agree with me that, at least based

14   upon your memo, various female voices were used in order to

15   secure this reservation; is that a fair statement?

16             MR. BAX:  I'm going to object to the form of the

17             question.

18       A.    I don't know.

19             MR. BAX:  When you say "various female voices" --

20             MR. ADAMS:  Let me try to rephrase it.  I'll

21             withdraw the question and try to rephrase it more

22             accurate.

23       Q.    Do you recall how many female voices were utilized

24   in order to obtain or to make inquiries regarding the

25   reservation for this particular weekend?

1        MR. BAX:  I'm just going to object to the form of

2        the question again.

3   Q.   You can answer.

4        MR. BAX:  Let me just give you the basis of my

5        objection.  The question is ambiguous, and --

6        MR. HUTTON:  It's confusing.

7        MR. BAX:  -- may call for information beyond what

8        this witness has personal direct knowledge of.  If

9        you're asking her how many persons or how many

10       voices did she hear, that's one thing, but that's

11       not clear.  If you're asking her to summarize the

12       reservation history, that's something different,

13       and I don't understand your question.

14       MR. HUTTON:  I join, too.

15  Q.   When is the first contact you had by anybody

16  regarding this particular reservation?

17  A.   When it was brought to my attention from the water

18  park that this was a stolen credit card.  That's how I

19  knew --

20  Q.   Okay.

21  A.   -- that there was involvement.

22  Q.   Now, what communication did you receive from the

23  water park indicating that the reservation was with a stolen

24  credit card?

25  A.   My memo states that a woman by the name of Kim from

1    the water park called the reservation center and made

2    statements because she had received a call from Tonya

3    Traylor, and the woman was concerned, because although we're

4    listed as Splash Lagoon, Inc., when you're charged, there's

5    also Splash Lagoon the water park itself.  So there was

6    confusion for Tonya as to where did the charge come from,

7    physically.

8        Q.    Now, can you explain, when somebody telephones a

9    reservation, exactly how does the reservation clerk

10   memorialize the reservation for purposes of a credit card

11   number specifically?

12       A.    Sure.  They have to repeat back the information.

13   They repeat back your address, your phone number, and also,

14   the credit card given.  They go over the numbers.  We also

15   now take the last three digits on the back of the card.

16   That's a new procedure just because of the fees associated

17   with, you know, charging a credit card.  It also lessens our

18   fees when we take that number.  It's a new procedure with

19   Discover, things like that.  It came up in the last year.

20       Q.    Okay.  So when this reservation for that 4th of July

21   weekend came in, you received the name of the person for the

22   reservation, correct?

23       A.    Yes.

24       Q.    You received the address of the person for the

25   reservation?

1       A.    Um-hum.

2       Q.    I'm assuming some telephone numbers that you might

3   contact if Splash Lagoon burned down or something to cancel?

4       A.    Right.

5       Q.    And the credit card information?

6       A.    Right.

7       Q.    And then that's put on a form of some sort?

8       A.    It's into our computer which has printable forms,

9   yes.

10      Q.    Did you print out a form of that reservation?

11      A.    If it's made within a week's time frame, we might

12  print a folio and fax the hotel.  That way they have the

13  information to put into the system.  Our system is not linked

14  to any of our hotels.

15      Q.    So your current computer system would have on it the

16  information of the name, the address, and the phone numbers

17  as of today's date?

18      A.    Yes.  I --

19            MR. BAX:  If you --

20      A.    Yes.

21      Q.    So we could obtain that information by you accessing

22  the computer?

23            MR. BAX:  I believe I've produced that to you.

24            MR. ADAMS:  Okay.  Is this in the packet?  Your

25            initial disclosures, Mr. Bax?

10

1          THE WITNESS:  That would say who did it, and this

2          is all the notes.  Everything that goes to the

3          hotel.

4          MR. BAX:  It's three pages.

5      Q.   So when the initial call was made, do you know what

6   date it was to make the reservation?  And go ahead and look

7   at the report?

8      A.   Sure.  It shows June 25th, and since this was a

9   reservation for the holiday weekend, of course we'd want to

10  keep our hotels updated with any new reservations.

11     Q.   Is there -- okay.  I see it.  The address and

12  telephone number.

13     A.   Right.

14     Q.   That was provided?

15     A.   Yes.  That's what was provided.

16     Q.   And so, that information, is that gleaned from your

17  phone or is that gleaned from the person calling you on the

18  phone?

19     A.   No.  The person has to give us that.  We don't have

20  caller ID.

21     Q.   So the person that called on that first day, which

22  was June the 25th, correct?

23     A.   Correct.

24     Q.   Indicated that the -- the name of the reservation is

25  to be Tanielle Shurney, and that the arrival date is the 3rd,

1   they're leaving on the 4th, and that the address is 13411

2   East Sixth Street, East Cleveland, Ohio 44112; is that

3   correct?

4        A.   Right.

5        Q.   And to the best of your knowledge, do you know whose

6   address that is?

7        A.   No.  I wouldn't -- I would have no knowledge.

8        Q.   Now, the telephone number that was provided,

9   216-323-6004 -- do you see that phone number?

10       A.   Yes.

11       Q.   I think you've already indicated, but that would be

12   a phone number that would be provided by the person who's on

13   the phone with you; is that correct?

14       A.   Right.  I didn't make the reservation, so it was

15   provided to Kristen.

16       Q.   Right.  Kristen is the one that took down that

17   information?

18       A.   Right.

19       Q.   By policy, Kristen would have double-checked the

20   credit card number with the person who made the call?

21       A.   Yes.  Absolutely.  It's our procedure.

22       Q.   At least based upon the June 25, 2004 telephone

23   call, it is entirely possible that a person other than

24   Tanielle Shurney could have been that person on the phone

25   providing Kristen with that information?

1       MR. HUTTON:  Object to the form.

2       MR. BAX:  I'm going to object to the form of the

3       question.  It calls for speculation.  I'm not going

4       to let her give you an answer based on speculation.

5   Q.  You can answer the question.

6       MR. BAX:  No.

7       MR. HUTTON:  No.  No.  He objects.

8       MR. BAX:  I'm not going to allow her to answer

9       hypothetical questions for you.  She's a fact

10      witness.  She's not an expert witness, she's a fact

11      witness, and she can answer fact questions.

12  Q.  Well, based upon the policy that you have at the

13  reservation center, would you agree with me that a person

14  could assume somebody's identity and then call you on the

15  phone and provide that information?

16      MR. BAX:  I'm going to object to that.  That's

17      calling for speculation.  It assumes facts not in

18      evidence.

19  Q.  Is there anything in the system that would prevent

20  me from calling that number and indicating my name is Gary

21  Bax and I reside at a certain address?

22  A.  No.

23  Q.  Now, what was the second reference to that

24  reservation?

25  A.  I don't understand.

1      Q.    My indication is that the reservation was made June

2   25th, that Kristen received the reservation, and took down

3   the information involving Ms. Shurney's name and address.

4   What was the second contact --

5      A.    Actually, the second contact was noted here in the

6   special notes when the cousin would have called back with the

7   credit card information.

8      Q.    Now, what day was that?

9      A.    Same day.  Because everything was finalized with the

10  reserved time.  It's reserved once everything is finalized.

11     Q.    So a second person -- now, are you saying that there

12  was a second telephone call made?

13     A.    Yes.  Tanielle Shurney called back --

14     Q.    Hold on for a second.  I know you're assuming that

15  the person identified herself as Tanielle Shurney.

