1  information with me at all when I called Adelphia. They
2  just said file it with your bank, and that's as far as I
3  got with Adelphia.
4  Q            How did you learn about Ms. Chapman's
5  being the person for the two other transaction accounts?
6  A            When I called both of those -- wait.
7  That's on this one. When I called Cosmetique and when I
8  called Bry Lane Home, they were able to trace my credit
9  card number, and they told me a Lisa Chapman made this
10 particular purchase in both cases.
11 Q            And you had some conversation with
12 Officer Hurley about his efforts regarding contacting Ms.
13 Chapman?
14 A            I don't remember. It's in my report,
15 but I don't remember speaking to him about it.
16 Q            Okay. Did you have any contact with
17 Ms. Chapman?
18 A            No.
19 Q            And you do not know who Ms. Chapman is?
20 A            I do not know who she is.
21 Q            When were you compensated for Ms.
22 Chapman's use of your card?
23 A            I don't remember exactly.
24 Q            Okay.
25 A            I don't remember.

1   Q            All right.
2               MR. HUTTON:  Make a belated
3   objection to the form of the question.  It assumes there
4   was a Ms. Chapman, which is the person who used Ms.
5   Chapman's name in making the charge.
6   Q            Where is the Salvation Army office that
7   you work at?
8   A            2507 East 22nd Street in Cleveland.
9   Q            Is that East Cleveland or regular
10  Cleveland?
11  A            Downtown Cleveland.  Zip code is 44115.
12  Q            Did anything unusual happen around the
13  end of June of 2004 that you can think of as to that
14  debit card number?
15  A            I can guess.  I mean, obviously was
16  trying to wonder where I might have been.  I did eat at a
17  restaurant at one place, and it just stuck out as maybe
18  it was at the restaurant, but that is based on nothing
19  other than me trying to wonder when it could have
20  happened.
21  Q            Do you remember the name of the
22  restaurant?
23  A            I can see the restaurant.  I remember
24  what I ate.  I can't think of the name of it.
25  Q            It's close by your office?

1  A          Relatively close.
2  Q          Okay.  So then what is the first
3  contact you have with anybody from the Pennsylvania State
4  Police about this matter?
5             MR. BAX:  I'm going to object to
6  the form of the question.  Assumes she had contact.
7  Q          Did you ever have contact with anybody
8  from the Pennsylvania State Police regarding this?
9  A          I never had contact with the police in
10 Pennsylvania.
11 Q          So you've never heard from Trooper
12 Pierce or anybody from the Pennsylvania State Police
13 right up to today's date?
14 A          Correct.
15 Q          Okay.  Have you heard from the
16 Pennsylvania State Police in any way since this incident
17 happened?
18 A          No.
19 Q          Either directly or through the attorney
20 general's office?
21 A          No.
22 Q          Did you submit any reports to anybody
23 from the Pennsylvania State Police or the Pennsylvania
24 Attorney General regarding this incident?
25 A          No.

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TANIELLE SHURNEY,                    :
        Plaintiff                    :
                                     :
        v.                           : Case No. 05-196 Erie
                                     :
SCOTT'S ECONO INN, INC.,             :
SCOTT'S SPLASH LAGOON, INC.;         :
                                     :
SEAN PIERCE, INDIVIDUALLY AND IN     :
HIS CAPACITY AS A TROOPER OF THE     :
PENNSYLVANIA STATE POLICE;           :
                                     :
JOHN DOE, INDIVIDUALLY AND IN HIS    :
CAPACITY AS THE SUPERVISOR OF        :
TROOPER SEAN PIERCE OF THE           :
PENNSYLVANIA STATE POLICE,           :
        Defendants                   :
```

Deposition of PATRICIA PURCHASE, taken before and by Sondra A. Black, Notary Public in and for the Commonwealth of Pennsylvania, on Tuesday, February 21, 2006, commencing at 11:02 a.m., at the offices of A.J. Adams, 602 West Ninth Street, Erie, Pennsylvania 16502.

Reported by Sondra A. Black
Ferguson & Holdnack Reporting, Inc.