16     A.    Yes.  I believe Kristen's memo indicates the cousin

17  got on the phone, and we have Tracey Smith's name next to

18  this credit card in my system, I could print it, and that's

19  the name that, you know, was given.

20     Q.    And I'm sorry if I got somewhat confused here.

21  Didn't you say that somebody took the phone from somebody?

22     A.    I believe Kristen indicates that the cousin got on

23  the phone.  Is that not on there?  Or the cousin called in.

24         MR. HUTTON:  Maybe we could look at your note and

25         see what you said.

1        Q.   Right.  Why don't you look at your note and see if
2   you can refresh your recollection.
3        A.   She had a call back, she didn't own a credit card.
4   Tanielle Shurney, yeah, put her cousin, Tracey Smith, on the
5   phone, and Tracey Smith gave the credit card information.
6             MR. BAX:  Just for the record, you're referring to
7             the Kristen Mooney written statement?
8             THE WITNESS:  Right.
9        Q.   And we're still talking about the first contact with
10  the reservation center; is that correct?
11       A.   That would be the second phone call.  Tanielle
12  called back, got Kristen specific -- asked for her because
13  she did ask for Kristen's name, and then they completed the
14  transaction when Tracey gave the credit card number.
15       Q.   So it's your understanding, then, that based on the
16  first conversation there wasn't a credit card available to
17  make the reservation?
18       A.   Right.
19       Q.   And so, how much time transpired, if you know, from
20  the first call where there wasn't credit card information to
21  the second call where there was credit card information?
22       A.   I can't recall something like that.  I mean, we can
23  get up to a thousand calls a day.  I don't know that sort of
24  thing.
25       Q.   Do you believe it was that day?

1    A.    Absolutely.  Because we don't hold reservations.

2    Q.    So sometime during that given day, which was --

3    A.    Kristen was my night shift, so --

4    Q.    June 25th --

5          MR. BAX:  Let's take a break for just a minute.  No

6          questions pending, right?

7          MR. ADAMS:  Go ahead.

8          MR. BAX:  Is there a question pending that you want

9          answered or not?

10         MR. ADAMS:  You can go ahead.

11         (Pause in the proceedings.)

12         MR. BAX:  We can go back on the record.

13   Q.    I believe that we were back talking about the first

14   contact, June 25, 2004, involving the clerk Kristen, and by

15   way of background, it was my understanding that after Kristen

16   received the first telephone conversation regarding the

17   reservation that there was not credit card information

18   available and a second call had to be made; is that a correct

19   statement?

20   A.    Yes.

21   Q.    Do you have any idea as to how much time transpired

22   from the time of the first to the second call?

23   A.    No.

24   Q.    You indicated that Kristen was your night clerk and

25   that this reservation was made on June 25th.  Does that

1    assist you in giving us an hourly range?  That is, when her

2    shift would have ended in relation to June 25th for purposes

3    of the second phone call's timing.

4        A.   No.

5        Q.   Now, based upon your information, what was the

6    substance of the second phone call?

7        A.   To complete the transaction.

8             MR. BAX:  I'm just going to object to the form of

9             the question.  Your questions all infer that

10            Ms. Purchase was the person who took the call or

11            who made the reservation, and she's told you that

12            that is not, in fact, the case.

13       Q.   Clearly now indicating on the record that Kristen

14   was the person that took both of the first telephone

15   conversations, what is your understanding of what happened

16   during this second conversation?

17       A.   Kristen completed the reservation.

18       Q.   And during the course of that second phone

19   conversation, would you agree that supposedly a Tanielle

20   Shurney handed the phone to a second party who, in fact, then

21   provided credit card information?

22       A.   I only know that information from Kristen's

23   statement.

24       Q.   Right.  And what was the name of that person who

25   supposedly provided the credit card information?

1      A.   Tracey Smith.

2      Q.   Now, when that credit card information was provided,

3   how is it recorded?  How do you write down the number?

4      A.   We don't write anything down.  We type it into our

5   system.

6      Q.   And obviously -- no.  Strike that.  Do you have

7   something in your system that red flags when a credit card is

8   reported stolen and then somebody calls your reservation

9   center and makes a reservation?

10     A.   Yes.  It would give us a message.  Because it goes

11  through a system electronically.

12     Q.   So on June 25, 2004, when the reservation was made,

13  was there a red flag that the card that was used was stolen?

14          MR. HUTTON:  Objection to the form.  That was

15          reported as stolen.

16     Q.   Reported as stolen?

17     A.   What question am I answering now?

18     Q.   Was there, in fact, when that second call was made

19  and that reservation number was given, that is the credit

20  card number was given, did a red flag go up indicating that

21  the credit card was reported stolen?

22     A.   I don't know.  I didn't make the reservation.

23     Q.   Is there anything in your report?

24     A.   The reservation would not be completed without the

25  deposit.  So, no, there was no red flag.

1      Q.   Now, what is the next contact that the reservation

2  center would have had with regard to this particular

3  reservation?

4      A.   It would be the 30th -- June 30th.

5      Q.   What was the sum and substance of that?

6      A.   Kim called from Splash Lagoon to indicate a woman by

7  the name of Tonya Traylor wanted to know why her credit card

8  was charged for $198.79.  That's the next time that we had

9  any knowledge that we needed to look at this.

10      Q.   Now, since, obviously, the card wasn't red flagged

11  June 25th but you received a call on June 30th, I'm assuming

12  you concluded that the card was stolen sometime after the

13  25th of June?

14      A.   Don't know.

15      Q.   So what, if anything, did you do with respect to the

16  June 30th communication when Kim called from Splash Lagoon

17  indicating the credit card may be a possible stolen card?

18      A.   I believe the information was taken down and given

19  to me for a message.  I can't recall where I was exactly

20  or -- I don't know.

21      Q.   What is the procedure, then, when you receive

22  information that a reservation has possibly been reserved

23  using a stolen credit card?  What are you supposed to do?

24      A.   I don't know how to answer that.

25      Q.   Isn't there an interoffice procedure when somebody

1    says, hey, this reservation that we've already gotten now

2    turns out to be a stolen credit card?  Aren't you supposed to

3    do something?

4        A.   I wouldn't know that it was stolen unless the person

5    called me directly, or a police officer.

6        Q.   I'm not trying to confuse you here.  You seem to

7    indicate that on June the 30th you received a call from Kim

8    saying that the credit card, regarding this reservation, may

9    be a possible stolen card, correct?

10       A.   Yes.

11       Q.   When you receive that information, what are you

12   supposed to do procedurally within your corporation?  What

13   are you supposed to do?  What's the next step?

14           MR. BAX:  If you know.

15       A.   Bring it to the attention of my superior.

16       Q.   And who would that have been?

17       A.   Jeffrey Mona.

18       Q.   So did you, in fact, contact -- and is that M-O-N-A?

19       A.   M-O-N-A, yes.

20       Q.   Did you, in fact, contact Mr. Mona?

21       A.   I don't remember.

22       Q.   What do you recall doing after June the 30th next

23   regarding this?

24       A.   I know that, as Kim stated, Tonya Traylor was going

25   to contact me, and I was awaiting her call because I didn't

1    have her phone number.  She's the owner of the credit card.

2    So I was waiting.

3        Q.    And then what happened?  Did you, in fact, receive a

4    call from Ms. Traylor?

5        A.    Yes.

6        Q.    When did you receive that call?

7        A.    I believe on July 2nd.

8        Q.    And what was the sum and substance of that phone

9    call?