```
                         DIRECT EXAMINATION
 1
 2   BY MR. ADAMS:
 3
 4       Q.   Ms. Purchase, where do you reside?
 5       A.   818 Cherry, second floor.  Right around the corner.
 6       Q.   How were you employed in 2004?
 7       A.   2004, I worked for a division of Scott Enterprises,
 8   as the manager of the reservation center for Splash Lagoon.
 9       Q.   How long had you worked in that capacity?
10       A.   It'll be three years this June.
11       Q.   So you started in June of '03?
12       A.   Correct.
13       Q.   Now, can you briefly explain what the reservations
14   center does.
15       A.   We are an inbound call center, they -- the guest
16   will make their reservation with us, providing us with name,
17   address, phone number, probably e-mail, credit card
18   information, and we are predeposit so we charge a credit card
19   at the time of reservation.
20       Q.   What do you mean "predeposit"?
21       A.   Meaning, we do not hold the room.  We are not a
22   hotel, we are a reservation center.  A hotel may put it on a
23   6:00 or 4:00 hold, whereas we are predeposit.  Like most
24   water parks are in the industry, we charge your card when you
25   call us.
```

```
 1        Q.    To your knowledge, is that something that's sort of
 2   separate and apart for your industry as opposed to the
 3   general hotel trade?
 4        A.    I can't answer that.  I really can't.  Because a lot
 5   of places, like even Peek 'N Peak, are going to charge your
 6   credit card.  They're going to predeposit, they want their
 7   funds.
 8        Q.    Now, prior to this incident that occurred around the
 9   4th of July weekend 2004, did you know Tanielle Shurney?
10        A.    No.
11        Q.    Did you ever meet her?
12        A.    Not that I'm aware of, no, sir.
13        Q.    So have you ever seen Tanielle Shurney in person?
14        A.    Only in the back of the squad car when I walked from
15   my office over to Econo Lodge.
16        Q.    Did you have any conversation with her --
17        A.    No.
18        Q.    -- in the back of the squad car?
19        A.    No.
20        Q.    Could you overhear her taking to anybody from the
21   squad car?
22        A.    No.  She was sitting alone in the squad card.
23        Q.    So you didn't hear her voice when it was outside?
24        A.    No.
25        Q.    And you didn't hear her voice when she was in the
```

1    A.    Um-hum.

2    Q.    I'm assuming some telephone numbers that you might
3    contact if Splash Lagoon burned down or something to cancel?

4    A.    Right.

5    Q.    And the credit card information?

6    A.    Right.

7    Q.    And then that's put on a form of some sort?

8    A.    It's into our computer which has printable forms,
9    yes.

10    Q.    Did you print out a form of that reservation?

11    A.    If it's made within a week's time frame, we might
12    print a folio and fax the hotel.  That way they have the
13    information to put into the system.  Our system is not linked
14    to any of our hotels.

15    Q.    So your current computer system would have on it the
16    information of the name, the address, and the phone numbers
17    as of today's date?

18    A.    Yes.  I --

19    MR. BAX:  If you --

20    A.    Yes.

21    Q.    So we could obtain that information by you accessing
22    the computer?

23    MR. BAX:  I believe I've produced that to you.

24    MR. ADAMS:  Okay.  Is this in the packet?  Your
25    initial disclosures, Mr. Bax?

1    THE WITNESS:  That would say who did it, and this