10       A.    She identified herself, gave me the information that

11   her credit card was used for multiple purchases, one of which

12   was Splash Lagoon, and she also indicated she filed a police

13   report or spoke with a police officer in Streetsboro, and he

14   would be calling me, she gave me his name.

15       Q.    And that was Officer Hurley, correct?

16       A.    Correct.

17       Q.    Did you contact Mr. Mona after you received this

18   information from Ms. Traylor?

19       A.    I don't recall.

20       Q.    Do you remember doing anything else, other than wait

21   for the call from Officer Hurley, regarding this situation?

22       A.    I would say everything was progressing fastly --

23   quickly.  So I was just waiting for phone calls.  There was

24   no need to make unnecessary calls until I had all the

25   information.

1      Q.    Sure.  Did you, in fact, receive a call from Officer
2  Hurley?
3      A.    Yes.
4      Q.    And what was the sum and substance of that call?
5      A.    He gave me -- he identified himself, he gave me the
6  police department he worked for, which I'm familiar with
7  Streetsboro itself, south of Cleveland, and he gave me his
8  direct telephone number.  He stated there was an
9  investigation, and he wanted any information that I had and
10  to fax him, and I did.
11      Q.    What information did you fax him?
12      A.    These items that you see here.  The -- who made it,
13  when was it made, and what are the addresses that we had on
14  it.
15      Q.    Did you fax him anything else?
16      A.    No.  I wouldn't have anything else to fax him.
17      Q.    And you didn't communicate with him in any other
18  way, other than those facsimiles?
19      A.    Right.
20      Q.    What was the next thing that happened then regarding
21  this particular reservation after you faxed the materials to
22  Officer Hurley?
23      A.    In our conversation, he said that he already spoke
24  to the Pennsylvania State Police and that he would be
25  arresting this woman when she showed up.  I don't know in

1    what manner he would be doing that.

2        Q.    By "he," you mean Officer Hurley?

3        A.    Officer Hurley, yes.

4        Q.    I see that there's some indication that he was

5    asking about the jurisdiction of where your business is

6    located.  Do you recall indicating to him that it would be

7    the Pennsylvania State Police as opposed to Millcreek PD, for

8    example?

9        A.    Right.  Because we're in Millcreek, but we also deal

10   with State Police.  If there's a fire or if there's anything,

11   State Police usually comes down the road.

12       Q.    Are you sure you're not in Summit Township?

13       A.    Maybe we're Summit.  I don't know.  I live in Erie,

14   I don't know.

15       Q.    You recall that we had the preliminary hearing

16   before District Justice Dwyer in this case?

17       A.    I was never asked to it.

18       Q.    You didn't go?

19       A.    It wasn't a matter of not going, I wasn't informed.

20       Q.    So then, after you received the indication from

21   Officer Hurley that he was going to arrest Ms. Shurney,

22   what's the next thing that happened regarding this

23   reservation?

24       A.    I don't know.  I'd have to look at this.  I spoke to

25   Econo Lodge possibly, and we all were on the same page,

1   knowing that there was an investigation, the State Police

2   were involved as well as the Streetsboro Police, and then I

3   received a call that night from a guest.

4       Q.   Who was that person?  If you know.

5       A.   She said that she was Tanielle Shurney.

6       Q.   Where did this call emanate from?

7       A.   I don't know what -- what number she called from,

8   but she called on the 2nd to verify her July 3rd reservation.

9       Q.   Was there some reason why it would have been

10  necessary to verify the July 3rd reservation since it had

11  already been approved through your system?

12      A.   I don't --

13           MR. BAX:  I'm just going to object to the form of

14           the question.  That you're asking this witness why

15           Tanielle Shurney called to confirm the reservation.

16      Q.   Is there anything in your reservation system that

17  would have required anyone to make that call to confirm the

18  reservation?

19      A.   People confirm their reservations all the time.

20      Q.   Is it necessary, in order to maintain the

21  reservation --

22      A.   No.

23      Q.   I'll have to complete the question.  Is it

24  necessary, in order to maintain the reservation, for the

25  person to confirm the reservation as was reflected in your

1    prior testimony?

2        A.   No.

3        Q.   Were you the party that received that telephone

4    call?

5        A.   Kristen received the call, and said somebody was

6    calling to verify this particular reservation.  I took the

7    call then from that point on.

8        Q.   And when you took the call from that point on, what

9    was the sum and substance of the call?

10       A.   I asked the person to identify themselves because we

11   do not discuss reservations without verification of who we're

12   speaking with.

13       Q.   What did the person say?

14       A.   She gave me the address and the telephone number,

15   and I asked her to verify the credit card used.

16       Q.   Did she give you her name?

17       A.   Yes.  She gave me her name as Tanielle Shurney, and

18   her address and phone number.

19       Q.   Then I interrupted you, I'm sorry.  What did she say

20   after that?  You said something about the credit card in use.

21       A.   Right.  I asked her to verify it because she

22   indicated that she did not want this credit card charged for

23   any other incidentals or any other reason.

24       Q.   And then what happened?

25       A.   She said it was Tracey Smith, and correctly spelled

1    Tracey on the name of the card, because there's various

2    Traceys --

3        Q.    How do you know what was the correct spelling of

4    Tracey versus what wasn't?

5        A.    Because we were given T-R-A-C-E-Y, and she verified

6    it by correctly spelling T-R-A-C-E-Y.

7        Q.    So a person who identified herself as Tanielle

8    Shurney called to confirm the reservation and to say that the

9    person responsible on the credit card was the correct

10   spelling of Tracey, T-R-A-C-E-Y, Smith; is that right?

11       A.    Right.

12       Q.    Now, did the person who identified herself as

13   Ms. Shurney also give you, again, the credit card number?

14       A.    No.

15       Q.    Was there anything else said during that

16   conversation?

17       A.    I let her know she can come at noon for her passes

18   by going to her hotel, and that was it.

19       Q.    Is it unusual, based upon all your years at the

20   reservation center, for somebody to have a reservation in

21   their name but have it paid for by a third party's credit

22   card?

23       A.    It's not unusual.

24       Q.    So you didn't think anything unusual about this

25   situation, other than the fact that there's this --

1    reportedly that this card was stolen?

2         A.   Right.

3         Q.   When Ms. Shurney, or the person identifying herself

4    as Ms. Shurney, confirmed, did you want to confront her

5    knowing that the credit card was supposedly stolen?

6         A.   No.

7         Q.   Why is that?

8         A.   Because that's not part of our procedure.  I would

9    not get in an intentional argument or embarrassing situation.

10        Q.   No.  I understand that, but, I mean, you had some

11   information leading you to believe that this reservation was

12   made with a stolen credit card when the person identifying

13   herself as Ms. Shurney calls you on the phone, correct?

14        A.   Right.

15        Q.   Is there any reason why you wouldn't say to

16   Ms. Shurney, Ms. Shurney, I'm sorry, there's a problem with

17   your reservation because we checked that credit card number

18   and the credit card number turned out to be stolen?

19             MR. BAX:  I'm going to object to the form of the

20             question.  The question assumes that Scott's

21             checked the card, and that's not this witness'

22             testimony.

23        Q.   Can you answer the question?

24        A.   I was told there was an investigation, and I'm not

25   impeding an investigation.  I would proceed as an officer

1    instructed me to.

2        Q.    So you were instructed not to confront Ms. Shurney

3    regarding the fact that this reservation was made with,

4    supposedly, a stolen credit card by Officer Hurley?