2    is all the notes.  Everything that goes to the
3    hotel.
4    MR. BAX:  It's three pages.
5    Q.   So when the initial call was made, do you know what
6    date it was to make the reservation?  And go ahead and look
7    at the report?
8    A.   Sure.  It shows June 25th, and since this was a
9    reservation for the holiday weekend, of course we'd want to
10   keep our hotels updated with any new reservations.
11   Q.   Is there -- okay.  I see it.  The address and
12   telephone number.
13   A.   Right.
14   Q.   That was provided?
15   A.   Yes.  That's what was provided.
16   Q.   And so, that information, is that gleaned from your
17   phone or is that gleaned from the person calling you on the
18   phone?
19   A.   No.  The person has to give us that.  We don't have
20   caller ID.
21   Q.   So the person that called on that first day, which
22   was June the 25th, correct?
23   A.   Correct.
24   Q.   Indicated that the -- the name of the reservation is
25   to be Tanielle Shurney, and that the arrival date is the 3rd,

11

1    they're leaving on the 4th, and that the address is 13411
2    East Sixth Street, East Cleveland, Ohio 44112; is that
3    correct?
4        A.   Right.
5        Q.   And to the best of your knowledge, do you know whose
6    address that is?
7        A.   No.  I wouldn't -- I would have no knowledge.
8        Q.   Now, the telephone number that was provided,
9    216-323-6004 -- do you see that phone number?
10       A.   Yes.
11       Q.   I think you've already indicated, but that would be
12   a phone number that would be provided by the person who's on
13   the phone with you; is that correct?
14       A.   Right.  I didn't make the reservation, so it was
15   provided to Kristen.
16       Q.   Right.  Kristen is the one that took down that
17   information?
18       A.   Right.
19       Q.   By policy, Kristen would have double-checked the
20   credit card number with the person who made the call?
21       A.   Yes.  Absolutely.  It's our procedure.
22       Q.   At least based upon the June 25, 2004 telephone
23   call, it is entirely possible that a person other than
24   Tanielle Shurney could have been that person on the phone
25   providing Kristen with that information?

1    Q.   Right.  Why don't you look at your note and see if
2    you can refresh your recollection.
3    A.   She had a call back, she didn't own a credit card.
4    Tanielle Shurney, yeah, put her cousin, Tracey Smith, on the
5    phone, and Tracey Smith gave the credit card information.
6         MR. BAX:  Just for the record, you're referring to
7         the Kristen Mooney written statement?
8         THE WITNESS:  Right.
9    Q.   And we're still talking about the first contact with
10   the reservation center; is that correct?
11   A.   That would be the second phone call.  Tanielle
12   called back, got Kristen specific -- asked for her because
13   she did ask for Kristen's name, and then they completed the
14   transaction when Tracey gave the credit card number.
15   Q.   So it's your understanding, then, that based on the
16   first conversation there wasn't a credit card available to
17   make the reservation?
18   A.   Right.
19   Q.   And so, how much time transpired, if you know, from
20   the first call where there wasn't credit card information to
21   the second call where there was credit card information?
22   A.   I can't recall something like that.  I mean, we can
23   get up to a thousand calls a day.  I don't know that sort of
24   thing.
25   Q.   Do you believe it was that day?

15