5        A.    I was instructed that there was an investigation,

6    and being intelligent, I would assume you would not impede

7    that.  You know, you can't -- I can't stop that from

8    happening.  I'm not going to interfere with an investigation.

9    If there's an investigation, the officer -- I don't

10    understand why it's not so simple.

11        Q.    So let's say I called you to make a reservation, I

12    give you a credit card number, the red flag comes up and

13    says, that's a stolen credit card number.

14        A.    If the red flag came up, I would tell you

15    immediately.  If not, then it goes on.

16        Q.    So, because you used your intuition, you did not to

17    want to impede the investigation by telling this person, hey,

18    the reservation was made supposedly with a stolen credit

19    card?

20        A.    Correct.

21        Q.    Did you say, you can check in at noon and pick up

22    your passes at that time for Splash Lagoon?

23        A.    Correct.  I let them know that.

24        Q.    Is there anything else that you said about that?

25        A.    No.

1    Q.    That was the sum total of that conversation?

2    A.    That was it.

3    Q.    That was the night before the day in question,

4    right?

5    A.    Correct.

6    Q.    Now, what is the next contact that you've had with

7    this reservation, then?

8    A.    After the State Police had arrived to Econo Lodge, I

9    was called by the manager of the Econo Lodge to come over.

10    Q.    And when you went over to the Econo Lodge, who was

11    this?

12    A.    I believe Jeffrey Mona had shown up because he was

13    around, that's my boss; police cruiser was there; and staff

14    members from the Econo Lodge were there.

15    Q.    How many cruisers were there?

16    A.    I believe one was parked under our overhang.

17    Q.    Did you stay -- strike that.  You arrived and went

18    immediately inside of the Econo Lodge?

19    A.    Yes.

20    Q.    When you got inside the Econo Lodge, what office did

21    you go to?

22    A.    I was at the front desk.

23    Q.    And who was at the front desk with you?

24    A.    My boss and the manager of the Econo Lodge.

25    Q.    That would be who?  Mr. Mona?

1    A.    Mr. Mona and Sandy Calibreeze, I think.

2    Q.    Who's your boss?

3    A.    Jeffrey Mona.

4    Q.    Who's Sandy Calibreeze?

5    A.    She's the general manager of Econo Lodge.

6    Q.    Those were the only two people that were there when

7    you arrived?

8    A.    That I recall.

9    Q.    Did you have a conversation with Mr. Mona and

10   Ms. Calibreeze about this incident?

11   A.    I asked if they were aware of everything, and they

12   indicated that they were.

13   Q.    Did you talk about anything else?

14   A.    No.

15   Q.    What were your instructions?  What were you supposed

16   to do when you got to Econo Lodge?

17        MR. BAX:  I'm just going to object to the form of

18        the question.  It assumes that she had

19        instructions.

20   Q.    Were you told to go to the Econo Lodge?

21   A.    I wasn't told I would be going to the Econo Lodge, I

22   was called there by the general manager.

23   Q.    And that's Sandy Calibreeze?

24   A.    Yes.

25   Q.    Did Sandy call you to come to deal with this

1    particular reservation or was this about something else?

2        A.    This was about this reservation.

3        Q.    Did she say anything else to you, other than come

4    over?

5        A.    No.  She just said come over.

6        Q.    So when you arrived there, Sandy Calibreeze and Jeff

7    Mona were the two people you were relating to, correct?

8        A.    Yes.

9        Q.    What did you tell those two people, if anything?

10       A.    I didn't discuss anything further with them.  I

11   mean --

12       Q.    All right.  What did Ms. Calibreeze or Mr. Mona say

13   to you?

14       A.    Nothing.  The officer then walked up -- the

15   arresting officer then walked up.

16       Q.    Officer Pierce that was here?

17       A.    Yeah.  Is that his name?

18       Q.    The record should reflect that you were here for

19   part of Officer Pierce's deposition.  You've just seen him

20   physically.

21       A.    Right.

22       Q.    So Officer Pierce then walks up to the reservation

23   area where you and Mr. Mona and Ms. Calibreeze are located,

24   correct?

25       A.    The front desk of Econo Lodge, right.

1    Q.   Front desk, I'm sorry.  And Ms. Shurney was not

2    around?

3    A.   I did not see her in the lobby, no.

4    Q.   So when Trooper Pierce then comes into the front

5    desk area, is there a conversation between you and Officer

6    Pierce -- or excuse me, Trooper Pierce, Ms. Calibreeze and

7    Mr. Mona?

8    A.   I believe he asked for signatures.  I don't

9    remember.  He had paperwork with him.

10   Q.   Would you agree that he was provided the Tanielle

11   Shurney signature on the reservation form and a Xerox copy of

12   her driver's license?

13   A.   I didn't see those things, nor would I remember.

14   It's been two years.

15   Q.   Did you do anything at all while you were there,

16   other than stand there then?

17   A.   I don't know.  I probably conversed with my boss

18   about anything else that he had to relate to me.

19   Q.   What else was Trooper Pierce saying?  If you can

20   recall.

21   A.   Don't remember.  He's -- I don't remember.  I don't

22   remember any of it.

23   Q.   Now, you said you went outside for some reason.

24   A.   Yeah.  To go back to my office.

25   Q.   So you were just in passing going out past where the

1    State Police car was located?

2        A.    In order to get into the Econo Lodge -- it was

3    parked right in front of the door.

4        Q.    So you had to go by the cruiser --

5        A.    Right.

6        Q.    -- correct?  And you observed Ms. Shurney in the

7    back seat of the vehicle?

8        A.    Right.

9        Q.    How long did you observe her while you were walking

10   past the cruiser to go to your vehicle?

11       A.    I didn't have a vehicle.  I walked.

12       Q.    How long did you walk past the cruiser --

13       A.    I was standing outside, I had another coworker with

14   me, my assistant manager --

15       Q.    So you stood there for a while in front of the

16   cruiser?

17       A.    Maybe 30 seconds.

18       Q.    What were you talking to your assistant manager

19   about during that period?

20       A.    I told her I had signed some papers.  The trooper

21   also came outside, he handed me, I think, his card in case

22   there was anything else needed.

23       Q.    So is it safe to say that during the 30 seconds that

24   you were in front of the cruiser you exchanged some

25   information with the trooper and with your assistant manager?

1    A.   I don't know what we talked about.  I mean, it

2  just --

3    Q.   I'm just saying during that 30-second period.

4    A.   Sure.  We stated who we were and --

5    Q.   You gave your card to Trooper Pierce?

6    A.   No.  He gave me his.

7    Q.   He gave his card to you?

8    A.   Right.

9    Q.   And you also told your assistant manager something?

10   A.   I said I had to sign papers, and that's it.

11   Q.   Where did you go from there?

12   A.   Walked back over to the building.  We walked back to

13  our reservation center.

14   Q.   What time of day was this, or night?

15   A.   Shortly after noon.

16   Q.   And how many troopers were outside?

17   A.   I only recall seeing Officer Pierce.  I wasn't

18  paying attention for that.  I just was told to come over to

19  the hotel.  I mean, I don't know.

20   Q.   So is it safe to say that during that 30-second

21  period that you were by the cruiser you spent most of that

22  time either talking to Trooper Pierce, getting information

23  from Trooper Pierce, or talking to your assistant manager?

24   A.   Yeah.  Very basic.

25   Q.   And then you went to walk back to --

1      A.   The office.

2      Q.   -- your office?

3      A.   And that's it.

4      Q.   Now, when were you asked to create any memorandums

5   regarding this incident?