```
 1   assist you in giving us an hourly range?  That is, when her
 2   shift would have ended in relation to June 25th for purposes
 3   of the second phone call's timing.
 4       A.   No.
 5       Q.   Now, based upon your information, what was the
 6   substance of the second phone call?
 7       A.   To complete the transaction.
 8            MR. BAX:  I'm just going to object to the form of
 9            the question.  Your questions all infer that
10            Ms. Purchase was the person who took the call or
11            who made the reservation, and she's told you that
12            that is not, in fact, the case.
13       Q.   Clearly now indicating on the record that Kristen
14   was the person that took both of the first telephone
15   conversations, what is your understanding of what happened
16   during this second conversation?
17       A.   Kristen completed the reservation.
18       Q.   And during the course of that second phone
19   conversation, would you agree that supposedly a Tanielle
20   Shurney handed the phone to a second party who, in fact, then
21   provided credit card information?
22       A.   I only know that information from Kristen's
23   statement.
24       Q.   Right.  And what was the name of that person who
25   supposedly provided the credit card information?
```

1    A.   Tracey Smith.
2    Q.   Now, when that credit card information was provided,
3 how is it recorded?  How do you write down the number?
4    A.   We don't write anything down.  We type it into our
5 system.
6    Q.   And obviously -- no.  Strike that.  Do you have
7 something in your system that red flags when a credit card is
8 reported stolen and then somebody calls your reservation
9 center and makes a reservation?
10   A.   Yes.  It would give us a message.  Because it goes
11 through a system electronically.
12   Q.   So on June 25, 2004, when the reservation was made,
13 was there a red flag that the card that was used was stolen?
14        MR. HUTTON:  Objection to the form.  That was
15        reported as stolen.
16   Q.   Reported as stolen?
17   A.   What question am I answering now?
18   Q.   Was there, in fact, when that second call was made
19 and that reservation number was given, that is the credit
20 card number was given, did a red flag go up indicating that
21 the credit card was reported stolen?
22   A.   I don't know.  I didn't make the reservation.
23   Q.   Is there anything in your report?
24   A.   The reservation would not be completed without the
25 deposit.  So, no, there was no red flag.

18

```
 1   knowing that there was an investigation, the State Police
 2   were involved as well as the Streetsboro Police, and then I
 3   received a call that night from a guest.
 4        Q.   Who was that person?  If you know.
 5        A.   She said that she was Tanielle Shurney.
 6        Q.   Where did this call emanate from?
 7        A.   I don't know what -- what number she called from,
 8   but she called on the 2nd to verify her July 3rd reservation.
 9        Q.   Was there some reason why it would have been
10   necessary to verify the July 3rd reservation since it had
11   already been approved through your system?
12        A.   I don't --
13             MR. BAX:  I'm just going to object to the form of
14        the question.  That you're asking this witness why
15        Tanielle Shurney called to confirm the reservation.
16        Q.   Is there anything in your reservation system that
17   would have required anyone to make that call to confirm the
18   reservation?
19        A.   People confirm their reservations all the time.
20        Q.   Is it necessary, in order to maintain the
21   reservation --
22        A.   No.
23        Q.   I'll have to complete the question.  Is it
24   necessary, in order to maintain the reservation, for the
25   person to confirm the reservation as was reflected in your
```

1  prior testimony?
2  A.  No.
3  Q.  Were you the party that received that telephone
4  call?
5  A.  Kristen received the call, and said somebody was
6  calling to verify this particular reservation.  I took the
7  call then from that point on.
8  Q.  And when you took the call from that point on, what
9  was the sum and substance of the call?
10 A.  I asked the person to identify themselves because we
11 do not discuss reservations without verification of who we're
12 speaking with.
13 Q.  What did the person say?
14 A.  She gave me the address and the telephone number,
15 and I asked her to verify the credit card used.
16 Q.  Did she give you her name?
17 A.  Yes.  She gave me her name as Tanielle Shurney, and
18 her address and phone number.
19 Q.  Then I interrupted you, I'm sorry.  What did she say
20 after that?  You said something about the credit card in use.
21 A.  Right.  I asked her to verify it because she
22 indicated that she did not want this credit card charged for
23 any other incidentals or any other reason.
24 Q.  And then what happened?
25 A.  She said it was Tracey Smith, and correctly spelled