6           MR. BAX:  Object to the form of the question.

7           Assumes that someone asked her.

8      Q.   Did somebody ask you to memorialize information

9   regarding this incident?

10     A.   Yes.

11     Q.   Who did that?

12     A.   Jeffrey Mona.

13     Q.   When did Mr. Mona ask you to do that?

14     A.   That day.

15     Q.   Now, you walk back to your office, what's the next

16  thing that you do in relation to this reservation and/or

17  arrest of Ms. Shurney?

18     A.   I don't know that I put any more notes in the folio.

19  I -- I don't think I -- I believe I received a call from

20  Tonya Traylor.  I'm assuming that she was informed what was

21  happening.

22     Q.   And she wanted her money back, right?

23     A.   Right.

24     Q.   And separate and apart from trying to refund

25  Ms. Traylor's money, did you do anything else regarding this

1    reservation or this investigation after the arrest of

2    Ms. Shurney?

3        A.   Just wrote my memo, gave it to my boss, and that was

4    it.

5        Q.   So you didn't have any more contact with Trooper

6    Pierce or with Officer Hurley and Streetsboro or --

7        A.   I don't recall beyond Tonya, I -- I verified by the

8    end of July here that we did, in fact, have a check for her

9    for a refund because the account was closed that was used.

10       Q.   Were you told by anybody to contact the State Police

11   if Ms. Shurney came in contact with you?

12       A.   No.

13       Q.   Were you told by Officer Hurley to contact him if

14   Ms. Shurney came in contact with you?

15       A.   I don't believe so.

16       Q.   So when Ms. Shurney supposedly called the night

17   before to check on her reservation, you didn't tell anybody

18   about it?

19       A.   Can't recall.

20       Q.   Do you still work there?

21       A.   Yes.  Absolutely.

22       Q.   Same capacity?

23       A.   Yes.

24            MR. ADAMS:  I have nothing further.  Thank you.

25

CROSS-EXAMINATION

BY MR. HUTTON:


    Q.   Ms. Purchase, my name is Jerry Hutton.  I represent Scott's Econo Lodge.  I just have a couple questions for you. This incident -- I guess the first time you became aware of a problem is when the receptionist tells you that there was a possible stolen credit card?

    A.   Right.

    Q.   And that was June 30th?

    A.   Right.

    Q.   As of that time, would it have been fair to say when the reservation had been placed, and I think it was placed on the 25th of June 2004, that the charge had been made against that debit account by Splash Lagoon?

    A.   Yes.  It's done on preauthorization, and finalizes with our audit the next morning.

    Q.   So when the credit card information is provided, or the debit card information, funds are actually drawn from the account holder's bank account and transferred to another bank, essentially, so those funds are no longer available to the debit card holder?

    A.   Right.

    Q.   And that occurred on June 25, 2004?

    A.   Right.

1    Q.    Is that withdrawal of funds by Splash Lagoon -- is

2    that done on reliance that the credit card or debit card

3    information that is being provided to you or to your clerk is

4    accurate and truthful?

5    A.    Yes.

6    Q.    In this instance, the individual gave the

7    information that a Tracey Smith, Tanielle Shurney's cousin,

8    was the owner of that card or -- that debit card or credit

9    card?

10    A.    That's what Kristen indicated.

11    Q.    And in transferring those funds from -- I guess from

12    that account to the Splash Lagoon's bank account, you're

13    relying that that person is telling you the truth that they

14    own that account and have the authority to authorize the

15    transfer of funds?

16    A.    Correct.

17    Q.    And if the person who tells you that doesn't have

18    the authority, you understand that to be a criminal matter --

19    A.    Yes.

20    Q.    -- in the Commonwealth of Pennsylvania?

21    A.    Yes.

22    Q.    I guess, on the 30th it comes up, June 30th, that

23    this is a possible stolen credit card, and that information

24    comes from a woman named Tonya Traylor?

25    A.    Correct.

1        Q.   And Tonya talked to someone at Splash Lagoon --

2        A.   Right.

3        Q.   -- told them, I didn't authorize this account to be

4 utilized; is that fair?

5        A.   Correct.

6        Q.   And then, I guess your direct involvement actually

7 begins on July 2, 2004; is that fair?  I say "direct," I mean

8 you had a conversation with Tonya Traylor.

9        A.   Right.

10       Q.   And in that conversation you had with Tonya Traylor,

11 were you satisfied that Tonya Traylor, in fact, owned the

12 card on which this reservation was placed?

13       A.   Yes.

14       Q.   And that reservation was the Tanielle Shurney

15 reservation; is that fair?

16       A.   Yes.

17       Q.   And there was no mistake or clerical errors in the

18 reservation department; is that fair?

19       A.   Right.  If you make a typo, it does flag it as an

20 inaccurate account.

21       Q.   None of that happened here.  So the information that

22 was taken by the clerk, identifying Tanielle Shurney and

23 Tracey Smith and the address, that was all accurately

24 transcribed by the clerk and put into your systems; is that

25 right?

1      A.    Yes.

2      Q.    And when Tonya Traylor called you, she was real

3  clear that she alerted the Streetsboro Police Department of

4  this matter; is that accurate?

5      A.    Yes.

6      Q.    And subsequently, you got a call from the

7  Streetsboro Police Department, John Hurley, that he was

8  investigating a criminal offense?

9      A.    Yes.

10     Q.    And that was the unauthorized use of Tonya Traylor's

11  credit card, and that was to place the reservation on Tonya

12  Traylor's credit card to Splash Lagoon?

13     A.    Yes.

14     Q.    I was looking at this note, and I guess it was a

15  note that was dated -- I don't have a date on it.

16     A.    I don't know what that is.  Is that an e-mail?

17           MR. BAX:  Take your time to read that.

18     Q.    I was just going to ask you about that conversation

19  with Officer Hurley.  And that's a conversation that you

20  yourself had with the officer?

21     A.    Um-hum.

22     Q.    Is that yes?

23     A.    Yes.

24     Q.    We have to get a yes or no.

25     A.    Sorry.  Yes.  I apologize.

1      Q.   Did Officer Hurley instruct you to have the front

2   desk of the Econo Lodge allow Tanielle Shurney to check in

3   and make a copy of her license?  Is that what you were

4   requested to do?

5      A.   Yes.  Correct.

6      Q.   And did Officer Hurley ask you to instruct the Econo

7   Lodge to call the Pennsylvania State Police who would come to

8   the hotel and make the arrest?

9      A.   Correct.

10      Q.   Is that what -- the instructions you actually

11   received from Officer Hurley of the Streetsboro Police

12   Department?

13      A.   Yes.

14      Q.   I was looking at the next line of that, and it says,

15   later, on July 2nd, the Pennsylvania State Police contacted

16   you and confirmed how everything would proceed; is that --

17      A.   Yes.

18      Q.   Maybe I missed it when you were testifying earlier,

19   but would it follow that first you got the contact from Tonya

20   Traylor that the card was being improperly used, Officer

21   Hurley advised you that he was doing an investigation, and

22   the Pennsylvania State Police were involved; is that fair?

23      A.   Yes.

24      Q.   And subsequently, right after that, the Pennsylvania

25   State Police actually contacted you to discuss the matter?

1       A.   It would be so, yes.

2       Q.   It says here, contacted you and confirmed how

3   everything would proceed for the next day at the check-in; is

4   that right?