```
 1   Tracey on the name of the card, because there's various
 2   Traceys --
 3       Q.   How do you know what was the correct spelling of
 4   Tracey versus what wasn't?
 5       A.   Because we were given T-R-A-C-E-Y, and she verified
 6   it by correctly spelling T-R-A-C-E-Y.
 7       Q.   So a person who identified herself as Tanielle
 8   Shurney called to confirm the reservation and to say that the
 9   person responsible on the credit card was the correct
10   spelling of Tracey, T-R-A-C-E-Y, Smith; is that right?
11       A.   Right.
12       Q.   Now, did the person who identified herself as
13   Ms. Shurney also give you, again, the credit card number?
14       A.   No.
15       Q.   Was there anything else said during that
16   conversation?
17       A.   I let her know she can come at noon for her passes
18   by going to her hotel, and that was it.
19       Q.   Is it unusual, based upon all your years at the
20   reservation center, for somebody to have a reservation in
21   their name but have it paid for by a third party's credit
22   card?
23       A.   It's not unusual.
24       Q.   So you didn't think anything unusual about this
25   situation, other than the fact that there's this --
```

26

1  instructed me to.
2     Q.   So you were instructed not to confront Ms. Shurney
3  regarding the fact that this reservation was made with,
4  supposedly, a stolen credit card by Officer Hurley?
5     A.   I was instructed that there was an investigation,
6  and being intelligent, I would assume you would not impede
7  that.  You know, you can't -- I can't stop that from
8  happening.  I'm not going to interfere with an investigation.
9  If there's an investigation, the officer -- I don't
10 understand why it's not so simple.
11    Q.   So let's say I called you to make a reservation, I
12 give you a credit card number, the red flag comes up and
13 says, that's a stolen credit card number.
14    A.   If the red flag came up, I would tell you
15 immediately.  If not, then it goes on.
16    Q.   So, because you used your intuition, you did not to
17 want to impede the investigation by telling this person, hey,
18 the reservation was made supposedly with a stolen credit
19 card?
20    A.   Correct.
21    Q.   Did you say, you can check in at noon and pick up
22 your passes at that time for Splash Lagoon?
23    A.   Correct.  I let them know that.
24    Q.   Is there anything else that you said about that?
25    A.   No.

1    computer program used, I don't know much more about the
2    technicalities, but that verifies a preauthorization of
3    funds.
4        Q.    Does that also indicate the name of the person on
5    the account?
6        A.    No.  It would not do that.
7        Q.    Do you know why?
8        A.    I do not know that.
9        Q.    Is there any way you can verify with any of the
10   systems that you have, when somebody gives you a credit card
11   number, whose name is on that account?
12       A.    No.
13       Q.    You did have contact, obviously, with Kristen Mooney
14   regarding this incident before the State Police arrived at
15   the scene, correct?
16       A.    Yes.
17       Q.    And I see from her report she indicated that
18   Tanielle put her cousin Tracey Smith on the phone, I took
19   Tracey Smith's credit card information, told her she would
20   need to tell Tanielle that she would be paying cash for any
21   incidentals, that the credit card was not hers.  You were
22   aware of that before the State Police arrived?
23       A.    Yes.
24       Q.    Did you tell anybody from the State Police that,
25   wait a minute, someone that identified herself as Tanielle

45

```
 1    Shurney indicated to us that it wasn't her credit card, it
 2    was, in fact, Tracey Smith's?
 3        A.   No.
 4        Q.   Was there some reason why you didn't do that?
 5        A.   There was an investigation.
 6        Q.   I mean, just to tell the State Police that
 7    information, not to tell anybody else?
 8        A.   No.  Because the State Police were working with the
 9    Streetsboro Police.  So they all had the same information.
10        Q.   You certainly knew that Ms. Shurney was getting
11    arrested; didn't you?
12        A.   Yes.  That's what was indicated.
13        Q.   And did you not think it would be relevant for you
14    to tell the trooper, wait a minute, somebody named Tanielle
15    Shurney made the reservation, but our records indicate that
16    the credit card information was provided by somebody named
17    Tracey Smith?
18        A.   I would assume that the police would have handled
19    that.
20        Q.   How would they have known that information if you
21    didn't tell them?
22        A.   Because they had all my information that
23    Streetsboro -- Streetsboro was in contact with the PA State
24    Police, they would have all been on the same page.
25        Q.   So you're thinking that the Kristen Mooney
```