5       A.   Correct.

6       Q.   Did you follow those, I guess requests, that were

7   given to you by Officer Hurley and by the Pennsylvania State

8   Police in handling this matter?

9       A.   Yes.

10      Q.   Did Tanielle Shurney ever tell you why she seemed to

11  be concerned that the reservation may have been cancelled --

12           MR. ADAMS:  For all of the questions, I'm objecting

13           on the basis that she could not be identified as

14           actually Tanielle Shurney but a person who

15           identified herself as Tanielle Shurney.

16           MR. HUTTON:  And Tracey Smith, too.  No one seems

17           to be able to identify anyone.

18      Q.   Let me ask you this:  Tanielle Shurney, did she

19  explain or give you any reason why she seemed to be concerned

20  that this reservation, on this particular credit card, may

21  have been cancelled when she called you on July 2nd?  Did she

22  give you any reasons for her concerns?

23      A.   She didn't tell me why.

24      Q.   And then, I understand that she -- Tanielle Shurney

25  did appear and did attempt to use that reservation that was

1  placed, I guess, earlier, on June 25th?

2      A.   Correct.

3      Q.   In this report it says Tracey Smith was her cousin.

4  Did Tanielle Shurney identify her as her cousin?  Is that

5  also the information that you received that this

6  individual --

7      A.   I only received it from Kristen Mooney.  That's who

8  the took the call.

9      Q.   You were here when the Trooper said, Tracey Smith

10  was identified as her sister and another time as a close

11  friend?

12          MR. ADAMS:  Object to the form of the question.

13     Q.   Were you here when the trooper testified to that?

14     A.   Yes.

15     Q.   Did Ms. Shurney ever tell you what the actual

16  relationship is between her and Ms. Smith?

17     A.   She told me it was her cousin on the credit card.

18     Q.   So she's still saying she's her cousin?

19     A.   Yes.

20     Q.   Can I ask you this:  Did anyone at Splash Lagoon, or

21  anyone at Scott's Econo Lodge, actually instruct or give

22  directions to the Pennsylvania State Police to arrest or

23  charge Ms. Tanielle Shurney with any crime?

24     A.   No.

25     Q.   Was it simply that you were, I guess both the Econo

1    Lodge and Splash Lagoon, responding to the request made by

2    the Streetsboro Police Department and by the Pennsylvania

3    State Police in connection to the criminal investigation that

4    had been under way?

5        A.   Yes.

6        Q.   Is it your understanding that this investigation

7    actually sprung or started or instigated with a complaint

8    made by Tonya Traylor to the Streetsboro Police Department?

9        A.   Yes.

10       Q.   It didn't start with your office?

11       A.   No.

12       Q.   It didn't start with the Econo Lodge; is that fair?

13       A.   Correct.  It did not start with the Econo Lodge.

14            MR. HUTTON:  That's all the questions I have.

15            MS. MALONE:  I have no questions.

16            MR. BAX:  None.

17

18                    REDIRECT EXAMINATION

19   BY MR. ADAMS:

20

21       Q.   Just to follow-up.  When the credit card information

22   is given over the telephone, you put that into a computer

23   database, and it tells you whether or not the credit card was

24   stolen; is that correct?

25       A.   It goes to a PB admin, that's the name of the

1   computer program used, I don't know much more about the

2   technicalities, but that verifies a preauthorization of

3   funds.

4       Q.   Does that also indicate the name of the person on

5   the account?

6       A.   No.  It would not do that.

7       Q.   Do you know why?

8       A.   I do not know that.

9       Q.   Is there any way you can verify with any of the

10  systems that you have, when somebody gives you a credit card

11  number, whose name is on that account?

12      A.   No.

13      Q.   You did have contact, obviously, with Kristen Mooney

14  regarding this incident before the State Police arrived at

15  the scene, correct?

16      A.   Yes.

17      Q.   And I see from her report she indicated that

18  Tanielle put her cousin Tracey Smith on the phone, I took

19  Tracey Smith's credit card information, told her she would

20  need to tell Tanielle that she would be paying cash for any

21  incidentals, that the credit card was not hers.  You were

22  aware of that before the State Police arrived?

23      A.   Yes.

24      Q.   Did you tell anybody from the State Police that,

25  wait a minute, someone that identified herself as Tanielle

1    Shurney indicated to us that it wasn't her credit card, it

2    was, in fact, Tracey Smith's?

3        A.    No.

4        Q.    Was there some reason why you didn't do that?

5        A.    There was an investigation.

6        Q.    I mean, just to tell the State Police that

7    information, not to tell anybody else?

8        A.    No.  Because the State Police were working with the

9    Streetsboro Police.  So they all had the same information.

10       Q.    You certainly knew that Ms. Shurney was getting

11    arrested; didn't you?

12       A.    Yes.  That's what was indicated.

13       Q.    And did you not think it would be relevant for you

14    to tell the trooper, wait a minute, somebody named Tanielle

15    Shurney made the reservation, but our records indicate that

16    the credit card information was provided by somebody named

17    Tracey Smith?

18       A.    I would assume that the police would have handled

19    that.

20       Q.    How would they have known that information if you

21    didn't tell them?

22       A.    Because they had all my information that

23    Streetsboro -- Streetsboro was in contact with the PA State

24    Police, they would have all been on the same page.

25       Q.    So you're thinking that the Kristen Mooney

1   information was already faxed down to Officer Hurley?

2        A.   Well, this -- this piece of paper was given to

3   Officer Hurley indicating the cousin put it on her credit

4   card.

5        Q.   And this September 27, 2004 information, somehow

6   Officer Hurley would have gotten that in another form around

7   June -- end of June?

8        A.   I have no idea if that was faxed to him at any

9   point.

10       Q.   This wasn't created until three months later?

11       A.   Right.  So I don't know if my memos were given in

12  any way to anybody else beyond what I did in June.

13            MR. ADAMS:  Thank you.  I have nothing further.

14            Reading --

15            MR. BAX:  We'll waive signature.

16            (Pause in the proceedings.)

17            MR. BAX:  I have been informed by Attorney Adams

18            that the Plaintiff in this case, Tanielle Shurney,

19            will not be appearing today for her deposition.

20            She was appropriately noticed pursuant to the

21            Federal Rules of Civil Procedure for her

22            deposition, and she will not be appearing today.

23            And accordingly, I reserve our right to reconvene

24            her deposition and to conduct her discovery

25            deposition for purposes of this lawsuit.

1         I also wanted to put on the record and repeat

2    my request that Attorney Adams dismiss this lawsuit

3    after the deposition testimony of Patricia

4    Purchase, who confirmed that neither Econo Lodge or

5    Scott's Splash Lagoon instigated or initiated this

6    arrest.  But rather, Patricia Purchase confirmed

7    facts that indicate that it was, in fact, the theft

8    victim, Tonya Traylor, from Streetsboro, Ohio, and

9    on that basis, I would request that it be

10    dismissed.

11    MR. ADAMS:  Ms. Shurney was notified by me via

12    telephone to appear at 11:00 this morning for

13    purposes of her deposition.  As I indicated to

14    opposing counsel, her son was a recent homicide

15    victim in Cleveland, I received a telephone message

16    from her this morning at my office at 7:30

17    indicating that someone last night was booked in

18    that homicide and she had to appear at the

19    Cleveland Police Station at 12:30 this afternoon.

20    I have had no further contact with Ms. Shurney as

21    of this time, which is approximately 12:15 p.m.

22

23    (Deposition concluded at 12:09 p.m.)

24

25

**$**

**$198.79**
[1] 19:8

**'**

**'03**
[1] 5:11

**0**

**05**
[1] 4:14
**05-196**
[1] 1:4

**1**

**11:00**
[1] 48:12
**11:02**
[1] 1:18
**12:09**
[1] 48:23
**12:15**
[1] 48:21
**12:30**
[1] 48:19
**13411**
[1] 12:1
**15219**
[1] 2:17
**15222**
[1] 2:9
**16**
[1] 7:9
**16501**
[1] 2:13
**16502**
[2] 1:20 2:5
**196**
[1] 4:14

**2**

**2**
[1] 39:7
**2004**
[10] 5:6 5:7 6:9 12:22 16:14 18:12 37:14 37:24 39:7 47:5
**2005**
[1] 7:9
**2006**
[1] 1:18
**202**
[1] 2:12
**21**
[1] 1:18
**210**
[1] 2:9
**216-323-6004**
[1] 1:9
**25**
[4] 12:22 16:14 18:12 37:24
**25th**
[10] 11:8 11:22 14:2 16:4 16:25 17:2 19:11 19:13 37:14 43:1
**27**
[1] 47:5
**2nd**
[4] 21:7 24:8 41:15 42:21

**3**

**30**
[2] 33:17 33:23
**30-second**
[2] 34:3 34:20
**30th**
[9] 19:4 19:4 19:11 19:16 20:7 20:22 37:10 38:22 38:22
**3500**

**3rd**
[3] 11:25 24:8 24:10

**4**

**44112**
[1] 12:2
**4:00**
[1] 5:23
**4th**
[3] 6:9 9:20 12:1

**5**

**564**
[1] 2:16

**6**

**602**
[2] 1:19 2:4
**6:00**
[1] 5:23

**7**

**7:30**
[1] 48:16

**8**

**818**
[1] 5:5

**9**

**900**
[1] 2:12

**A**

**A.J.**
[2] 1:19 2:4
**Able**
[1] 42:17
**Absolutely**
[3] 12:21 16:1 36:21
**Accessing**
[1] 10:21
**Accordingly**
[1] 47:23
**Account**
[11] 36:9 37:15 37:20 37:20 38:12 38:12 38:14 39:3 39:20 45:5 45:11
**Accurate**
[3] 7:22 19:4 40:4
**Accurately**
[1] 39:23
**Actual**
[1] 43:15
**Adams**
[16] 1:19 2:4 4:21 5:2 7:20 10:24 16:7 16:10 36:24 42:12 43:12 44:19 47:13 47:17 48:2 48:11
**Adams...............................5**
[1] 3:4
**Adams.............................44**
[1] 3:6
**Address**
[12] 5:17 9:13 9:24 10:16 11:11 12:1 12:6 13:21 14:3 25:14 25:19 39:23
**Addresses**
[1] 22:13
**Admin**
[1] 44:25
**Advised**
[1] 41:21
**Afternoon**
[1] 48:19
**Agree**
[4] 7:13 13:13 17:19 30:10
**Agreed**
[1] 4:16

**Ahead**
[3] 11:6 16:7 16:10
**Al**
[1] 4:13
**Alerted**
[1] 40:3
**Allow**
[2] 13:8 41:2
**Alone**
[1] 6:22
**Ambiguous**
[1] 8:5
**Answer**
[8] 6:4 8:3 13:4 13:5 13:8 13:11 19:24 27:23
**Answered**
[1] 16:9
**Answering**
[1] 18:17
**Apart**
[2] 6:2 35:24
**Apologize**
[1] 40:25
**Appear**
[3] 42:25 48:12 48:18
**Appearing**
[2] 47:19 47:22
**Appropriately**
[1] 47:20
**Approved**
[1] 24:11
**Area**
[2] 31:23 32:5
**Argument**
[1] 27:9
**Arrest**
[6] 23:21 35:17 36:1 41:8 43:22 48:6
**Arrested**
[1] 46:11
**Arresting**
[2] 22:25 31:15
**Arrival**
[1] 11:25
**Arrived**
[6] 29:8 29:17 30:7 31:6 45:14 45:22
**Assist**
[1] 17:1
**Assistant**
[5] 33:14 33:18 33:25 34:9 34:23
**Associated**
[1] 9:16
**Assume**
[3] 13:14 28:6 46:18
**Assumes**
[4] 13:17 27:20 30:18 35:7
**Assuming**
[4] 10:2 14:14 19:11 35:20
**Attempt**
[1] 42:25
**Attention**
[3] 8:17 20:15 34:18
**Attorney**
[3] 2:15 47:17 48:2
**Audit**
[1] 37:17
**August**
[1] 7:9
**Authority**
[2] 38:14 38:18
**Authorize**
[2] 38:14 39:3
**Available**
[3] 15:16 16:18 37:21
**Avenue**
[2] 2:9 2:16
**Awaiting**
[1] 20:25
**Aware**

**Awhile** 37:6 45:22

**B**

**Background**
[1] 16:15
**Bank**
[3] 37:20 37:21 38:12
**Based**
[7] 7:13 12:22 13:4 13:12 15:15 17:5 26:19
**Bashline**
[1] 2:7
**Basic**
[1] 34:24
**Basis**
[3] 8:4 42:13 48:9
**Bax**
[32] 2:11 4:4 4:4 7:6 7:16 7:19 8:1 8:4 8:7 10:19 10:23 10:25 11:4 13:2 13:6 13:8 13:16 13:21 15:6 16:5 16:8 16:12 17:8 20:14 24:13 27:19 30:17 35:6 40:17 44:16 47:15 47:17
**Became**
[1] 37:6
**Begins**
[1] 39:7
**Best**
[1] 12:5
**Between**
[2] 32:5 43:16
**Beyond**
[3] 8:7 36:7 47:12
**Black**
[2] 1:16 1:25
**Booked**
[1] 48:17
**Boss**
[5] 29:13 29:24 30:2 32:17 36:3
**Break**
[1] 16:5
**Briefly**
[1] 5:13
**Bring**
[1] 20:15
**Brought**
[1] 8:17
**Building**
[1] 34:12
**Burned**
[1] 10:3
**Business**
[1] 23:5

**C**

**Calibreeze**
[8] 30:1 30:4 30:10 30:23 31:6 31:12 31:23 32:6
**Call's**
[1] 17:3
**Caller**
[1] 11:20
**Cancel**
[1] 10:3
**Cancelled**
[2] 42:11 42:21
**Capacity**
[4] 1:7 1:9 5:9 36:22
**Car**
[4] 6:14 6:18 6:21 33:1
**Card**
[84] 5:17 5:18 5:24 6:6 6:22 8:1 8:24 9:10 9:14 9:15 9:17 10:15 12:20 14:7 14:18 15:13 15:15 15:14 15:16 15:20 15:21 16:17 17:21 17:25 18:2 18:7 18:13 18:20 18:21 19:7 19:10 19:12 19:17 19:23 20:2 20:8 20:9 21:1 21:11 25:15 25:20 25:22 26:

[1] 26:9
[5] 27:12 27:17 27:18 27:21
28:4 28:12 28:13 28:19 33:
21 34:5 34:7 37:8 37:18 37:
19 37:22 38:2 38:8 38:
8 38:9 38:23 39:12 40:11 40:
12 41:20 42:20 43:17 44:21
44:23 45:10 45:19 45:21 46:
1 46:16 47:4

**Case**
[5] 1:4 17:12 23:16 33:21
47:18

**Cash**
[1] 45:20

**Center**
[11] 5:8 5:14 5:15 5:22 9:1
13:13 15:10 18:9 19:2 26:20
34:13

**Certain**
[1] 13:21

**Certainly**
[1] 46:10

**Charge**
[6] 5:18 5:24 6:5 9:6 37:14
43:23

**Charged**
[3] 9:4 19:8 25:22

**Charging**
[1] 9:17

**Check**
[5] 28:21 36:8 36:17 41:2
42:3

**Check-in**
[1] 42:3

**Checked**
[3] 12:19 27:17 27:21

**Cherry**
[1] 5:5

**Civil**
[2] 4:10 47:21

**Clear**
[2] 8:11 40:3

**Clearly**
[1] 17:13

**Clerical**
[1] 39:17

**Clerk**
[6] 9:9 16:14 16:24 38:3 39:
22 39:24

**Cleveland**
[4] 12:2 22:7 48:15 48:19

**Close**
[1] 43:10

**Closed**
[1] 36:9

**Commenced**
[1] 4:12

**Commencing**
[1] 1:18

**Commonwealth**
[2] 1:17 38:20

**Communicate**
[1] 22:17

**Communication**
[2] 8:22 19:16

**Complaint**
[1] 44:7

**Complete**
[2] 17:7 24:23

**Completed**
[3] 15:13 17:17 18:24

**Complex**
[1] 2:16

**Computer**
[5] 10:8 10:15 10:22 44:22
45:1

**Concerned**
[3] 9:3 42:11 42:19

**Concerns**
[1] 42:22

**Concluded**
[2] 19:12 48:23

**Conduct**
[1] 47:24

**Conducted**
[1] 4:9

**Confirm**
[5] 24:15 24:17 24:19 24:25
26:8

**Confirmed**
[5] 27:4 41:16 42:2 48:4 48:
6

**Confront**
[2] 27:4 28:2

**Confuse**
[1] 20:6

**Confused**
[1] 14:20

**Confusing**
[1] 8:6

**Confusion**
[1] 9:6

**Connection**
[1] 44:3

**Contact**
[21] 8:15 10:3 14:4 14:5 15:
9 16:14 19:1 20:18 20:20 20:
25 21:17 29:6 36:5 36:10 36:
11 36:13 36:14 41:19 45:13
46:23 48:20

**Contacted**
[4] 7:10 41:15 41:25 42:2

**Conversation**
[14] 6:16 15:16 16:16 17:16
17:19 22:23 26:16 29:1 30:9
32:5 39:8 39:10 40:18 40:19

**Conversations**
[1] 17:15

**Conversed**
[1] 32:17

**Copy**
[2] 32:11 41:3

**Corner**
[1] 5:5

**Corporation**
[1] 20:12

**Correct**
[31] 5:12 7:11 9:22 11:22
11:23 12:3 12:13 15:10 16:
18 20:9 21:15 21:16 26:3 26:
9 27:13 28:20 28:23 29:5 31:
7 31:24 33:6 38:16 38:25 39:
5 41:5 41:9 42:5 43:2 44:13
44:24 45:15

**Correctly**
[2] 25:25 26:6

**Counsel**
[3] 4:8 4:16 48:14

**Couple**
[1] 37:5

**Course**
[2] 11:9 17:18

**Court**
[2] 1:1 4:12

**Cousin**
[12] 14:6 14:16 14:22 14:23
15:4 38:7 43:3 43:4 43:17
43:18 45:18 47:3

**Coworker**
[1] 33:13

**Create**
[1] 35:4

**Created**
[1] 47:10

**Credit**
[63] 5:17 5:18 6:6 8:10 8:
24 9:10 9:14 9:17 10:5 12:
20 14:7 14:18 15:3 15:5 15:
14 15:16 15:20 15:21 16:17
17:21 17:25 18:2 18:7 18:19
18:21 19:7 19:17 19:23 20:2
20:8 21:1 21:11 25:15 25:20
25:22 26:9 26:13 26:21 27:5
27:12 27:17 27:18 28:4 28:
12 28:13 28:18 37:8 37:18
38:2 38:8 38:23 40:11 40:12

**Conducted**
[2] 10 45:19 45:21 46:1 46:16
47:3

**Crime**
[1] 43:23

**Criminal**
[3] 38:18 40:8 44:3

**Cross-Examination**
[2] 3:5 37:1

**Cruiser**
[7] 29:13 33:4 33:10 33:12
33:16 33:24 34:21

**Cruisers**
[1] 29:15

**Current**
[1] 10:15

**CV**
[1] 4:14

---

### D

**Database**
[1] 44:23

**Date**
[4] 10:17 11:6 11:25 40:15

**Dated**
[2] 7:8 40:15

**Deal**
[2] 23:9 30:25

**Debit**
[5] 37:15 37:19 37:22 38:2
38:8

**Defendants**
[1] 1:10

**Department**
[7] 22:6 39:18 40:3 40:7 41:
12 44:2 44:8

**Deposit**
[1] 38:25

**Deposition**
[11] 1:15 4:7 4:15 31:19 47:
19 47:22 47:24 47:25 48:3
48:13 48:23

**Depositions**
[1] 4:17

**Desk**
[6] 29:22 29:23 31:25 32:1
32:5 41:2

**Different**
[1] 8:12

**Digits**
[1] 9:15

**Direct**
[6] 3:4 5:1 8:8 22:8 39:6
39:7

**Directions**
[1] 43:22

**Directly**
[1] 20:5

**Disclosures**
[1] 10:25

**Discover**
[1] 9:19

**Discovery**
[2] 4:7 47:24

**Discuss**
[3] 25:11 31:10 41:25

**Dismiss**
[1] 48:2

**Dismissed**
[1] 48:10

**District**
[5] 1:1 1:1 4:11 4:12 23:16

**Division**
[1] 5:7

**Docket**
[1] 4:14

**DOE**
[1] 1:8

**Done**
[2] 37:16 38:2

**Door**

---

### Double
[1] 12:19

**Double-checked**
[1] 12:19

**Down**
[8] 10:3 12:16 14:2 18:3 18:
4 19:18 23:11 47:1

**Drawn**
[1] 37:19

**Driver's**
[1] 32:12

**Duly**
[1] 4:2

**During**
[8] 16:2 17:16 17:18 26:15
33:19 33:23 34:3 34:20

**Dwyer**
[1] 23:16

---

### E

**E-mail**
[2] 5:17 40:16

**East**
[2] 12:2 12:2

**Econo**
[26] 1:5 2:6 6:15 7:1 23:25
29:8 29:9 29:10 29:14 29:18
29:20 29:24 30:5 30:16 30:
20 30:21 31:25 33:2 37:5 41:
2 41:6 43:21 43:25 44:12 44:
13 48:4

**Either**
[1] 34:22

**Electronically**
[1] 18:11

**Emanate**
[1] 24:6

**Embarrassing**
[1] 27:9

**Employed**
[1] 5:6

**End**
[2] 36:8 47:7

**Ended**
[1] 17:2

**Enterprises**
[2] 4:13 5:7

**Entirely**
[1] 12:23

**Erie**
[5] 1:4 1:20 2:5 2:13 23:13

**Errors**
[1] 39:17

**Esquire**
[4] 2:4 2:7 2:11 2:15

**Essentially**
[1] 37:21

**Et**
[1] 4:13

**Evidence**
[1] 13:18

**Exactly**
[2] 9:9 19:19

**Examination**
[4] 3:4 3:6 5:1 44:18

**Examine**
[1] 4:21

**Example**
[1] 23:8

**Except**
[1] 4:18

**Exchanged**
[1] 33:24

**Excuse**
[1] 32:6

**Expert**
[1] 13:10

**Explain**
[3] 5:13 9:8 42:19